IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-cr-60133-WILLIAMS/SNOW

UNITED STATES OF AMERICA,
       Plaintiff,

v.

SCOTT A HAIRE,
       Defendant.

_____

**DEFENDANT SCOTT HAIRE'S OBJECTIONS TO THE PRESENTENCE REPORT
AND RESPONSE TO THE GOVERNMENT'S OBJECTIONS**

_____

Defendant Scott Haire objects to the Presentence Investigation Report and Responds to the Government's Objections to the Presentence Investigation Report and states as follows:

1.      On June 28, 2013, U.S. Probation Officer Rebecca Hill filed her Presentence Investigation Report ("PSIR"), D.E. 166 (which was received by defense counsel on July 1, 2013).

2.      On July 9, 2013, the Government filed its Objections to the Pre-Sentence Investigation Report (the "Government Objections"), D.E. 172.

3.      Mr. Haire accepts the PSIR except as described below and herewith responds to the Government's Objections.[1]

**LOSS**

4.      The PSIR recommends a total intended loss of $73,975.00. *See* PSIR at ¶ 30. The Government asserts a total intended loss of over $400,000.00. *See* Government Objections at PP.

---

[1]In addition to the following comments to the PSIR, Mr. Haire notes that PSIR at ¶ 76, Assets and Liabilities Summary, improperly refers to the equity in the Destin residence as $73,780 when that amount should be $473,780.

1-2. Mr. Haire objects to the Government's loss figure, agrees that the methodology employed by the Probation Officer in her calculation of loss is somewhat logical, but asserts that additional facts merit further reduction in the Probation Officer's calculation of loss, and further asserts that the most logical and appropriate method of calculation of loss is that presently contained in the U.S. Sentencing Guidelines Manual §2B1.1 cmt. n. 3(F)(ix).

**<u>The Government's Loss Analysis</u>**

5.     The Government's sole citation to authority for its proposition that the loss should be over five times the amount proposed by the Probation Officer is to a case pending in the Southern District of Florida, *U.S. v. Brennan*, Case No. 12-cr-60064. The Government does not cite to a published opinion, an unpublished opinion, a docket entry or other order of the court, and nowhere in the case docket is there an order or transcript reflecting the proposition for which the Government cites. Contrarily, the docket reflects that the defendant in that case has appealed his conviction and sentence such that if there is a ruling suggested by the Government, it is not final and is inappropriate for authoritative citation. *See Brennan,* D.E. 226 and 227.

6.     The appropriate analysis for intended loss is outlined in the reported case of *U.S. v. Muzio*, Case No. 09-20327-CR-King, 2010 U.S. Dist. Lexis 64781 (S.D. Fla. 2010),  cited by the Government in its request for sophisticated means (see below discussion). In *Muzio*, the Government asserted that the intended loss calculation should include efforts and actions of the defendant that were not subject of the offenses regarding which the defendant was convicted. The District Court rejected the Government's request, noting that "[w]hile the government is correct in stating that loss calculation under §2B1.1 can include both actual and intended losses, the undersigned finds that estimating the 'intended' loss from defendant's criminal acts based on his efforts to obtain an equity line of credit . . . or from any other activity of defendant relating to [the

subject company] is highly speculative and not based on a reasonable mathematical calculation as required for use of intended loss for offense level purposes." *Muzio* at *4 n. 3. *See also* U.S.S.G. §2B1.1 cmt. n. 3(A)(ii)(I) (Intended loss is the pecuniary harm that was intended to result from *the offense*) (emphasis added).

7.      Here, Mr. Haire pled to the offenses described in the Offense Conduct section of the PSIR and those are the offenses relevant for the Court's loss analysis. It is "highly speculative" to use the reasoning set forth in the Government's objections based upon the offense defendant plead to in the Plea Agreement Further, the Government is requiring that this Court speculate as to what might have been the conduct of defendant causing the purported loss.

**The Probation Officer's Loss Analysis**

8.      The Probation Officer calculated loss by totaling the amount of money the FBI undercover agent spent purchasing the securities subject of the three transactions. *See* PSIR at ¶ 30. However, this calculation fails to credit monies paid to the undercover FBI agent. *See, e.g.,* USSG §2B1.1  cmt. n. 3(E)(i) and (ii) (Credits Against Loss. Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected . . . (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing  . . . ."); *U.S. v. Ekpo,* 266 Fed. Appx. 830, 834 (11th Cir. 2008) ("The application notes to USSG §2B1.1 provide that the loss amount is to be reduced by the amount of money or fair market value of property or services rendered that is *returned* to the victim before the offense was detected.").

9.      Because a total of $17,000 was paid to the agent, s*ee* PSIR at ¶¶ 12 and 30, under the Probation Officer's methodology, the total loss would be $56,975.00 ($73,975 - $17,000).  .

10.     Furthermore, as discussed below, the Probation Officer's analysis does not take into account the value of the securities. Pursuant to USSG §2B1.1 cmt. n. 3(E)(i) and (ii), such value must be deducted from any calculated loss amount.

**The Appropriate Loss Analysis**

11.     However, USSG §2B1.1 cmt. n. 3(F)(ix) specifically provides the following:

> Fraudulent Inflation or Deflation in Value of Securities or Commodities. In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, there shall be a rebuttable presumption that the actual loss attributable to the change in value of the security or commodity is the amount determined by--
>
> **(I)**  calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> **(II)**  multiplying the difference in average price by the number of shares outstanding.
>
> In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

12.     Accordingly, the appropriate calculation for loss is as follows:

Private pension Fund Private Transaction in Wound Management Technologies, Inc. ("WNDM"):

September 29, 2009 - 21,739 shares purchased at a price of $2.30 per share. Total purchase price of $50,000.00.

| Date | Price | Value | Differential |
|------|-------|-------|--------------|
| September 29, 2009 | $2.60 | $56,521.40 | $6,521.40 |
| High Closing Price for the next 90 days | $2.70 | $58,695.30 | $8,695.30 |
| Low Closing Price for the next 90 days | $1.80 | $39,130.20 | ($10,869.80) |
| Average Closing Price for the next 90 days | $2.09 | $45,434.51 | ($4,565.49) |

Open Market Transaction in WNDM:

October 16, 2009 - 8,000 shares purchased at a price of $1.95 per share. Total purchase price of $15,600.00

| Date | Price | Value | Differential |
|------|-------|-------|--------------|
| High Closing Price for the next 90 days | $2.20 | $17,600.00 | $2,000.00 |
| Low Closing Price for the next 90 days | $1.30 | $10,400.00 | ($5,200.00) |
| Average Closing Price for the next 90 days | $1.95 | $15,600.00 | $0 |

Open Market transaction in VHGI Holdings, Inc.

October 25, 2011 - 80,000 shares purchased at a price of $0.104 per shares. Total purchase price of $8,320.00

| Date | Price | Value | Differential |
|------|-------|-------|--------------|
| High Closing Price for the next 90 days | $0.71 | $56,800.00 | $48,480.00 |
| Low Closing Price for the next 90 days | $0.09 | $7,200.00 | ($1,120.00) |

| Average Closing Price for the next 90 days | $0.325 | $26,000.00 | $17,680.00 |
| --- | --- | --- | --- |

13.     The total purchase price for the shares in these three stock transactions, as correctly set forth in the PSIR, was $73,295.00.  These charts evidence that as of the date of the purchase of each of these three transactions, the government received shares of stock having a value of $80,446.40 or $7,151.40 more than was paid for the shares. Further, if the shares acquired were sold during the next 90 days at the average closing price of those shares as listed the shares would have had a value of $13,114.51 more than was paid for the shares. It is respectfully requested that the PSIR report fails to take into account that the shares when purchased here had a real value as determined by the market place and upon sale could have resulted in a substantial profit. Since defendant does not know the actual disposition of the shares that were purchased in these transactions, defendant has applied a 25% discount to the actual average closing prices of the shares over the next 90 days resulting in the amount the government could have realized upon a sale of the shares during that period from $86,706.25 (as set forth in the charts) to $65,029.62. In turn this 25% discount of the actual available average price would result in the government having sustained a loss of $8,265.38 for these transaction ($73, 295.00 purchase price - $65,029.63 the discounted sale price = $8,265.38).

## SOPHISTICATED MEANS

14.     Although the Probation Officer did not request a sophisticated means enhancement, the Government seeks such an enhancement. Government Objections at P. 2-4. Neither the facts nor the law support an enhancement. As reflected in the PSIR, the offense conduct occurred over a limited period of time (four months in 2009 and four months in 2011) and involved a limited number of transactions (three), all of which included legitimate securities

and legitimate companies, and each included sting operations pursuant to which undercover agents were primary participants. None of the cases cited by the Government are factually comparable.

15.     In *U.S. v. Fowler*, 213 Fed. Appx. 788 (11th Cir. 2007), the defendant was convicted of defrauding a victim into investing in a non-existent company. The scheme lasted over five years and consisted of "various means of deception" including disseminating literature, disseminating fake samples, use of a marketing firm to solicit investors, and claiming representation by a well-known attorney. *U.S. v. Muzio*, Case No. 09-20327-CR-King, 2010 U.S. Dist. Lexis 64781 (S.D. Fla. 2010) and *U.S. v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008) are similarly inapposite. In *Muzio*, the defendant conceived and created a publicly traded company, drafted purported board minutes and false press releases and used other companies he controlled to manipulate market share prices. He met directly with investors to tout his experience and legitimacy and failed to advise investors of his conflicting interests. In *Parris*, the defendants issued numerous false press releases (and concealed their involvement in the issuance of the false press releases) and false corporate resolutions, caused the improper issuance of 28.6 million unregistered securities, fired their transfer agents who questioned certain transactions and engaged in wire transfers to third party companies regarding funds that ultimately went to the defendants.

16.     As noted by the Eleventh Circuit in *Fowler*, sophisticated means involves "especially complex or especially intricate offense conduct ...." *Fowler* at *6. *See also* USSG §2B1.1 cmt. n. 8. ("'[S]ophisticated means' means especially complex or especially intricate offense conduct ...."). Unlike the facts in *Muzio* and *Parris*, the facts here establish that the two companies involved were active, legitimate companies listing their respective stocks on the pink

Sheets and Bulletin Board, there was no use of false documents, false board minutes or other misleading statements or writings. The Government has failed to establish that a sophisticated means enhancement should apply.

17.     Consistent with the above analysis, in connection with co-defendant Doug Martin's sentencing, the Government did not request nor did Mr. Martin receive a sophisticated means enhancement. Mr. Martin's offense conduct relates to one of the three transactions included within Mr. Haire's offense conduct, all three of which involve virtually identical means. There is no basis to enhance Mr. Haire's sentence for sophisticated means where this Court did not so enhance the co-defendant's sentence.

## OBSTRUCTION

18.     The PSIR recommends an obstruction enhancement.

19.     Mr. Haire objects to Paragraph 33 of the PSIR, which recommends a two-level adjustment under Section 3C1.1 for obstruction of justice.  This recommended adjustment relates to an alleged attempt by Mr. Haire to intimidate Lucy Meton, a former employee of HEB, LLC and possible government witness at trial.  *See* PSIR at ¶ 33.  The PSIR states that Mr. Haire, "attempt[ed] to intimidate a government witness" because Michael Blubaugh, a business associate of Mr. Haire, made a good faith, accurate and factually-supported report to law enforcement of what he believed to have been property theft by Ms. Singleton from a company in which he, like Mr. Haire, was an owner and manager.  *See id.*

20.     In the first instance, the determination to file the report and complaint made against Ms. Singleton was the sole decision of Mr. Blubaugh. *See* Declaration of Michael A. Blubaugh, attached to Defendant's Objections to the PSIR as Exhibit1. Although Mr. Blubaugh may have contacted Mr. Haire to get certain details regarding Ms. Singleton's misconduct, Mr.

Haire did not cause or instruct Mr. Blubaugh to contact the authorities and file the complaint against Ms. Singleton. Id. This action was taken solely by Mr. Blubaugh. *Id.*

21.     Moreover, in any event, as discussed below, the recommended adjustment is unwarranted and should not be applied by the Court.  Specifically, neither Mr. Haire nor Mr. Blubaugh:  (1) attempted to intimidate, threaten or harass Ms. Singleton in any way; (2) attempted to significantly impede this prosecution in any way; or (3) despite the assertion in the PISR, request or seek Ms. Singleton's arrest at any time.  Instead, Mr. Blubaugh did no more than make a truthful, transparent report to law enforcement of what he believed to have been criminal activity by Ms. Singleton.  Such a report does not, and cannot, amount to obstruction of justice.  Accordingly, the recommended adjustment is unwarranted.

**Factual Background**

22.     Ms. Singleton was an employee of HEB Technologies, LLC ("HEB") from approximately 1997 until approximately June 2012.    At all relevant times, Mr. Haire and Mr. Blubaugh were co-owners (with others) and members of HEB, a private company that is unrelated to any of the charges in this case.  *See id.* (stating that Mr. Blubaugh was "an owner and member of HEB…").  As an HEB employee, Ms. Singleton performed bookkeeping and accounting functions for HEB and other affiliated companies.

23.     Ms. Singleton left HEB in approximately June 2012.  After her departure from the company, it became increasingly apparent over time that Ms. Singleton took, without authorization, certain computer items from the company.  As described in Mr. Blubaugh's Declaration, that HEB property was believed to have included "a laptop computer, desktop computer, and electronic images of HEB business data."  *Id.*

24.     As an owner and control person of HEB, Mr. Blubaugh, like Mr. Haire, had

known or suspected that Ms. Singleton had taken these items before he made the police report cited in the PSIR. *See id.* (stating that Mr. Blubaugh had "known or at least suspected that Ms. Singleton took this property for some time."). However, he only learned over time that Ms. Singleton was providing, on an ongoing basis, confidential and proprietary HEB business information and documents to third parties. These third parties included James Stuckert, who was an opposing party to HEB – a company partially owned by Mr. Blubaugh – in an ongoing multi-million dollar lawsuit styled *James Stuckert, Trustee, v. HEB, LLC,* Case No. 153-2623-12, pending in Tarrant County, Texas. Further, Mr. Blubaugh learned, again over time and as business events developed, that the information and documents Ms. Singleton was believed to have been providing to Mr. Stuckert were also being used by him to the detriment of another one of Mr. Blubaugh's companies, Kingdom Resources, in apparent attempts by Mr. Stuckert to secure ownership and control over VHGI Holdings, Inc.

25.     Accordingly, while Mr. Blubaugh, like others, suspected that Ms. Singleton had stolen computer equipment and electronic information from HEB "for some time," he did not learn or suspect until the spring of 2013 the business and economic damage to his and others' interests that was or may have been resulting from this suspected theft. As this information became increasingly known to him, Mr. Blubaugh acted to address the source of the information, the computer items believed to have been in Ms. Singleton's possession.

26.     Contrary to the PSIR, however, Mr. Blubaugh did not at any time seek Ms. Singleton's arrest, the alleged factual basis for the proposed obstruction adjustment. *See* PSIR at ¶ 33; *see also* Blubaugh Declaration ("I did not ask, seek or expect Ms. Singleton to be arrested as a result of my report, nor did the Police Department ever indicate that such action would be imminent."). Moreover, as further proof of this fact, Mr. Blubaugh privately approached Ms.

Singleton **before** he contacted law enforcement about the believed theft, clearly demonstrating that he did not intend to have her immediately arrested or otherwise interfere with her trial possible testimony in any way. Specifically, Mr. Blubaugh called and talked to Ms. Singleton on at least two occasions before he spoke to the authorities, when he requested that "she simply return the [computer] items to HEB." *See* Blubaugh Declaration.

27.    As described by Mr. Blubaugh, it was "[o]nly after she declined to return the HEB items, and after extensive thought, [that he] contact[ed] the Fort Worth Police Department..." *Id.* These requests for the voluntary return of the property, **pre-dating** his report to law enforcement, clearly show that Mr. Blubaugh, and by extension Mr. Haire, did not intend to obstruct or interfere with Ms. Singleton's possible trial testimony in this case. Finally, as stated, Mr. Haire did not cause or direct Mr. Blubaugh to make his report to law enforcement. *Id.* Instead, Mr. Blubaugh did so because he believed it was in the best interests of HEB. At the time of that report, as a result of the time and attention Mr. Haire was required to expend focusing on his defense in this matter, Mr. Blubaugh had become the de facto managing member of HEB. *Id.* In so doing, he had no intention of influencing or preventing her testimony in this case; indeed, he "would have been shocked if the authorities took any action concerning Ms. Singleton that would impact her ability to testify at Mr. Haire's criminal trial in April 2013, nor did [he] ask or intend that they do so." *Id.*

**Legal Argument Standard**

28.    In order for an adjustment for obstruction of justice to be appropriate under Section 3C1.1, the defendant must have "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction..." U.S.G.G. § 3C1.1. The Application Notes to

Section 3C1.1 provide a number of examples of the type of conduct that the Sentencing Commission intended to be covered by this adjustment.  These examples include, *inter alia,* "threatening, intimidating, or otherwise unlawfully influencing a…witness…" and "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  U.S.G.G. § 3C1.1, App. Note 4(A) and (G).

29.    The government has the burden of proving the applicability of a sentencing guideline that would enhance the defendant's offense level.  *United States v. Wilson,* 884 F.2d 1355, 1356 (11th Cir. 1989).   Here, the government bears the burden of proving by a preponderance of the evidence that the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice.  *United States v. Aguilar-Portillo,* 334 F.3d 744 (8th Cir. 2003).

30.    In so doing, the government must prove that the allegedly obstructive conduct was material.  That is, the government must show that the defendant's conduct significantly impeded the investigation or prosecution.  *See United States v. Shriver,* 967 F.2d 572, 574-75 (11th Cir. 1992) (government failed to meet its burden of proving that the defendant's false statement to IRS investigator significantly impeded official investigation).  Where the conduct does not significantly impede the investigation or prosecution, the increase is improper.  *See, e.g., United States v. Banks,* 347 F.3d 1266 (11th Cir. 2003) (court failed to find that the defendant's release under a false identity significantly hindered the investigation); *United States v. Scott,* 405 F.3d 615 (7th Cir. 2005) (defendant's conduct during pretrial release did not complicate or hinder prosecution on fraud charges).

**Mr. Haire's Conduct was Not Obstructive**

31.     There is no evidence that the conduct described in the PSIR was obstructive of this prosecution in any way, nor that it was even intended to obstruct the government's prosecution of this case.  As an initial point, the PSIR states that the "government ***uncovered*** an attempt to intimidate a government witness."  PSIR at ¶ 33 (emphasis added).  The report made by Mr. Blubaugh, however, was transparent in every way; in other words, the government was not required to "uncover" anything.   As described in his Declaration, Mr. Blubaugh openly provided information to local law enforcement regarding the apparent theft by Ms. Singleton.  *See* Blubaugh Declaration.  Further, the report prepared by the Fort Worth Police Department (attached as an exhibit to the government's Motion to Amend/Revoke Bond) [D.E. 134] notes that Mr. Blubaugh, in a clear effort to make full disclosure, transparently informed the police investigator of the pending case against Mr. Haire in this Court and that Ms. Singleton was a possible trial witness.  *See id.*

32.     The only logical reason for him to have done so was to ensure that the investigator was not surprised by the pendency of this case, not to influence or "speed up" the investigation before trial of this case, as incorrectly concluded by the PSIR.   Indeed, any reasonable person would expect the investigator, upon Mr. Blubaugh's disclosure, to do exactly what appears to have happened here:  to contact the government to discuss the pending case.  To the contrary, ***if*** his report amounted to "an attempt to intimidate a government witness," Mr. Blubaugh would have done the exact opposite of what he did; namely, he would have ***concealed*** the pendency of this trial setting, including Ms. Singleton's possible trial testimony, and simply pressed the police to quickly (1) investigate his allegations and (2) charge Ms. Singleton.

33.     There simply is no evidence that Mr. Blubaugh did either.  Instead, the evidence is that Mr. Blubaugh first contacted Ms. Singleton privately, in an attempt to secure the items in

question without contacting law enforcement.  *See* Blubaugh Declaration.  This, of course, is arguably the last thing he would do if his intent was to prevent her trial testimony through a trumped-up theft prosecution.  Second, the evidence is that Mr. Blubaugh never asked that Ms. Singleton immediately be arrested or charged, but instead only that the police investigate his report.  *See id.* ("I did not ask, seek or expect Ms. Singleton to be arrested as a result of my report…"); *see also* police reports attached to the Government's Motion to Revoke/Amend Bond [D.E. 134], which fail to identify, despite the detailed factual narrative in the reports, any request by Mr. Blubaugh that Ms. Singleton be immediately arrested or charged.

34.     In short, it defies logic and the facts before the Court that Ms. Singleton would be quickly arrested based simply on the theft report or, similarly, that anyone would reasonably expect or intend that to happen.  Instead, the facts show that Mr. Blubaugh made a good faith, factually-accurate report to law enforcement based on the information that had become available to him over time.  He did not request that Ms. Singleton be arrested.  He did not request that she be charged.  He did not "call 911" to report the theft on an emergency basis, but instead arranged for a routine meeting with a police department investigator.

35.     Further, there is no allegation – by the government or contained in the PSIR – or evidence that what Mr. Blubaugh reported was false or omitted any material information; indeed, the PSIR appears to challenge it for making too many disclosures.  Not surprisingly, the defense can find ***no cases*** in which making a lawful, good faith report to law enforcement has been used as a basis for an obstruction enhancement under Section 3C1.1 or otherwise.  Instead, the only known obstructive conduct that comes close to the present case is the making of ***false statements*** to law enforcement, provided that the other requirements of Section 3C1.1 are present as well.

U.S.G.G. § 3C1.1, App. Note 5.  Here, however, there simply is no evidence that Mr. Blubaugh's report was inaccurate or untrue in any way.

36.     Accordingly, there is no evidence that Mr. Haire intended to obstruct this prosecution through the report of Ms. Singleton's possible theft.

**Mr. Haire's Conduct was Not Material**

37.     In order to be material, the purportedly obstructive conduct must significantly impede the prosecution or investigation.  *See Shriver,* 967 F.2d at 575 ("the question is whether Shriver's false statement significantly obstructed or impeded the official investigation or prosecution of the offense."); *Banks,* 347 F.3d 1266 (the court failed to find that the defendant's release under a false identity significantly hindered the investigation).   The government, of course, has the burden of proving that, in this case, its prosecution was significantly impeded.  *See Wilson,* 884 F.2d at 1356 ("The guidelines contemplate that the government has the burden of proving the applicability of sections which would enhance the offense level…").

38.     There simply is no evidence that Mr. Haire, through the police report, significantly impeded the prosecution of this case in any way or that he had any intent of doing so.   The report did not make a government witness unavailable for trial, nor was there any reasonable possibility that it ever could have done so.   The report did not intimidate, threaten or harass Ms. Singleton in any way.   The report was not false, meaning that it could not send any government resources down the wrong investigative trail.  *See, e.g., United States v. Phipps,* 319 F.3d 177 (5th Cir. 2003) (upholding enhancement where the defendant's lie sent investigators down the wrong trail).   The report did not request or demand that Ms. Singleton be quickly arrested or charged, the only way in which it could have arguably impeded this prosecution.[2]

---

[2]   There is no evidence whatsoever that Mr. Blubaugh sought or requested Ms. Singleton's arrest before trial. However, assuming only for argument that he did, this conduct still would fall short of significantly impeding this

39.     In conclusion, there is no evidence whatsoever that Mr. Blubaugh's report to law enforcement in any way impeded this prosecution.  To so find – specifically, that making a lawful report to the authorities of believed criminal conduct can amount to obstruction of justice – would penalize the truthful reporting of possible crimes and effectively immunize possible government witnesses from prosecution, or even from *investigation*, any time they hold the status of possible government witnesses.  This would be against all reasonable public policy, basic fairness, and the most fundamental, objective interests of law enforcement.  Accordingly, an adjustment for obstruction of justice for Mr. Haire under Section 3C1.1 is improper and should not be imposed by the Court.

## UPWARD DEPARTURE

40.     The PSIR suggests that an upward departure may be appropriate. . *See* PSIR at ¶ 103.

41.     The reference in paragraph 24 of the PSIR to 404(b) evidence regarding defendant's explaining to "S.L." that he needed someone to generate volume in the WNDM Stock is misplaced.  Defendant is unaware of any such 404(b) evidence.  Defendant is aware that in the original indictment, S.L. was identified as a possible co-conspirator with the defendant with regard to the transaction with the fictitious pension fund.  However, in the superseding indictment, the government withdrew the conspiracy charge and accordingly, dropped S.L.'s name from the superseding indictment.  Further, the government withdrew its original 404(b) allegations after being satisfied that certain matters in West Virginia had been properly resolved and instituted a second 404(b) motion on March 1, 2013, but in that motion, S.L. does not appear

prosecution as required under the case law.  Consequently, it still would not have been material in any way.  For a non-violent offense such as minor property theft, Ms. Singleton surely would have been released on bond almost immediately, and therefore available to the government for trial.  Further, in the highly unlikely event that she was not released, the government could have easily secured her trial appearance while still in custody – which it easily does for government witnesses on a daily basis throughout the country.

nor does the conduct alleged to be attributable to defendant in paragraph "24". Of the PSIR

Accordingly, it is respectfully requested that paragraph 24 of the PSIR be stricken.

42.     Defendant also objects to that portion of paragraph 25 of the PSIR which states

that defendant discussed a scheme to "defraud the lender". That statement is not supported by the

tapes of the undercover operation.  Defendant discussed with Richard Epstein that in general,

Wound Care, like most small cap companies, cannot borrow money on their stock unless there is

sufficient liquidity, i.e., trading volume, in the company stock.  At the time of the discussions

with Mr. Epstein, defendant did not have a lender in mind, but rather was speaking from

experience that he had gained in the market place.  Regarding the buying back of the purchased

stock from Mr. Epstein, it is not part of the events which took place since the tape recordings of

these conversations do  not clarify whether such a repurchase of shares would have been reported

on Form 10-Q or 10-K of the Wound Care filings.  Accordingly, the repurchasing of stock which

is not illegal conduct and in a lawful documented manner following the proper securities law

should not be part of this paragraph in the PSIR.

43.     Defendant believes with respect to the conduct set forth in paragraph "26" of the

PSIR, that the probationary office may have again mistakenly relied upon certain allegations

contained in the original 404(b) filed by the government; however, as stated above, the

government withdrew the items set forth in that original filing.  The allegations that form the

basis of paragraph 26 arise out of a lawsuit that was commenced in West Virginia in which

certain false allegations were interposed against MLH and defendant Haire.  The Court in the

West Virginia action indeed ruled that the allegations against MLH and defendant Haire were

false and dismissed the action against defendant Haire and MLH with prejudice.  Moreover, the

Court awarded certain property to MLH and acknowledged that the Lis Pendens at issue was

properly filed.  Annexed hereto as Exhibit 2 is the decision of the West Virginia Court and correspondence from the attorney who represented MLH and defendant Haire supporting defendant's position that the conclusions made in paragraph 26 of the PSIR are erroneous. Moreover, defendant objects to the statements that MLH is controlled by defendant Haire or is in any manner the alter ego of defendant.  Mr. Frank Barker owns, manages and controls MLH independent of Mr. Haire.  While it is true that defendant Haire had a business relationship extending over many years with Mr. Barker and MLH, he did not have an ownership interest in MLH. (*See* Exhibit 3, a copy of MLH's incorporation filing in Nevada, Exhibit 4, a copy of Mr. Barker's K-1 issued by MLH evidencing his ownership of MLH and correspondence from Mr. Barker to Mr. James Stuckert transferring assets on behalf of MLH in October 2009.)

44.    Defendant Haire is not certain as to the basis of the claim set forth in paragraph 27 of the PSIR; however, defendant did complain during the sting conversations that he was introduced to a Steve Koifman who held himself out as a legitimate "investor relations person" associated with an investor relations company.  It should be noted that many investor relations firms engage in the business of assisting public companies legally and legitimately in compliance with the securities laws and rules in order to keep investors apprised of the business operations of such public companies. In the taped conversations with Mr. Epstein, defendant Haire complained of Mr. Koifman's non-performance in failing to provide investor relation services to Wound Care. Accordingly it is respectfully requested that paragraph 27 of the PSIR be stricken.

45.    Defendant Haire objects to paragraph 28 of the PSIR in its entirety inasmuch as there is no basis for the allegations contained therein.  Allegedly this allegation of defrauding an investor arose out of a brief telephone conversation between the FBI and the investor, James Stuckert, on or about February 26 or 27, 2013.  A few days later, the government on or about

March 1, 2013, filed a 404(b) motion setting forth this allegation of defendant defrauding an investor of $30 million. It should be noted that this Court, in hearing this motion after reviewing opposition papers from defendant Haire, denied the government's request to include this claim as part of the 404(b) allegations. (*See* April 11, 2013 transcript.)  A review the FBI 302 Report (*see* Exhibit 5) which summarizes the conversation with Mr. Stuckert, the 302 Report does not reveal any reference therein to a claim by Mr. Stuckert of being defrauded or misrepresented by defendant Haire.  Mr. Stuckert was a business associate of HEB and Mr. Haire.  Mr. Stuckert, from approximately 2005 through to the end of 2012, loaned/invested substantial funds to/in HEB and its affiliate companies.  A dispute has arisen between Mr. Stuckert and HEB as to the amount at issue and more specifically, which portion of the funds were loaned as opposed to invested in HEB and its affiliate companies.  To evidence this dispute, we are attaching a copy of the lawsuit commenced by Mr. Stuckert in the State of Texas against HEB claiming a default by HEB on the repayment of a promissory note made by HEB to the order of Mr. Stuckert in the amount of $22.5 million. (*See* Exhibit 6 for a copy of the complaint in this lawsuit.)  We are also attaching a letter from HEB attorney in that action demanding Mr. Stuckert return substantial shares of public company stock he took from HEB with the assistance of Lucy Singleton, a former employee of HEB. (*See* Exhibit 7 for a copy of the attorney's letter.)

46.     The lawsuit brought by Stuckert against HEB does not make any allegation whatsoever of misrepresentation or fraud nor does the lawsuit name defendant Haire as a party to the action.  Moreover, in the discovery materials produced in that action, Mr. Stuckert has listed all of his investments/loans with amounts and dates and provides a list of distribution of those funds by HEB to its affiliate companies evidencing the fact that Mr. Stuckert was, at all times, aware of his investment/loans to HEB and the use of the funds.  It should be noted that Mr.

19

Stuckert holds substantial equity in several of these affiliated companies, namely, Wound Management Technologies, Inc. ("Wound"), VHGI Holdings, Inc. ("VHGI") and Redfin Network, Inc., two of which are the subject of the criminal action against the defendant Haire. Additionally, Mr. Stuckert has investments in several other affiliated companies of HEB and in exchange for certain of the loans/investments, Mr. Stuckert was granted security interests (mortgages) in several of these affiliated entities to secure his loans/investments through HEB to these affiliates.  (*See* Exhibit 8, copies of these security filings.)  Further refuting this allegation of defendant defrauding Mr. Stuckert is the fact that over the last twelve months, Mr. Stuckert has continued to invest in certain of HEB's affiliate companies in excess of 10 million, i.e., VHGI and Wound.  (*See* Exhibits 9, 10 and 11 for recent 8-K, 10-Q and 10-K SEC filings evidencing these investments b.)

47.     Moreover, defendant Haire did not use Stuckert's loan/investment money or any other investor of HEB to pay personal expenses, especially the allegation of using $3million to pay expenses related to defendant's divorce.  First, defendant, through the HEB Operating Agreement, was the Managing Member of HEB and as such, had the discretionary use of such funds; however, defendant not only disputes this false allegation, but is submitting documents to show that a substantial portion of this alleged $3million was loaned to HEB by defendant's present wife and her mother and that all accounting records show that defendant accounted for all payments properly to his ex-wife.  (*See* Exhibit 12 for wire transfers made direct to HEB accounts    to substantiate certain payments by Mr. Haire's wife and mother-in-law.) Additionally, it should be noted that defendant's ex-wife made claims against assets belonging to HEB and that it was necessary in the settlement of this dispute to make payments to defendant's ex-wife in order to protect the assets of HEB, its members and investors, including Mr. Stuckert

who was aware of these payments at the time they were made.

48.     Significantly, the Government, in its objections, recharacterizes this alleged offense stating that defendant['s] "fraudulent transfer of $30mm from his principal investor (PSI Paragraph 28) and his role in depriving Ponzi scheme victims of their money (PSI Paragraph 29) … the government will argue that Uncharged Conduct are aggregating factors under U.S.C Section 3553." This new contention by the Government expands the Government's prior statement contained in its 404(b) Motion which is the language found in paragraph 28 of the PSIR. There is no supporting documents or even an explanation by the Government as to the basis for these new contentions (*See*, Government's objections to PSIR page 2, footnote 1). Accordingly., it is respectfully requested that the Court deny the improperly expanded allegations.

49.     Defendant Haire objects to paragraph 29 of the PSIR since there is no basis for the allegations contained therein.  The Ardinger matter was a complicated commercial case which involved several parties.  To oversimplify the case, monies were taken wrongfully from Ardinger, but such conduct in no manner involved defendant Haire or HEB; in fact, through certain commercial relationships, HEB paid the obligation into an escrow account to repay Mr. Ardinger.  However, the funds in the escrow account were not used for the intended purpose which resulted in Mr. Ardinger not receiving payment and at the same time, causing a loss to HEB of approximately $1.3 million.  This entire matter was adjudicated in the United States Bankruptcy Court for the Northern District of California which did not attribute any wrongdoing to defendant Haire or any participation by defendant Haire in a Ponzi scheme.  (*See* Exhibits 13, 14, 15, and 16 for a copy of the Rescission Settlement Agreement, the Court Approval of transaction, bank records, Haire Deposition in the Ardinger matter, pages 130-135, conducted by

Ardinger's attorney wherein it is acknowledged that certain repayments were made by HEB.) Accordingly, the statements contained in paragraph 29 of the PSIR should be stricken since the misconduct alleged therein did not related to Mr. Haire individually.

50.     The government has indicated to counsel that at sentencing, it will take the position that Mr. Haire's objection to the adjustment for obstruction of justice proposed in the PSIR should result in his loss of acceptance of responsibility credit under Section 3E1.1.  That simply is not the case.  As a preliminary matter, Mr. Haire is entitled to assert good faith objections to the information set forth in the PSIR.  Indeed, as the Court knows, failure to do so would result in his likely waiver of any argument regarding the accuracy of that information. Moreover, this objection is not a frivolous legal or factual challenge to the PSIR's irrefutable assertions.  Instead, it is a well-grounded, good faith objection that, as described above, the conduct set forth in the Probation Office's report does not, as a legal matter, set forth a valid justification for an obstruction adjustment.  This objection simply is no basis to strip Mr. Haire of his acceptance of responsibility, which until now has been unchallenged.

51.     Mr. Haire clearly has accepted responsibility.  His conduct since entering his guilty plea is entirely consistent with the factors the Court should consider in determining whether acceptance of responsibility credit is warranted.  He timely entered into a guilty plea in this case.  Consequently, the Probation Officer recommended that Mr. Haire receive a reduction for acceptance of responsibility.  *See* PSIR at §§ 34 and 43.  Further, he truthfully admitted the conduct constituting the offense of conviction, he voluntarily ceased any criminal activity, and he has fully and consistently complied with all of his release conditions – even to the point that the Court recently modified those conditions to be less onerous.  *See* § 3E1.1 App. Note 1 (setting forth the Court's considerations for this adjustment).  To find otherwise, as the Court

will likely be invited by the government, would unfairly penalize Mr. Haire for asserted a good

faith objection to what he believes to be an unwarranted adjustment.

## CONCLUSION

Accordingly, Mr. Haire objects to the PSIR and responds to the Government's Objection

as described above.

Dated:     July 15, 2013

          Respectfully submitted,

          s/Ronald Gainor, Esq.
          Ronald Gainor, Esq.
          Florida Bar No. 606960
          GAINOR & DONNER
          799 Brickell Plaza, Suite 606
          Miami, FL 33131
          Telephone: (305) 358-1064
          Facsimile: (305) 372-1644
          Cell: (305) 206-2008
          E-Mail: gainorlaw@gmail.com

          And

          Carl F. Schoeppl, Trial Counsel
          Florida Bar No. 818518
          Counsel for Defendant Scott A. Haire
          SCHOEPPL & BURKE, P.A.
          4651 North Federal Highway
          Boca Raton, Florida 33431-5133
          Telephone: (561) 394-8301
          Facsimile: (561) 394-3121
          E-Mail: carl@schoepplburke.com

          And

          Jeffrey J. Ansley,
          Trial Counsel (admitted pro hac vice)
          Texas Bar No. 00790235
          BELL NUNNALLY & MARTIN LLP
          3232 McKinney Avenue, Suite 1400

Dallas, Texas 75204-2429
Telephone: (214) 740-2429
Facsimile: (214) 740-1499
 E-Mail:  jeffa@bellnunnally.com

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on July 15, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to the following: H. Ron Davidson, Esq., Assistant United States Attorney; and Mark C. Perry, Esq., Attorney for Defendant Douglas P. Martin.

<u>s/Ronald Gainor, Esq.</u>
Ronald Gainor, Esq.
*Counsel for Defendant Scott A. Haire*