UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. <u>12-CR-60133-Williams(s)</u>

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| SCOTT HAIRE, | ) |
|     Defendant. | ) |

**RESPONSE TO MOTION FOR DOWNWARD**
**<u>DEPARTURE AND VARIANCE</u>**

The United States, through the undersigned Assistant United States Attorney, respectfully submits this Response to Defendant Scott Haire's Motion for Downward Departure and Variance. (DE 182.) The Court should deny the Defendant's request for home confinement and should instead sentence the Defendant to the statutory maximum term of imprisonment of five years. Simply put, Haire cannot claim that this "isolated case" does not represent his otherwise "unblemished years" of good conduct. (*Id.* at 8.) To the contrary, this case represents the tip of a larger iceberg of questionable and illegal conduct. Because the Defendant consistently and repeatedly exhibited a pattern of placing his self-interests above the interests of others, he represents an ongoing economic danger to the community.

In his most recent Motion and his submissions to this Court, the Defendant argues that the criminal conduct in the single count to which he pleaded guilty does not reflect his true disposition. (*See, e.g.*, DE 182 at 10.) In addition, Haire argues that the Court should show leniency because he did not intend to harm any real victims. On both points, he is

wrong: The overwhelming evidence shows that Haire demonstrated a repeated pattern of attempting to defraud whomever he could.

Page 8 of what would have been Government Trial Exhibit 14 (Attachment #1) gives this Court a flavor of the true Scott Haire. When the cooperating defendant asks Haire why he wants to manipulate the stock volume, Haire explains his intent to deceive:

> Cooperator: [Y]ou've got … a lender [who] wants to see some volume?
>
> Haire: That's the concern, we don't have any volume and any liquidity in this stock.

Here, Haire asks for assistance from the cooperating defendant in manipulating the stock volume so that Haire could entice a lender by what appeared to be legitimate volume in his stock. Haire's proposed procurement fraud, however, did not materialize because – unlike Haire – the government did not intend to harm anyone. The cooperating defendant, following the government's instructions, did not move forward with the deal that the Defendant proposed.

Instead, Haire agreed to a series of illegal transactions – all captured on tape – involving hidden inducement payments. Haire did not realize it at the time, but his efforts to harm others failed because the FBI acted as a barrier between Haire and his intended victims. Haire agreed to bribe a pension fund fiduciary to put Haire's interests ahead of the retirees; bribe a stock broker to put Haire's interests ahead of the investing public; and make payments to a buying group to place insiders ahead of the ordinary investors.

Pages 16 to 20 of what would have been Government Trial Exhibit 17 (Attachment #2) give this Court a flavor of how Haire hoped to personally benefit from these fraud schemes by bringing almost $500,000 into his company's coffers. In the undercover

recording, the cooperating defendant discusses how Haire previously engaged in another pay-for-play deal that would have brought in approximately $500,000 into one of Haire's companies. After the cooperating defendant confirms Haire's prior misdeeds (page 16,) and asks Haire, "What kind of volume are you looking at?," Haire responds, referring to his prior efforts to pay for buying (emphasis added):

> Well, *he* was trying to bring in 200 to 250 in a 30-day period.

The cooperating defendant confirms and elaborates on the numbers (emphasis added):

> Ok so *he* was trying to bring in … 200,000 shares which would be between $400[,000] and $500,000 worth of buying in essence.

Haire then explains his bigger plans to artificially pump his company to bring it to a larger securities exchange (emphasis added):

> And then *he* wanted to roll it up with *another* [deal] … and I had *another couple hundred thousand shares* and we could've played ball with and *bring another million shares* over … the next 6 months and let this thing run and take on go to AMEX [ the American Stock Exchange].

After Haire confirms that he wants the same amount of paid buying from the cooperating defendant, the cooperating defendant then states similar terms (emphasis added):

> So if *we* can get a couple hundred thousand shares of volume of buying in there … in essence about *$400[,000 to] $500,000 worth of buying*.

Haire then states, "*Absolutely*," demonstrating his unambiguous intent to (yet again) generate up to $500,000 through fraudulent means (first through an uncharged conspirator, but then through the cooperating defendant).

These two recordings clearly demonstrate that the single count to which Haire pleaded guilty was not an "isolated case" that tarnishes an otherwise "unblemished" history, as Haire suggests. Instead, Haire engaged in a pattern of illegal and questionable

conduct, consisting of, at least, (1) an attempt to defraud a lender (uncharged), (2) previous but uncharged market manipulation through a third party (uncharged), (3) bribing a pension fund, (4) bribing a stock broker, and (5) paying for buying are merely part of his darker character.

Finally, the case of *H.E.B, LLC v. Ardinger*, Case No. 02-11-00092-CV (Ct. App. Tex. 2012) (Attachment #3), presents further evidence about Haire's questionable character. Just like Haire's efforts to have a cooperating witness arrested, the conduct should give this Court pause. In *Adringer*, the Court of Appeals found that one of Haire's companies unjustly enriched itself of approximately $1.3 million that belonged to the victims of a Ponzi scheme. Instead of agreeing that his company did not deserve its ill-gotten gains and returning $1.3 million to the victims, Haire fought the case to the Court of Appeals, which noted more of Haire's questionable conduct. The opinion reads (emphasis added):

> *Contrary to the terms of the rescission and settlement agreement, Haire testified* that the 75% membership interest reacquired by H.E.B. was "devalued" because Somoza failed to prosecute the patents involved in the original transaction with H.E.B. and because licenses were cancelled. *But there was no evidence from any source* of any particular amount of damages attributable to the devaluation of the 75% membership interest, let alone in the specific amount of $1,300,405.04.

Simply put, Haire is a man corrupted by greed,[1] willing to place himself ahead of others, who misled law enforcement to tarnish his former employee, and unjustly enriched himself through ill-gotten gains belonging to Ponzi scheme victims.  But for the intervention of law enforcement, he would have defrauded a lender and the market.  Such a man deserves the statutory maximum sentence.

                Respectfully submitted,
                WIFREDO A FERRER
                UNITED STATES ATTORNEY

By:   s/ H. Ron Davidson
      H. RON DAVIDSON
      Assistant United States Attorney
      Court ID No. A5501144
      99 Northeast Fourth Street, 4th floor
      Miami, Florida 33132-2111
      Tel: (305) 961-9405
      Fax: (305) 530-6168
      E-mail: H.Ron.Davidson@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 29, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                s/ H. Ron Davidson
                Assistant United States Attorney

---

[1] Haire claims that he is a giving man, "now solely responsible for providing for the financial well-being of his family."  (DE 182 at 2.)  It is curious, however, that when seeking to justify large personal payments from corporate accounts, Haire explained that "a substantial portion of this alleged $3 million was loaned to HEB by defendant's present wife and her mother…" (DE 177 at 20,) suggesting that a significant portion of Haire's wealth came from his wife or her family, and not Haire personally.

In addition to the attached exhibits, the government respectfully moves for the introduction of the FBI 302s of "J.S." and "L.S.," which the government incorporates as additional exhibits to this submission.