]



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00092-CV

H.E.B., L.L.C.  APPELLANT
AND APPELLEE

V.

HORACE T. ARDINGER, JR.  APPELLEES
AND WESTLAND CAPITOL INC.  AND APPELLANTS

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

Appellant and Cross-Appellee H.E.B., L.L.C. appeals the final judgment awarding Appellee and Cross-Appellant Horace T. Ardinger, Jr. $1,300,405.04. Ardinger appeals the trial court's denial of his requests for declaratory relief and for attorneys' fees. We will affirm the trial court's judgment in its entirety.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.     H.E.B., Curtis Somoza, and Envoii Technologies, LLC

H.E.B. is a limited liability company that was formed in 1997.  Its original members included Scott Haire, Steve Evans, and Frank Barker.[1]  Haire has been H.E.B.'s managing member since 1997.  He owned 98% of H.E.B. at its formation but only 60% at the time of trial.  Haire explained that H.E.B. primarily "manages different businesses" and "invests in distressed companies."

In May 2003, Envoii Healthcare, LLC, an entity owned and controlled by H.E.B., acquired certain technology assets from the bankruptcy estate of Envoii, Inc., a company developed by Michael Tolson in the 1990s.  Shortly thereafter, Envoii Healthcare sold most of those assets—the Envoii platform; five patents; and several licensed applications, including a payment processing application, a Fujitsu application, and the "disappearing email" application—to Envoii Technologies, LLC, an entity formed and wholly owned by H.E.B. to acquire and hold the Envoii technology.[2]

The Envoii platform was not yet "commercially usable" when Envoii Technologies acquired it in the summer of 2003.[3]  Haire realized that he needed

---

[1]Hence the abbreviation "H.E.B."

[2]According to Haire, when H.E.B. bought the Envoii platform and the "disappearing email" application, the goal of the technology was "[t]o be able to send an email with encrypted data in it so that you could erase the email if you chose to later on."

[3]Envoii Healthcare hired Tolson to continue developing the technology.

to raise capital to get the Envoii platform "up and running," and it was in this context that he was introduced to Curtis Somoza in August 2003. Haire met with Somoza on two separate occasions to discuss the Envoii platform—once in Florida and once at Somoza's 27,000-square-foot house in California. Somoza claimed to be a "bond trader" and expressed interest in the "disappearing email" application. Haire came away from his meetings with Somoza with the impression that he was very wealthy and had been successful in his business ventures.

On October 1, 2003, Envoii Technologies and the Curtis D. Somoza Living Trust[4] entered into a subscription agreement whereby the Somoza Trust agreed to pay Envoii Technologies $1 million in exchange for a 25% membership interest in Envoii Technologies.[5] The Somoza Trust paid Envoii Technologies $550,000 on October 2, 2003, and agreed to pay the remainder of the funds pursuant to two notes. The $550,000 paid on October 2, 2003, was the only money paid to Envoii Technologies under the subscription agreement.

Interested in acquiring control of Envoii Technologies, Somoza approached Haire not long after entering into the October 2003 subscription agreement and inquired about purchasing a greater interest in Envoii

---

[4]Somoza created the Somoza Trust in October 2002 to receive and manage assets for the benefit of Somoza during his lifetime.

[5]The Somoza Trust also agreed to pay Envoii Technologies $50,000 in exchange for the license to develop the "disappearing email" technology.

Technologies.  In December 2003, the Somoza Trust agreed to pay H.E.B. $9 million in exchange for a 45% equity interest in Envoii Technologies.  Under this letter agreement, the Somoza trust paid H.E.B. $100,000 and H.E.B. credited the Somoza Trust with a prior license payment of $250,000, totaling payments in the amount of $350,000 towards the 45% interest.  The letter agreement also called for the Somoza Trust to pay H.E.B. $650,000 upon the execution of a formal purchase agreement.  Haire executed a formal purchase agreement on behalf of H.E.B. on January 28, 2004, which acknowledged the prior payments totaling $350,000 and also required the payment of $650,000 upon its execution, but Haire rescinded his signature because the Somoza Trust paid H.E.B. only $500,000 of the required $650,000.  The formal purchase agreement thus fell apart, and Haire traveled to California to "throw Somoza out of Envoii Technologies."

But Somoza and Haire renegotiated, and H.E.B. and the Somoza Trust entered into a February 9, 2004 letter agreement whereby the Somoza Trust agreed to purchase not just a 45% interest in Envoii Technologies, but the remaining 75% interest held by H.E.B. (70%) and Tolson (5%).  On March 8, 2004, H.E.B. (by Haire) and Digitally Secured Communications, Inc.[6] (DSC) (by Somoza) formalized the February letter agreement by executing an "Agreement and Closing Memorandum for Purchase of Membership Interests" (the March

---

[6]Somoza formed DSC to make this acquisition, and he substituted DSC as the purchaser at the "last minute."  Haire had never heard of DSC.

4

2004 purchase agreement).[7] The March 2004 purchase agreement acknowledged that H.E.B. had received "Initial Payments" "from [DSC]" totaling $850,000 (the $350,000 plus the $500,000 paid by the Somoza Trust under the prior agreements that had fallen through), and it credited DSC with that amount towards the purchase price. In addition to future payments, the March 2004 purchase agreement required DSC to pay to H.E.B. $1,300,405.04 at closing.[8] H.E.B. was paid that amount, but not by DSC; Persistence Capital LLC, an entity used by Somoza to funnel monies stolen from investors, directed the payment to H.E.B. out of its escrow account.[9] DSC consequently acquired the remaining 75% interest in Envoii Technologies and, thus, control of the company.[10] H.E.B. spent the $1,300,405.04.

In September 2004, H.E.B. sued Somoza, the Somoza Trust, and DSC in California state court after DSC failed to make the next payment due under the March 2004 purchase agreement—$1,250,000 on August 2, 2004. In November

---

[7]Although the parties sometimes referred to H.E.B. as owning 70% of Envoii Technologies, the March 2004 purchase agreement reflects that H.E.B. owned 45% of Envoii Technologies and SAH, LLC, an entity of which Haire was the "sole manager member," owned 25% of Envoii Technologies. Tolson also agreed to sell his 5% interest in Envoii Technologies.

[8]The total amount to be paid to H.E.B. for the 75% membership interest in Envoii Technologies ranged from $5 million to $8 million.

[9]Persistence Capital filed for bankruptcy in California in September 2005.

[10]H.E.B. did not negotiate for a lien on the Envoii Technology membership interests transferred, nor did it condition the transfer of the interests on payments by DSC (or some other Somoza-controlled entity).

2004, H.E.B. placed DSC into involuntary bankruptcy in California.  H.E.B. and DSC (through Somoza) attempted to negotiate a resolution to both actions, entering into and proposing numerous settlement agreements between February 2005 and mid-2006, but all fell through.

On May 16, 2006, the FBI issued an announcement stating that Somoza had been arrested on charges that he and Robert Coberly, Jr. had "defrauded dozens of victims out of more than $68 million through an investment scheme." According to a criminal complaint, Somoza had allegedly "orchestrated a Ponzi scheme" in which he solicited individuals to invest in Persistence Capital, which was supposed to use the funds to purchase pools of life insurance policies, but only $4.7 million of the approximately $68 million collected from investors was used to purchase several pools of life insurance policies.  The other $64 million supported Somoza's lavish lifestyle.  Somoza was indicted in federal court on numerous counts, including conspiracy, wire and mail fraud, and promotional money laundering.[11]

In July 2006, H.E.B. filed an adversary complaint in the involuntary bankruptcy action against DSC for rescission of the March 2004 purchase agreement.  Several months later, in November 2006, after further negotiations, H.E.B. and DSC entered into a "Rescission and Settlement Agreement" whereby

_____

[11]The Securities and Exchange Commission had previously settled a suit with Somoza and Coberly involving allegations that they had cheated investors out of approximately $6.7 million as part of a prime note fraud.

H.E.B. agreed to pay DSC $850,000 in exchange for a 75% ownership interest in Envoii Technologies.   H.E.B. paid the $850,000 and reacquired the 75% ownership interest in Envoii Technologies, which included "control of the source code and the patents that were a part of it at the time that [it was] sold."[12]

### B.    Ardinger, Somoza, and Litigation

Interested in investment opportunities, Ardinger first met Somoza at his California house in 2003, where they discussed bond trading and insurance.  In July 2003, Ardinger loaned to or invested with Somoza $5,000,000, based on an expected return of 5% per month.  Somoza paid Ardinger the expected returns— $250,000 per month from July to December 2003—but unbeknownst to Ardinger, the funds paid to him were either his own or came from other bilked "investors."[13]

In October 2003, Ardinger lent Somoza another $5,000,000 to purchase a 90-day CD to use towards leveraged bond trading.  Ardinger received his expected returns, but Somoza did not use any of the $5,000,000 for bond trading.[14]

---

[12]H.E.B. subsequently entered into an agreement with the Persistence Capital bankruptcy trustee to acquire the remaining 25% interest.

[13]Somoza did not invest any of the $5,000,000 in bonds.  He used approximately $4,800,000 of the funds to settle with investors involved in the prime note scheme.

[14]Ardinger claimed that at this point, he had no reason to suspect that Somoza was lying to him; Ardinger had received the expected returns on his investments, but he did not realize that the returns were his own money.

In December 2003, Ardinger entered into a joint venture agreement with Persistence Capital and contributed $5,000,000 towards a supposed investment in pools of life insurance.  None of the $5,000,000 was used to purchase any pools of life insurance.

Soon thereafter, on March 9, 2004, Ardinger and Somoza (on behalf of the Somoza Trust and other entities, including Persistence Capital) entered into a "Master Agreement" whereby Ardinger agreed to contribute $10,000,000 to Westland Capital, Inc.—a company owned equally by Ardinger and Somoza, of which Ardinger was supposedly president—to "finance the acquisition of rights in other pools of life insurance."[15]  Through Ardinger Business Development, Inc., an entity controlled by Ardinger and used for business investments, Ardinger caused $10,000,000 to be transferred into Westland's bank account on March 11, 2004.  That same day, without authorization from Ardinger or Westland's board of directors, Somoza transferred $10,000,000 from Westland's bank account to a Persistence Capital escrow account.  The next day, on March 12, 2004, Somoza transferred $1,300,405.04 of the $10,000,000 from Persistence Capital's escrow account to H.E.B.'s account as a payment pursuant to the March 2004 purchase agreement between H.E.B. and DSC.

---

[15]The Master Agreement provided, "No funds shall be transferred from Westland without the written approval of the President and a majority of the Board of Directors."  Ardinger, Somoza, and Coberly were on its board of directors.

By mid-2005, the FBI had begun to investigate Somoza. Ardinger spoke to the FBI on several occasions and learned that Somoza had used much of Ardinger's investment monies to fund Somoza's extravagant lifestyle.[16] Ardinger conducted his own investigation and attempted to recover some of the stolen monies. Lance Ouellette, Ardinger's stepson, who began working with Ardinger in 2001 and was involved in various aspects of Ardinger's companies, recalled that it was not until June or July 2007 that he learned about the $1,300,405.04 paid to H.E.B. from the Persistence Capital escrow account.[17]

In November 2007, Ardinger sued the trustee of the Persistence Capital bankruptcy proceeding and obtained an order declaring that title to the $1,300,405.04 that Somoza caused to be transferred from the Persistence Capital escrow account to H.E.B. in March 2004 never passed from Ardinger to Persistence Capital. In March 2008, Ardinger and Westland sued H.E.B. to recover the $1,300,405.04, alleging claims for money had and received and unjust enrichment, among others.[18] After a bench trial, the trial court found that

---

[16]Ardinger told the FBI that he had received a return of approximately $3,375,000 on his principal investments of $25,000,000 with Somoza. He also confirmed "that it was never his intent that any of his investment monies be used for any purpose other than bond trading or the purchase of insurance policies."

[17]Ardinger's lawyers located H.E.B.'s California lawsuit against DSC and Somoza in November 2005. But Ouellette testified at trial that the complaint did not put him on notice that the $1,300,405.04 had been stolen from Ardinger.

[18]Ardinger and Westland also sued—and obtained a default judgment against—DSC and Somoza, in his individual capacity and as trustee of the Somoza Trust.

"[i]n equity and good conscience, HEB should be required to return [$1,300,405.04] to Mr. Ardinger, the lawful owner of these funds."  The trial court entered numerous other findings of fact and conclusions of law, many of which are challenged by H.E.B. on appeal, and declined to award Ardinger declaratory relief and attorneys' fees.  H.E.B. and Ardinger appeal.

### III.  BALANCING THE EQUITIES—MONEY-HAD-AND-RECEIVED ISSUES

In what we construe to be its second, third, fourth, and fifth issues, H.E.B. (1) challenges the trial court's conclusions of law numbers 3, 4, 9, 13, 24, 25, 31, 34, 37, 38, 39, 40, and 43; (2) argues that the evidence is legally and factually insufficient to support the trial court's findings of fact numbers 14, 15, 16, 19, 22, 42, 44, 47, 48, 69, 70, 73, 79, 80, 81, and 82; (3) complains of Ardinger's alleged failure to secure findings of fact or conclusions of law to support his discovery rule defense; and (4) contends that the trial court abused its discretion by awarding Ardinger judgment on his money-had-and-received claim.

### A.  Standard of Review

A claim for money had and received is equitable in nature.  *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007).  "'[T]he expediency, necessity, or propriety of equitable relief' is for the trial court, and its ruling is reviewed for an abuse of discretion."  *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428–29 (Tex. 2008).  But findings of fact entered in a case tried to the court are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence

supporting a jury's answer, while conclusions of law may be reviewed to determine their correctness based upon the facts. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.*, 307 S.W.3d 816, 823 (Tex. App.—Fort Worth 2010, pet. denied). Thus, the traditional standards of review regarding evidentiary sufficiency overlap the abuse of discretion standard. In cases involving overlapping standards of review, Texas courts have reasoned that a reviewing court must first determine (1) whether the trial court had sufficient information upon which to exercise its discretion and then (2) whether the trial court erred in applying that discretion. *See Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 835 n.6, 836 (Tex. App.—Dallas 2008, pet. denied); *El Paso Cnty. Hosp. Dist. v. Gilbert*, 64 S.W.3d 200, 203–04 (Tex. App.—El Paso 2001, pet. denied). We apply that framework in this case.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In

determining whether there is legally sufficient evidence to support the findings under review, we must consider evidence favorable to the findings if a reasonable factfinder could and disregard evidence contrary to the findings unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

A trial court exercises broad discretion in balancing the equities in a case seeking equitable relief. *Edwards*, 252 S.W.3d at 836. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same

circumstances.  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

**B.    Law**

Money had and received is an equitable action that may be maintained to prevent unjust enrichment when one person obtains money which in equity and good conscience belongs to another.  *Staats v. Miller*, 150 Tex. 581, 584, 243 S.W.2d 686, 687 (1951); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.); *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ) (stating that cause of action for money had and received belongs conceptually to doctrine of unjust enrichment); *see also Edwards*, 252 S.W.3d at 837 n.7 (acknowledging that courts use term "money had and received" interchangeably with other terms for similar claims, including assumpsit, unjust enrichment, and restitution).  The action is not based on wrongdoing; rather, it looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another.  *Amoco*, 946 S.W.2d at 164.  As the supreme court has reasoned,

> [A] cause of action for money had and received is 'less restricted and fettered by technical rules and formalities than any other form of action.  It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff.'

*Staats*, 150 Tex. at 584–85, 243 S.W.2d at 687 (citing *U.S. v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 402, 54 S. Ct. 443, 449 (1934)).

### C.    Consideration for $1,300,405.04

In its second issue, H.E.B. argues that conclusion of law number 3 is

legally erroneous.  Conclusion of law number 3 states,

> 3.    A third party transferee, such as HEB, who receives money from a fraudster (like Somoza/DSC) but provides no value for the money (sale transaction was rescinded and voided and stock returned) is in no better position tha[n] the fraudster in defeating a claim by the rightful owner for recovery of the money wrongfully obtained.  []

In its third issue, H.E.B. argues that the evidence is legally and factually

insufficient to support the trial court's findings of fact numbers 69, 70, 73, and 80,

which state,

> 69.    The $850,000 transferred by HEB was the sole consideration and value provided by HEB for the return of the 75% membership interest in Envoii.  The Rescission Agreement states that the "consideration" is "therein stated," and makes no mention of any refund, credit, or the $1.3M payment by Persistence Capital to HEB.  The Rescission Agreement also does not reference any damages to the disappearing email technology or any other software or technology in Envoii's possession.

> 70.    HEB did not return the $1.3M to Somoza, DSC, Persistence Capital or any other person or entity and did not, after giving effect to the Rescission Agreement, give any consideration or value in exchange for the 75% membership interest in Envoii.

> 73.    In the fall of 2007, Mr. Ardinger learned that his $1.3M had been transferred to HEB for no consideration.

> 80.    On March 12, 2008, less than eighteen months after the Rescission Agreement was executed, less than one year after HEB transferred the last part of the $850,000 to Commercial Escrow Services, Inc. pursuant to the Rescission Agreement, less than six months after Mr. Ardinger discovered that his $1.3M had been transferred to HEB for no consideration, and less than one month after prevailing against Persistence Capital regarding title to

Mr. Ardinger's $1.3M, Mr. Ardinger and Westland filed the present lawsuit.[19]

H.E.B. directs us to caselaw addressing post-transfer disputes between strangers over money, as opposed to a chattel, and contends that courts "are consistent in their protection of innocent third parties and the free flow of commerce." Specifically, "[o]ne who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner." *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211, 216 (Tex. App.—Houston [14th Dist.] 1984, no writ). Thus, "[t]he general rule is that the owner of stolen property can recover it or its value from anyone who has received it and exercised dominion over it." *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e). But *money* "is an exception to the general rule. This [is] because of the necessity that money pass freely in commercial transactions." *Id.* It is well settled that legal title to money passes with delivery to a person who acquires it in good faith *and for valuable consideration*. *Id.*; *see Tri-State Chem., Inc. v. W. Organics, Inc.*, 83 S.W.3d 189, 195 (Tex. App.—Amarillo 2002, pet. denied) (reasoning that "as to personalty *other than money*, a thief cannot pass good title" (emphasis added)). H.E.B. argues that the trial court's conclusions are inconsistent with this caselaw because "[t]here was no failure of consideration at the time of the March

---

[19]As to finding of fact number 80, H.E.B. only challenges the portion that states that "Mr. Ardinger discovered that his $1.3M had been transferred to HEB for no consideration."

2004 Purchase Agreement."   H.E.B. also challenges the sufficiency of the evidence to support the trial court's findings as they relate to the lack of consideration.  H.E.B.'s arguments miss the mark.

There is no dispute that H.E.B. provided consideration to DSC as part of the March 2004 purchase agreement—H.E.B. sold a 75% membership interest in Envoii Technologies in exchange for (1) "Initial Payments" "from [DSC]" totaling $850,000 and (2) $1,300,405.04 at closing (and the promise of future payments). If this were the extent of the transactional history between H.E.B. and DSC over the 75% membership interest in Envoii Technologies, then there would be little doubt that Ardinger would have no right to recover the stolen $1,300,405.04 from H.E.B.  *See Tri-State Chem.*, 83 S.W.3d at 195; *Sinclair*, 268 S.W.2d at 295.  But something happened in November 2006 that affected Ardinger's right to recover the stolen $1,300,405.04:  H.E.B. and DSC agreed to rescind the March 2004 purchase agreement and settle its disputes.[20]  Upon rescission, the rights and liabilities of the parties are extinguished; any consideration paid is returned, together with such further special damage or expense as may have been reasonably incurred by the party wronged; and the parties are restored to their respective positions as if no contract had ever existed.  *See Sharabianlou v.*

---

[20]In H.E.B.'s "Complaint for Rescission of Contract," H.E.B. prayed "[f]or an Order of Rescission, declaring that the [March 2004 purchase agreement] is, as declared by this Court, null and void, ab initio, effective as of and from March 8, 2004, and that as a result thereof, the Sellers remain and are the owners and holders of 75% of the Members Interest in Envoii Technologies, LLC."   The bankruptcy court approved the rescission and settlement agreement.

*Karp*, 181 Cal. App. 4th 1133, 1145, 105 Cal Rptr. 3d 300, 310 (2010) ("Rescission extinguishes the contract . . . , terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received."); *see also Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex. 1987); *Smith v. Nat'l Resort Cmtys. Inc.*, 585 S.W.2d 655, 660 (Tex. 1979); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Indeed, in conclusion of law number 18, which is unchallenged, the trial court concluded that "[b]ecause rescission 'undoes' the agreement, any consideration received under the contract *must be restored*." [Emphasis added.]

Notwithstanding the unambiguous terms of the rescission and settlement agreement, which provide that "DSC agrees to stipulate to judgment for rescission," Haire agreed at trial that the rescission and settlement agreement "undid," "unwound," and "made null and void" the March 2004 purchase agreement. H.E.B. thus reacquired from DSC the 75% ownership interest in Envoii Technologies, *but it returned only $850,000*. As Haire testified, H.E.B. reacquired the 75% membership interest in Envoii Technologies and repaid the $850,000 that the March 2004 purchase agreement credited towards DSC's purchase of the 75% membership interest in Envoii Technologies, but H.E.B. kept the $1,300,405.04 that was also paid as consideration under the terms of

the March 2004 purchase agreement.[21]   Therefore, unless the record demonstrates that H.E.B. agreed to part with some form of consideration in exchange for retaining the $1,300,405.04 that it was previously paid for the 75% membership interest in Envoii Technologies, then H.E.B. retained the $1,300,405.04 for no consideration.  If that is the case, the rule that legal title to money passes with delivery to a person who acquires it in good faith *and for valuable consideration* cannot shelter H.E.B. from Ardinger's equitable claim to recover the stolen $1,300,405.04.  *See Staats*, 150 Tex. at 584–85, 243 S.W.2d at 687 (reasoning that claim for money had and received "aims at the abstract justice of the case").

H.E.B. argues that the evidence conclusively shows that it gave valuable consideration for the $1,300,405.04 because (a) H.E.B. and DSC negotiated, and the bankruptcy court approved, "equitable adjustments to the relative considerations to be exchanged under" the rescission and settlement agreement; (b) H.E.B. "paid back" $850,000 toward the $1,300,405.04 in exchange for the return of the 75% membership interest in Envoii Technologies; and (c) the rescission and settlement agreement involved a settlement and mutual covenant of releases between H.E.B. and DSC.

---

[21]The March 2004 purchase agreement stated that the initial payments ($850,000) "are part of [DSC's] purchase of the Interests from [H.E.B. and Tolson], in addition to the payments required by this Agreement."  Both Haire and Henry Simon, an attorney who has represented Haire or his companies for years, acknowledged this at trial.

The rescission and settlement agreement is governed by and construed in accordance with California law.  "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 810, 71 Cal. Rptr. 2d 265, 276 (1998).  California recognizes the objective theory of contracts, under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956, 135 Cal. Rptr. 2d 505, 514 (2003).

The rescission and settlement agreement states that the parties have entered into it "for the consideration therein stated" and provides that it "contains the entire understanding between the Parties concerning the subject matter contained herein."  It states that "DSC agrees . . . to transfer its seventy-five (75) percent ownership interest in Envoii Technology, LLC . . . to HEB to be held in escrow until the Payment Terms are met."  The payment terms call for H.E.B. to pay to DSC $850,000 by March 24, 2007, pursuant to a particular schedule, which H.E.B. did.  Nowhere in the rescission and settlement agreement does it state that H.E.B. exchanged anything for the $1,300,405.04.[22]  Thus, the unambiguous terms of the rescission and settlement agreement do not support H.E.B.'s contentions that it gave consideration to retain the $1,300,405.04 in the

---

[22]Haire even agreed at trial that the rescission and settlement agreement does not characterize the payments as a refund of the $1,300,405.04.

form of "equitable adjustments" or by "pa[ying] back" $850,000 towards the $1,300,405.04.[23]

H.E.B.'s other argument—that the consideration for the $1,300,405.04 involved the mutual covenant of releases between H.E.B. and DSC—is equally unpersuasive.  The rescission and settlement agreement indeed provides that each party agrees to release the other from "any and all claims or causes of any kind relating to the contractual agreements made the basis of the Lawsuit," but there is nothing therein indicating that H.E.B. retained the $1,300,405.04 in exchange for DSC's release.  Along the line of mutual releases, the record does demonstrate that on the same date that the bankruptcy court approved the rescission and settlement agreement, the court dismissed the involuntary bankruptcy proceeding that H.E.B. had initiated against DSC.  That was a mutual release as contemplated by the rescission and settlement agreement.

_____

[23]There is also no evidence that the bankruptcy court "approved" any claimed equitable adjustments to the considerations exchanged.  The $1,300,405.04 is not mentioned in the rescission and settlement agreement nor was it addressed at the settlement hearing.  The only discussion at the settlement hearing of the consideration exchanged was the following:

THE COURT:   So the payment is basically a return of consideration.

MR. KUHNER:  It's a lesser amount --

THE COURT:   Yeah, but in that nature.

MR. KUHNER:  That's right.

THE COURT:   Okay.  Okay.

H.E.B. additionally contends that California rescission law, like Texas, takes into account not just the consideration previously exchanged but also subsequent damage or injury to the consideration or parties involved and that "[w]hile Envoii was in the possession and control of Somoza (via DSC), the value of its technology and patents was diminished due to mismanagement by Somoza and DSC." Thus, according to H.E.B., consideration in the form of damage to the membership interest accounted for H.E.B.'s retention of the $1,300,405.04. The only part of the rescission and settlement agreement that relates to H.E.B.'s devaluation argument is section 8.01, titled "EXPLANATION OF DELAY IN PROSECUTION OF PATENT(S)," which provides as follows:

> 8.01   The Parties understand that certain patents identified as part of the March 8, 2004 contract, a listing of which is attached hereto as Exhibit "C" continue to pend before the United States Patent and Trademark Office ("USPTO"). Each Party, upon request of the other or the USPTO, will provide due and adequate explanation regarding the prior legal proceedings in state and federal bankruptcy court and the consequent effect of delaying the prosecution of the patent applications.

This part of the rescission and settlement agreement merely provides that certain patents remain pending and that upon request, each party will provide an explanation of legal proceedings related to the "effect of delaying the prosecution of the patent applications." Section 8.01 is no evidence that H.E.B. retained the $1,300,405.04 in consideration for damage to the 75% membership interest reacquired from DSC.

Contrary to the terms of the rescission and settlement agreement, Haire testified that the 75% membership interest reacquired by H.E.B. was "devalued" because Somoza failed to prosecute the patents involved in the original transaction with H.E.B. and because licenses were cancelled.  But there was no evidence from any source of any particular amount of damages attributable to the devaluation of the 75% membership interest, let alone in the specific amount of $1,300,405.04.  In other words, H.E.B. did not establish a link between the "devalued" membership interest that it reacquired and its retention of $1,300,405.04.  Further, the parol evidence rule prevented the trial court from giving any legal effect to Haire's testimony because it either varied or conflicted with the unambiguous terms of the fully integrated rescission and settlement agreement.  *See Johnson v. Driver*, 198 S.W.3d 359, 364 (Tex. App.—Tyler 2006, no pet.) ("The parol evidence rule is not a rule of evidence, but a rule of substantive law that bars the court from consideration of evidence violative of the rule, even though it is admitted without objection.").  To the extent that H.E.B. argues that it retained $1,300,405.04 on account of its reacquisition of a "devalued" 75% membership interest in Envoii Technologies, the record does not support that specific contention.

We hold that the trial court did not err by entering conclusion of law number 3 and that the evidence is legally and factually sufficient to support findings of fact numbers 69, 70, 73, and 80.  We overrule these parts of H.E.B.'s second and third issues.

**D.      Statute of Limitations and Accrual**

**1.      Challenged Conclusions and Findings**

In its second issue, H.E.B. challenges conclusions of law numbers 38, 39,

and 40, arguing that Ardinger's claim for money had and received is governed by

the two-year statute of limitations and was time barred.  Those conclusions state,

> 38.      Texas courts, including the Fort Worth Court of Appeals, have held that money had and received is in the nature of an action for debt and is thereby controlled by the four-year statute of limitations.  []

> 39.      An action for money had and received is a quasi-contractual action, and contractual actions are governed by a four-year statute of limitations.  []

> 40.      HEB cites two cases that supposedly hold that a claim for money had and received is subject to a two-year statute of limitations, *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869 (Tex. 2007), and *Verizon Employee Benefits Comm. v. Frawley*, 655 F.Supp.2d 644 (N.D. Tex. 2008).   Neither case supports HEB's proposition.   *Elledge* dealt with a claim for unjust enrichment and held only that *unjust enrichment* claims are governed by a two-year statute of limitations.  *Elledge*, 240 S.W.3d at 870.   The *Elledge* court does not even discuss the claim for money had and received.  *Verizon* dealt with an ERISA claim against an employee for recoupment of overpaid employee benefits.   The federal court merely compared the *ERISA* claim to a claim for money had and received on the basis that it [bore] the most similarity" to the ERISA claim for recoupment.   Thus, the federal court merely speculated in *dicta* as to what it thought Texas law *might* be, were it actually considering a claim for money had and received, which it was not.

H.E.B. also challenges conclusion of law number 43,[24] which addresses accrual for purposes of Ardinger's claim for money had and received and provides,

> 43.   Ardinger had no legal remedy, *i.e.*, no cause of action, against HEB until HEB executed the Rescission Agreement on November 8, 2006, made final payment under the Rescission Agreement on March 28, 2007, and was returned the consideration (the 75% membership interest in Envoii) it had received for Ardinger's $1.3M.  []

H.E.B. argues that a claim for money had and received is subject to the two-year statute of limitations because a claim for unjust enrichment, which by definition includes a cause of action for money had and received, is governed by the two-year statute of limitations.  *See Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870–71 (Tex. 2007).  Regarding accrual, it argues that a claim for money had and received accrues when money is "had and received" and that Ardinger's claim therefore accrued when H.E.B. "had and received" the stolen $1,300,405.04 in March 2004.   Ardinger responds that the four-year statute of limitations applies to a claim for money had and received and that his claim accrued when H.E.B. executed the rescission and settlement agreement in November 2006 but retained the $1,300,405.04.

"A legal injury must be sustained . . . before a cause of action arises" for limitations purposes.  *Atkins v. Crossland*, 417 S.W.2d 150, 153 (Tex. 1967); *see S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) ("As a rule, we have held that a cause

---

[24]In its third issue, H.E.B. challenges finding of fact number 79, which is duplicative of conclusion of law number 43.

of action accrues when a wrongful act causes some legal injury . . . ."). Assuming without deciding that the two-year statute of limitations applies to Ardinger's claim for money had and received, his claim was not time barred because he brought the action against H.E.B. within two years of when it accrued—at earliest, in November 2006, when H.E.B. executed the rescission and settlement agreement and was returned the 75% membership interest in Envoii Technologies but retained the $1,300,405.04 for no consideration. Ardinger's claim against H.E.B. did not accrue before this time because, as alluded to above, H.E.B. acquired the stolen $1,300,405.04 for consideration (the 75% membership interest in Envoii Technologies), and until H.E.B. rescinded the March 2004 purchase agreement and retained the $1,300,405.04 for no consideration, H.E.B. had not committed a wrongful act that caused Ardinger a legal injury. *See Tri-State Chem.*, 83 S.W.3d at 195; *Sinclair*, 268 S.W.2d at 295. But when H.E.B. reacquired the 75% membership interest in Envoii Technologies and retained the $1,300,405.04 for no consideration, Ardinger's claim accrued because H.E.B. caused Ardinger legal injury.  *See Atkins*, 417 S.W.2d at 153; *see also Tri-State Chem.*, 83 S.W.3d at 195; *Sinclair*, 268 S.W.2d at 295. Accordingly, Ardinger's March 2008 suit against H.E.B. was not time barred.

We hold that the trial court did not err by entering conclusion of law number 43.  To the extent that conclusions of law numbers 38, 39, and 40 are erroneous, they are harmless because we assumed for purposes of our analysis that the two-year statute of limitations applied to Ardinger's claim.  *See* Tex. R.

App. P. 44.1(a); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) ("If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal.").  We overrule this part of H.E.B.'s second and third issues.

### 2.    Lack of Findings and Conclusions for Discovery Rule Defense

In what we construe to be its fourth issue, H.E.B. complains of Ardinger's alleged failure to secure findings of fact or conclusions of law to support his discovery rule defense to the two-year statute of limitations.  Above, we assumed for purposes of our analysis that the two-year statute of limitations applied to Ardinger's money-had-and-received claim, and we held that the trial court did not err by entering conclusion of law number 43—that Ardinger's money-had-and-received claim did not accrue until November 2006.  Because Ardinger filed his claim against H.E.B. in March 2008, his discovery rule defense is not implicated, and we need not address H.E.B.'s arguments pertaining to it.  *See* Tex. R. App. P. 47.1.  We overrule H.E.B.'s fourth issue.

### E.    Unconscionable Loss and Unjust Enrichment

In its second issue, H.E.B. argues that the trial court erred by entering conclusions of law numbers 24 and 25,[25] which provide,

---

[25]In its third issue, H.E.B. challenges finding of fact number 81, which is duplicative of conclusions of law numbers 24 and 25.

24.    HEB will be unjustly enriched if not required to restore the $1.3M received as it provided nothing for these funds.  []

25.    Ardinger would suffer an unconscionable loss—the $1.3M—if HEB is permitted to keep Ardinger's funds.  []

H.E.B. contends that Ardinger has no right to the $1,300,405.04 because the funds came from Westland, not Ardinger.   In finding of fact number 19, however, the trial court found that Ardinger "contributed $10,000,000 to Westland's Bank of America account, via transfer from Ardinger Business Development, Inc.'s JP Morgan Private Bank account, controlled by Mr. Ardinger. Mr. Ardinger later reimbursed Ardinger Business Development, Inc. for these funds.  *As such, the entirety of this $10,000,000 was funded by Mr. Ardinger.*"[26] [Emphasis added.]  The record also demonstrates that Ardinger sued the trustee of the Persistence Capital bankruptcy proceeding and obtained an order declaring that title to the $1,300,405.04 that Somoza caused to be transferred from the Persistence Capital escrow account to H.E.B. in March 2004 never passed *from Ardinger* to Persistence Capital.  The trial court's conclusion of law number 77, which is unchallenged, reflects this.

_____

[26]In its brief, H.E.B. listed finding of fact number 19 in the title of its third issue challenging the legal and factual sufficiency of the evidence to support the trial court's findings of fact, but it provided no argument for that specific ground. Accordingly, to the extent that H.E.B. argues the evidence does not support finding of fact number 19, H.E.B. waived that argument for appellate review.  *See* Tex. R. App. P. 38.1(i) (requiring brief to contain clear and concise argument for the contentions made with appropriate citations to authorities); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing "long-standing rule" that issue may be waived due to inadequate briefing).

Citing several cases that rely on the same proposition, H.E.B. also argues that "equity dictates that as between two innocent parties, the party that must suffer the loss is the one who mistakenly created the situation and was in the best position to have avoided it." *See Holden Bus. Forms Co. v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 83 S.W.3d 274, 278 (Tex. App.—Fort Worth 2002, no pet.); *Lincoln Nat'l Life Ins. Co. v. Brown Schools, Inc.*, 757 S.W.2d 411, 413–15 (Tex. App.—Houston [14th Dist.] 1988, no pet.).  This is an exception to the general rule of restitution that "a party who pays funds under a mistake of fact may recover restitution of those funds if the party to whom payment was made has not materially changed his position in reliance thereon."  *See Bryan v. Citizens Nat'l Bank in Abiline*, 628 S.W.2d 761, 763 (Tex. 1982).  The exception in the *Holden* and *Lincoln* decisions is inapposite because Ardinger did not sue H.E.B. to recover money that he mistakenly paid to H.E.B.  Ardinger sued H.E.B. to recover money that was stolen by Somoza, a fraudster; used by a Somoza-controlled entity in furtherance of a separate business agreement and consequently acquired by another entity, H.E.B.; but then retained by H.E.B. for no consideration after the underlying agreement that brought the funds to H.E.B. was rescinded.  In no way does this set of circumstances implicate the exception addressed in *Holden* and *Lincoln*.

Referencing its consideration argument, H.E.B. also argues that it was not unjustly enriched but also "not enriched at all."  This argument is unpersuasive in

light of our analysis above that H.E.B. retained the $1,300,405.04 for no consideration.

We hold that the trial court did not err by entering conclusions of law numbers 24 and 25.  We overrule this part of H.E.B.'s second and third issues.

### F.      Additional Challenged Conclusions of Law

####     1.      Conclusions of Law Numbers 4 and 31

Conclusions of law numbers 4 and 31 provide,

> 4.      The claim for money had and received allows someone who has funds stolen to recoup those stolen funds from *anyone* who received it, *even a third party who received it in good faith for value*.  []

> 31.      "[T]he unjust enrichment for the purposes of restitution… comes by way of receiving that which actually belongs to another.  It does not matter that the ultimate recipient paid value…."  []

H.E.B. argues that conclusions of law numbers 4 and 31 are erroneous because unlike with a chattel, one may not recover money from a third party who received it in good faith and for value.  We agree that the law provides that legal title to money passes with delivery to a person who acquired it in good faith and for valuable consideration.  *See Tri-State Chem.*, 83 S.W.3d at 195; *Sinclair*, 268 S.W.2d at 295.  But it is apparent that conclusions of law numbers 4 and 31 are meant to address the unique facts of the money-had-and-received claim that are at issue in *this* case—one in which, using the above lingo, a person (H.E.B.) acquired "money" ($1,300,405.04 and $850,000) for "valuable consideration" (75% membership interest in Envoii Technologies) pursuant to an underlying

agreement that was *rescinded*, but the person (H.E.B.) not only reacquired the "valuable consideration" (75% membership interest in Envoii Technologies) originally exchanged but also kept for no consideration part of the "money" ($1,300,405.04) received pursuant to the underlying—but now rescinded—agreement.   Thus, considered in light of the specific facts of this case, conclusions of law numbers 4 and 31 are not erroneous.   To the extent that the conclusions are considered in a vacuum and are erroneous, they are harmless. *See* Tex. R. App. P. 44.1(a); *BMC Software*, 83 S.W.3d at 794.   We overrule this part of H.E.B.'s second issue.

### 2.   Conclusions of Law Numbers 9 and 13

Conclusions of law numbers 9 and 13 provide,

> 9.    Whether HEB acquired money in good faith or wrongfully is irrelevant in a claim for money had and received because the action is not premised on wrongdoing.  []

> 13.    Whether money was obtained *lawfully* by the defendant is likewise irrelevant; an action for money had and received is proper when the money was obtained wrongfully from the rightful owner.  []

H.E.B. argues that conclusions of law numbers 9 and 13 misstate the law of money had and received because money-had-and-received claims "do, indeed, take into account issues of good faith/bad faith or lawful/unlawful conduct in balancing the equities and determining whether money, in equity and good conscience, belongs to another."   But the trial court also entered conclusion of law number 26, which is unchallenged, and states that "[t]hough wrongful behavior by the defendant is not required to hold a defendant liable to restore

plaintiff's funds, the court may consider lack of innocence in balancing the equities in a claim for money had and received."  The trial court also concluded in conclusion of law number 10, which is unchallenged, that "the *sole* inquiry for the court is whether the defendant holds money that in equity and good conscience belongs to the plaintiff."  These conclusions indicate that the trial court did not disregard evidence of H.E.B.'s "good faith/bad faith or lawful/unlawful" conduct when it balanced the equities and determined whether the $1,300,405.04, in equity and good conscience, belonged to Ardinger.  At worst, conclusions of law numbers 9 and 13 are little more than attempts at referencing the well-established rule that a money-had-and-received claim looks to the justice of the case and inquires whether the defendant received money that rightfully belongs to another instead of basing recovery on the defendant's wrongdoing.  *See Amoco*, 946 S.W.2d at 164.  Consequently, as with conclusions of law numbers 4 and 31, to the extent that conclusions of law numbers 9 and 31 are considered apart from the trial court's other conclusions of law, they are harmless error.  *See* Tex. R. App. P. 44.1(a); *BMC Software*, 83 S.W.3d at 794.  We overrule this part of H.E.B.'s second issue.

### 3.    Conclusion of Law Number 37

Conclusion of law number 37 states,

> 37.    It does not matter that HEB allegedly spent the $1.3M.  []

H.E.B. argues that the trial court erred by entering conclusion of law number 37 because H.E.B.'s expenditure of the $1,300,405.04—and alleged detrimental reliance on DSC's purported lawful payment—is not irrelevant when addressing the equities of Ardinger's money-had-and-received claim.  In *Pickett v. Republic National Bank of Dallas*, the supreme court held that the defendant was liable under a money-had-and-received claim even though it no longer held the money.  619 S.W.2d 399, 400 (Tex.), *cert. denied*, 454 U.S. 1125 (1981). We construe conclusion of law number 37 as an attempt to express this point of law, not a conclusion that the trial court did not consider detrimental reliance, if any, by H.E.B. when weighing the equities.[27]  We overrule this part of H.E.B.'s second issue.

### 4.    Conclusion of Law Number 34

Conclusion of law number 34 provides,

> 34.    An action for conversion can arise even when a defendant acquires property lawfully.  []

H.E.B. argues that we should disregard conclusion of law number 34 because it relates to conversion, a claim rejected by the trial court and not relevant to any other findings of fact or conclusions of law.  The trial court erred by entering conclusion of law number 34, but it was harmless because the conclusion does

---

[27]A federal district court cited *Pickett* and reasoned, "The fact that [Appellee] no longer possesses the money is irrelevant."  *Newington Ltd. v. Forrester*, No. 3:08-CV-0864-G ECF, 2008 WL 4908200, at *5 (N.D. Tex. Nov. 13, 2008) (mem. op.).  This could be the source of the language used in conclusion of law number 37.

not relate to Ardinger's recovery against H.E.B.  *See* Tex. R. App. P. 44.1(a);

*BMC Software*, 83 S.W.3d at 794.  We overrule the remainder of H.E.B.'s second

issue.

### G.    Additional Challenged Findings of Fact

### 1.    Finding of Fact Number 14

Finding of fact number 14 provides as follows:

> 14.    In March 2004, Somoza completed his review of the accounting provided to him regarding the $720,000 paid to Envoii and HEB from the Somoza Trust, and raised several objections regarding the propriety of payments made by HEB.  One of the disputed payments concerned a $15,000 fee paid to HEB's attorney, Henry Simon, for introducing Somoza to HEB.   The parties negotiated further and agreed on March 8, 2004 at a meeting in Los Angeles, California that the transaction would continue but that Somoza would be given a $349,594.96 price reduction as full satisfaction of Somoza's objections regarding the accounting for the $720,000, *and the parties agreed to a new Membership Interest Purchase Agreement (the "Purchase Agreement") between HEB and Somoza's company, Digitally Secured Communications, Inc. ("DSC")*.  The Purchase Agreement called for HEB (and one of its employees) to be paid between $5 million and $8 million for the remaining 75% membership interest in Envoii, including a credit in the amount of $850,000 for the amounts previously paid by the Somoza Trust to HEB and $1,300,405.04 to be paid to HEB (the "$1.3M") at the execution of the Purchase Agreement.   The next payment of $1,250,000 was due to HEB on August 2, 2004.  DSC failed to make that payment or any other payment due under the Purchase Agreement.

[Emphasis added.]  H.E.B. argues that the finding "suggests" that it was involved

in the decision to substitute DSC for the Somoza Trust as the "Buyer" but that the

evidence actually shows that Somoza substituted DSC as the "Buyer" in the final

hours  preceding  the  March  2004  purchase  agreement's  execution.

Notwithstanding that we fail to see the significance of H.E.B.'s challenge to finding of fact number 14, the record is undisputed that Somoza's substitution of DSC as the purchaser was a "last-minute change made by Somoza."  Neither finding of fact number 14 nor the record contains any suggestion that H.E.B. had anything to do with Somoza's decision to substitute DSC for the Somoza Trust. Finding of fact number 14 merely sets out some of the circumstances surrounding H.E.B. and DSC's entering into the March 2004 purchase agreement.  The evidence is legally and factually sufficient to support finding of fact number 14.  We overrule this part of H.E.B.'s third issue.

### 2.      Finding of Fact Number 15

Finding of fact number 15 provides as follows:

> 15.    Less than 24 hours prior to the execution of the Purchase Agreement, Somoza substituted a new company, DSC, as the purchaser.  *At the time, Somoza represented to HEB that DSC already held the 25% ownership interest which had been held by the Somoza Trust.*  Somoza also represented to HEB that he was the president and sole shareholder of DSC and that DSC would become the manager of Envoii.

[Emphasis added.]  H.E.B. argues that the evidence conclusively demonstrates that the Somoza Trust, not DSC, owned the 25% membership interest in Envoii Technologies that was purchased in October 2003.  Although the rescission and settlement agreement reflected that the Somoza Trust continued to own a 25% ownership interest in Envoii Technologies, Somoza testified in his January 2006 deposition that DSC owned a 25% membership interest in Envoii Technologies in

March 2004 because the Somoza Trust had transferred that interest to DSC.[28]

Also, the March 2004 purchase agreement, which is between H.E.B. and DSC, states that the "Sellers and Buyer are the owners and holders of a total of 100% of the Member's Interests . . . in Envoii Technologies."  We hold that the evidence is legally and factually sufficient to support finding of fact number 15, and we overrule this part of H.E.B.'s third issue.

### 3.   Finding of Fact Number 42

Finding of fact number 42 provides as follows:

> 42.   The FBI Affidavit did not mention Haire, HEB, Mr. Ardinger's $1.3M, or any transactions involving DSC, which highlights the difficulty of discovering the full extent of Somoza's fraud.

H.E.B. argues that the evidence conclusively demonstrates that "the $10,000,000 (source of the $1.3M), as well as the other $15,000,000, for a total of all $25 million, was addressed in the FBI Affidavit and discussed with Ardinger" and, therefore, "[a]s a matter of common sense, Ardinger's discussion with the FBI about the stolen $25 million highlights that Ardinger knew all $25 million had been stolen, including the $1.3M."  The stolen $1,300,405.04 was part of the funds that Ardinger invested with Somoza, but that does not make it a matter of "common sense" that Ardinger knew that Somoza had taken the $1,300,405.04 and used it to pay H.E.B.  The FBI affidavit does not mention H.E.B., Haire, DSC, or the $1,300,405.04.  We hold that the evidence is legally and factually sufficient

---

[28]This portion of the deposition excerpt was admitted at trial.

to support finding of fact number 42, and we overrule this part of H.E.B.'s third issue.

### 4.    Findings of Fact Numbers 44 and 47

H.E.B. challenges findings of fact numbers 44 and 47, which provide,

> 44.    Henry Simon spoke to the FBI regarding Somoza's arrest and knew, or assumed, that Somoza had funded the $1.3M payment by Persistence Capital to HEB with funds stolen from Mr. Ardinger.

> 47.    Mr. Simon, at the time he sent the above-quoted e-mail on June 19, 2006, had read the FBI Affidavit, making him certain that Somoza had stolen from Mr. Ardinger the $1.3M paid by Persistence Capital to HEB.  Neither Mr. Simon, Haire or HEB ever contacted or informed Mr. Ardinger that HEB had received funds stolen from Mr. Ardinger.

H.E.B. argues that the evidence is legally and factually insufficient to support these findings because they contradict finding of fact number 42.  Specifically, H.E.B. questions how the trial court could find that Simon knew after reading the FBI affidavit that Somoza stole the $1,300,405.04 paid to H.E.B. while also finding that Ardinger did *not* know about the stolen $1,300,405.04 after reading the same FBI affidavit.  Simon testified at one point that he did not know that Somoza stole the $1,300,405.04 from Ardinger.  However, the evidence also shows that Simon learned that DSC's $1,300,405.04 payment (through Somoza) under the March 2004 purchase agreement was made to H.E.B. using the Persistence Capital escrow account; that by June 2006, Simon had read the FBI affidavit and the May 2006 press release, "all of which reflected Persistence Capital as being the entity through which the monies had been stolen in

connection with the insurance pool fraud"; and, significantly, that it was possible that someone had told him in the summer of 2006 that the $1,300,405.04 used to pay H.E.B. came from Ardinger.  In regard to being told that the $1,300,405.04 came from Ardinger, Simon testified, "I would think that somebody probably told me that after the indictment in some way, but I don't know who."  As the factfinder, the trial court was entitled to resolve the conflicts in Simon's testimony in favor of Ardinger.  *See City of Keller*, 168 S.W.3d at 820.  We hold that the evidence is legally and factually sufficient to support the trial court's findings of fact numbers 44 and 47.  We overrule this part of H.E.B.'s third issue.

### 5.    Finding of Fact Number 48

Finding of fact number 48 states,

> 48.    Fearing a "Mad dog attack" by defrauded investors, HEB did not want to implicate the Persistence Capital Bankruptcy because it would require notice to other creditors, including many defrauded insurance pool creditors like Mr. Ardinger.

As with several other findings, H.E.B. challenges this finding not for what it specifically states but for what it "suggests."   H.E.B. argues that the finding suggests that H.E.B. had a duty to notify DSC's creditors about the involuntary proceeding involving DSC and H.E.B. even though they had no such duty under law.  The record demonstrates that the finding is actually meant to reference a June 2006 email drafted by Simon in which he told Somoza's counsel that he was "fine" with rescinding the March 2004 purchase agreement but "want[ed] to get all the paperwork done ASAP before we run into a 'Mad dog' attack from one

or more of the allegedly defrauded insurance pool creditors" involved in the Persistence Capital bankruptcy.  The finding is also supported by the following exchange at trial between Simon and Ardinger's attorney in which Simon acknowledged that he was concerned about defrauded insurance pool investors attempting to recoup losses from whatever source they could, including from Envoii Technologies' assets:

> Q.     And there's a reference of -- that economics are fine and that you're okay with that.  And then the next sentence says, quote, "I do, however, want to get all the paperwork done asap before we run into a mad dog attack from one or more of the allegedly defrauded insurance pool creditors," end of quote.  Do you see that?

> A.     I do.

>           . . .

> Q.     Did you believe at that particular time that H.E.B. needed to get a deal done very quickly because of the potential risk associated with the defrauded insurance pool creditors looking to be paid from whatever source they could find?

> A.     Yes, I thought they were the -- what I had been told or what I called the defrauded insurance pool creditors were people that had given Somoza money believing he was making investments for them, which he did not, and they were -- they were very angry.  Conroy told me how angry they were, and it seemed very likely to me that if they got wind of the transaction with Digitally Secured Communications they would intervene.

> Q.     And they would do anything they could to make sure that any consideration that was going to Mr. Somoza or under his control would be directed to them, right?

> A.     I might say in the event -- they didn't do that, but that was what my fear was, yes.

We overrule this part of H.E.B.'s third issue.

### 6.    Findings of Fact Numbers 16 and 22

As with finding of fact number 19, H.E.B. listed findings of fact numbers 16 and 22 in the title of its third issue challenging the legal and factual sufficiency of the evidence to support the trial court's findings of fact, but it provided no argument for those two specific grounds.[29]   Accordingly, to the extent that H.E.B. challenges the legal and factual sufficiency of the evidence to support findings of fact numbers 16 and 22, H.E.B. waived those arguments for appellate review. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank*, 881 S.W.2d at 284.   We overrule this part of H.E.B.'s third issue.

### H.    Abuse of Discretion

In what we construe to be its fifth issue, H.E.B. argues that even if we overrule its challenges to the trial court's findings and conclusions, as we have done, the trial court still abused its discretion by awarding judgment in favor of

---

[29]Findings of fact numbers 16 and 22 state,

16.    The $1.3M payment under the Purchase Agreement to HEB was not made by DSC; instead, it was made by Persistence Capital, LLC of which Somoza was a member and controlled.

22.    On March 12, 2004, without written authorization from or knowledge of Mr. Ardinger (Westland's President) or Westland's board of directors, Somoza transferred $1.3M of Ardinger's $10,000,000 from Persistence Capital's Bank of America escrow account to HEB's account at Branch Banking & Trust Company as partial payment under the Purchase Agreement.

Ardinger on his money-had-and-received claim.[30]  H.E.B. repeats many, if not all, of the arguments that we have already addressed—and rejected—in reviewing the trial court's findings and conclusions.

We have reviewed the entire record that the trial court considered in weighing the equities involved in this case.  There is evidence that supports Ardinger's claim for money had and received and evidence that does not support Ardinger's claim.  But in balancing all of the equities of the case, there is one piece of evidence that the trial court reasonably could have assigned considerable weight in favor of Ardinger: H.E.B. rescinded the March 2004 purchase agreement but kept the $1,300,405.04 instead of returning it to DSC, which unchallenged conclusion of law number 18 indicates was required of H.E.B.  An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision.  *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).  That is precisely the case here.  Accordingly, we hold that the trial court neither acted without reference to any guiding rules or principles, nor acted arbitrarily or unreasonably—and therefore did not abuse its discretion—by awarding judgment for Ardinger on his claim for money had and received.  *See*

---

[30]In its third issue, H.E.B. challenges finding of fact number 82, which states, "In equity and good conscience, HEB should be required to return $1.3M to Mr. Ardinger, the lawful owner of these funds."  H.E.B. directs us to this, its fifth issue, for its argument under this ground.

*Low*, 221 S.W.3d at 614; *Staats*, 150 Tex. at 584, 243 S.W.2d at 687.   We overrule H.E.B.'s fifth issue and the remainder of its third issue.

## IV.  COLLATERAL ATTACK

In what we construe to be H.E.B.'s first issue, it argues that the trial court erred by allowing Ardinger to collaterally attack the DSC bankruptcy court order approving the rescission and settlement agreement between H.E.B. and DSC.

A collateral attack is an attempt to avoid the binding force of a judgment in a proceeding not instituted for that purpose, but in order to obtain some specific relief against which the judgment currently stands as a bar.  *Sweetwater Austin Props., L.L.C. v. SOS Alliance, Inc.*, 299 S.W.3d 879, 885 (Tex. App.—Austin 2009, pet. denied).  Collateral attacks on final judgments are generally disallowed because it is the policy of the law to give finality to the judgments of the courts. *Browning v. Prostok*, 165 S.W.3d 336, 345 (Tex. 2005).

Ardinger's claim against H.E.B. for money had and received is not an impermissible collateral attack on the DSC bankruptcy court order because Ardinger did not attempt to avoid or alter the binding force of the bankruptcy court order.  Instead, Ardinger sought to recover $1,300,405.04 from H.E.B. because H.E.B. retained those funds for no consideration after executing the rescission and settlement agreement.  We overrule H.E.B.'s first issue.

## V. DECLARATORY JUDGMENT

In his first issue, Ardinger argues that the trial court erred by not granting his request for declaratory relief. Ardinger had sought a declaration that his "rights and interests in the $1,300,405.04 at issue in this case are superior to the rights of HEB[,] and HEB is without any legal right to retain such funds."

The supreme court recently clarified that the Uniform Declaratory Judgment Act (UDJA) is "preventative" in nature—it is generally intended as a means of determining the parties' rights when a controversy has arisen but before a wrong has been committed. *Etan Indus., Inc. v. Lehmann*, No. 10-0318, 2011 WL 6276308, at *4 (Tex. Dec. 16, 2011) (citing *Cobb v. Harrington*, 144 Tex. 360, 367, 190 S.W.2d 709, 713 (1945)); *Redwine v. AAA Life Ins. Co.*, 852 S.W.2d 10, 17 (Tex. App.—Dallas 1993, no writ) (reasoning that UDJA is not available to settle disputes already pending before a court); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West 2008).

Here, Ardinger argued throughout trial and in this appeal that he did not suffer a legal injury at H.E.B.'s hands until H.E.B. executed the rescission and settlement agreement and retained the $1,300,405.04 for no consideration. Having then suffered a legal injury, Ardinger sued H.E.B. in March 2008 to recover $1,300,405.04 that Ardinger contended, in equity and good conscience, belonged to him. Thus, at no point during this litigation has Ardinger sought declaratory relief to determine his right to the $1,300,405.04 before a wrong had been committed against him. Rather, he has essentially sought declaratory relief

to supplement his claim against H.E.B. for money had and received.[31]   That is
not the type of relief that the UDJA is intended to provide.   Accordingly, we hold
that the trial court did not err by denying Ardinger's claim for declaratory relief,
and we overrule Ardinger's first issue.

## VI. ATTORNEYS' FEES

### A.   Ardinger's Attorneys' Fees

In part of his second issue, Ardinger argues that the trial court abused its
discretion by not awarding him reasonable and necessary attorneys' fees
pursuant to his requested declaratory relief.   Having determined that the trial
court did not err by denying Ardinger's request for declaratory relief, we hold that
the trial court did not abuse its discretion by declining to award Ardinger
attorneys' fees pursuant to his requested declaratory relief.   *See* Tex. Civ. Prac.
& Rem. Code Ann. § 37.009 (West 2008) (providing that trial court may award
reasonable and necessary attorneys' fees "as are equitable and just").

In the other part of his second issue, Ardinger argues that the trial court
abused its discretion by not awarding him attorneys' fees for prevailing on his
claim for money had and received.   Texas law does not allow recovery of
attorneys' fees unless authorized by statute or contract.   *Tony Gullo Motors I,
L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006).   Ardinger does not argue that

---

[31]Nor did Ardinger seek to recover under a contract.   *See MBM Fin. Corp.
v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009) (reasoning
that UDJA provides relief in contract cases before or after there has been a
breach).

his claim for money had and received is either a statutory or a contract action. The only support that Ardinger cites for this issue is *Amoco*. *See* 946 S.W.2d at 166. In that case involving a money-had-and-received claim, the appellate court reasoned that "[a]n award of attorney's fees in such a case may under some circumstances be appropriate, but we find it to be within the discretion of the trial court." *Id.*

We do not have to decide today whether a party may recover attorneys' fees on a claim for money had and received because even assuming that a trial court may award attorneys' fees on that claim, the trial court here nonetheless did not abuse its discretion. In *Amoco*, the appellate court held that the trial court did not abuse its direction by refusing to award attorneys' fees because "the overpayment to appellees was due to Amoco's own error rather than a breach or any wrongdoing on the part of appellees." *Id.* Similarly, along those equity lines, in this case, the trial court could have reasonably considered several of the equities that weighed in favor of H.E.B.—including that Ardinger had invested $25,000,000 with Somoza by March 2004 and had concerns about his investments around that same time but did not check Westland's bank records for over a year—and declined to award Ardinger attorneys' fees. Accordingly, assuming without deciding that the trial court could award attorneys' fees, we hold that the trial court did not abuse its discretion by denying Ardinger's request for attorneys' fees pursuant to his claim for money had and received. We overrule the remainder of Ardinger's second issue.

**B.** **H.E.B.'s Attorneys' Fees**

In what we construe to be its sixth issue, H.E.B. argues that the trial court abused its discretion by not awarding H.E.B. attorneys' fees because Ardinger did not prevail on his claim for declaratory relief.  The UDJA does not require an award of attorneys' fees to the prevailing party; rather, the statue "affords the trial court a measure of discretion in deciding whether to award attorney fees or not." *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998).  Considering that Ardinger merely sought declaratory relief to supplement his claim against H.E.B. for money had and received, the primary claim pursued by Ardinger, we hold that the trial court could have reasonably determined that it would not have been equitable and just to award H.E.B. reasonable and necessary attorneys' fees as the prevailing party on the declaratory relief action.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009.  We overrule H.E.B.'s sixth issue.

## VII. CONCLUSION

Having overruled all of H.E.B.'s issues, we affirm the trial court's judgment awarding Ardinger $1,300,405.04.  Having overruled Ardinger's cross-issues, we affirm the trial court's judgment declining to award Ardinger declaratory relief and attorneys' fees.

BILL MEIER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  March 22, 2012