```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                       CASE NO. 11-CR-60150-MGC

 3

     UNITED STATES OF AMERICA,
 4
                         Plaintiff,                  NOVEMBER 9, 2012
 5          vs.
                                                     MIAMI, FLORIDA
 6   DOUGLAS NEWTON,

 7                       Defendant.                  Pages 1 - 104

 8   _____/

 9

10                   TRANSCRIPT OF SENTENCING HEARING
                   BEFORE THE HONORABLE MARCIA G. COOKE
11                     UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Plaintiff:      H. RON DAVIDSON, AUSA
                             LUIS PEREZ, AUSA
15                           Office of U.S. Attorney
                             99 NE 4 Street
16                           Miami, Florida  33132

17

18   For the Defendant:      MIGUEL CARIDAD, AFPD
                             Office of U.S. Public Defender
19                           150 W Flagler Street
                             Miami, Florida  33130

20

21


22   Reported By:            Diane Miller, RMR, CRR
                             Official United States Court Reporter
23                           400 N. Miami Avenue, Room 11-2
                             Miami, FL  33128
24                           (305)523-5251
                             diane_miller@flsd.uscourts.gov
25
```

Friday, November 9, 2012

<u>PROCEEDINGS</u>

1

2    THE COURT:  Good morning.  Appearing for the United

3 States.

4    MR. DAVIDSON:  Good morning, Your Honor, Ron Davidson

5 on behalf of the United States.  With me is FBI Special Agent

6 Timothy Wright, and we also have Professor Halperd here behind

7 me.

8    THE COURT:  I'm sorry, Mr. Davidson.

9    MR. DAVIDSON:  I'm sorry, Judge.

10    THE COURT:  And appearing on behalf of Mr. Newton?

11    MR. CARIDAD:  Good morning, Your Honor, Miguel

12 Caridad, Assistant Federal Public Defender on behalf of

13 Mr. Newton, who is present.  Also present is Dr. Steve

14 Pomerantz and Mr. Larry Lowan, a lifetime friend of -- a

15 long-time friend of Mr. Newton's.

16    THE COURT:  All right.  Everyone may be seated.

17 Mr. Caridad, you do have pending before the Court, in addition

18 to the sentencing, the issues raised by your client's motion

19 for new trial?

20    MR. CARIDAD:  Yes, Your Honor.

21    THE COURT:  Would you care to discuss those with the

22 Court?

23    MR. CARIDAD:  Judge, just briefly, because we have

24 filed pleadings, the Government has responded, I filed

25 supplemental pleadings.

Friday, November 9, 2012

```
 1          THE COURT:  I think the supplementals have even had
 2   supplementals.
 3          MR. CARIDAD:  Yes.  In a nutshell, this is the
 4   problem as we see it.  The last witness the Government called
 5   was Special Agent Sputo who testified to conversations he had
 6   or investigations he conducted the night before his testimony.
 7   When he testified, we objected on the grounds that what he was
 8   saying was hearsay.  For example, he said he had gotten on the
 9   phone with a country club in California and determined that
10   there was a country club, and there was a country club that
11   the company RLAB had paid dues at.  I objected to that.  That
12   was overruled.
13          The other instances were hearsay -- what we believe
14   were hearsay evidence.
15          THE COURT:  He didn't just say, I got on the phone.
16   As I recall, he had checks.
17          MR. CARIDAD:  Well, let me explain.  The checks were
18   checks provided by the Government in discovery, introduced
19   into evidence from the company to various entities.  For
20   example, the country club, but that's all the check said.
21   There were payments by Billy Martin to RLAB, that company to
22   the country club.  That's all the check said, and that was
23   admitted into evidence.
24          Where this hearsay evidence went beyond that was to
25   say that this was a country club that RLAB was a member at,
```

1    that it was a golf club.  It went on to describe what this

2    entity was.  The other problem is that he was allowed to

3    testify that based upon his investigation, another one of the

4    checks had been written to a company that rented my client's

5    son's apartment. so we objected to this as hearsay, and we

6    tried as best we could to deal with it by cross-examining the

7    agent.  But in the end, we don't think it was enough, and we

8    asked the Court to postpone the trial so that I could get

9    evidence to explain why payments were going to the country

10   club, why payments were going to the son's condominium, and I

11   put in my supplement what we would have shown.

12          We would have shown that the company entertains

13   guests, potential guests, at that country club.  That's why

14   some of the fees are paid from that bank account, and that my

15   client's son did work for the company and also stored

16   equipment at his apartment thereby making it very proper for

17   the company to have paid part of his son's rent.

18          That's the problem, as we saw it, that I didn't

19   anticipate this evidence.  We believe it was hearsay; and if

20   we had more time, I believe we would have cleared all of this

21   up.  That's the basis of our motion, Your Honor.

22          THE COURT:  Mr. Davidson.

23          MR. DAVIDSON:  Thank you, Your Honor.

24          Let's be clear.  Months before trial, we gave

25   Mr. Caridad the bank records.  The bank records have checks

Friday, November 9, 2012

1   going to things like homeowners' association.  The indictment

2   alleges that Mr. Newton tried to benefit himself by engaging

3   in this fraud.  And as this Court already found, there is no

4   great leap of faith to imagine that the Government is going to

5   introduce the check that says homeowners' association and

6   argue that the defendant took this money so he could pay his

7   homeowners' association.  That all was foreseeable.

8        Now, the way that the Government went about proving

9   it is that we asked the agent about his investigation, that he

10  made phone calls, that he conducted record searches; and the

11  Eleventh Circuit has said you can do that.  You can introduce

12  that evidence, and the defendant has the right to

13  cross-examine the agent and say, your investigation was

14  faulty, you should have searched another database, or whatever

15  the cross-examination is.  And that's exactly what Mr. Caridad

16  did, he cross-examined the agent.

17       Mr. Caridad is now complaining about Mr. Sputo's

18  responses to his own questions saying that Mr. Sputo --

19  Special Agent Sputo provided hearsay testimony, but that was

20  in response to Mr. Caridad's questions.  So you can't fault

21  the Government for allowing the witness to answer the question

22  that the defendant posed to him.

23       And finally, Your Honor, as we put out in our

24  responses to the defendant's first motion and then the

25  supplement, this is really a tangential issue.  The defendant

Friday, November 9, 2012

1   was caught on tape engaging in securities fraud.  You had

2   already said that the plea agreement was not admissible

3   because the Government had so much evidence.  And I think you

4   said, why are you stacking even more evidence on.  And then to

5   say that somehow the jury, after watching several days of

6   tapes, would have gotten consumed by this issue about, you

7   know, where the money finally went to, there were a few days

8   of tapes, Your Honor.  So I don't think that the jury somehow

9   got sidetracked by this issue.  The evidence was overwhelming,

10  and we could have made the points anyway because the checks

11  went to homeowners' association, and that was all foreseeable.

12       And for those reasons, Your Honor, we ask the Court

13  to deny the original motion and then the supplement to the

14  original motion.  This was foreseeable, the questions were

15  proper; and to the extent that they were improper, the jury

16  had overwhelming evidence to convict the defendant.

17       MR. CARIDAD:  Judge, one brief reply.

18       The Government, I don't believe, has an answer to

19  this problem.  They have been investigating Mr. Newton for

20  three years almost by the time this trial began.  Yet, on the

21  last day of trial, literally the Sunday before this agent gets

22  up on the stand is when they go and search for this evidence,

23  the last day before this trial ends.

24       THE COURT:  Well, why is that a problem?  I mean, the

25  Government can conduct its investigation -- it would be

Friday, November 9, 2012

7

1   different, Mr. Caridad, if the Government had walked in on the

2   day that the agent testified and said, you know, we found

3   these checks, the defense had no idea about them, and then we

4   went and conducted an investigation.

5          You had the checks, you knew about the payments, and

6   you conducted a vigorous cross-examination of the agent.  So

7   let's say we -- let's assume that there was error in the

8   admission of the testimony.  I would say that it was harmless,

9   given the cumulative evidence in this case.  Even if I had --

10  the jury did not consider what you cross-examined on, there

11  was sufficient evidence in this case to go to the jury.

12         So the question is:  What is the prejudice that might

13  have resulted from the jury hearing about these payments?

14         When you read the indictment, it said he took money

15  that was supposed to be used for A, and he used it for B.

16  This wasn't an investment business he was running.  He was

17  running a scam, and the jury found that based upon the

18  evidence that this was a fraud.

19         I recognize that, on behalf of your client, you

20  disagree with that; but, one, that's what the overwhelming

21  evidence showed; two, that's what the jury found; and three,

22  even if this evidence was in error, there was cumulative other

23  evidence that does not result in prejudice to your client.

24         MR. CARIDAD:  What I would like to say, Your Honor, I

25  don't believe the evidence shows that my client's business was

Friday, November 9, 2012

```
1   a scam.  He has had this business for 30 years.
2           THE COURT:  Well, let me say maybe the business
3   itself wasn't the scam, but the behavior that we saw in this
4   trial was fraudulent.  So I would correct myself in saying
5   that.
6           MR. CARIDAD:  Thank you, Your Honor.
7           The checks are bare bones.  The checks just have the
8   name of -- a payee on them and that's it.  The Government,
9   during pretrial conversations, never mentioned they were going
10  to try to prove to me that the funds were used improperly.
11  The indictment just says, very basically, whatever it says,
12  which is nothing helpful.
13          The opening statement didn't reveal any of this.
14  None of the early witnesses revealed any of this.  It was the
15  very last witness that the Government chose to put on, who had
16  done his investigation the day before, that had to have caught
17  them by surprise because they didn't know what they were going
18  to find when they called out there.  Why did they call out
19  there?  Because they wanted to find out, so they didn't know.
20  So how am I supposed to know if they didn't know?
21          We presume they do an investigation to find out
22  things.  They do an investigation the day before the trial
23  ends, and they tell me I'm supposed to know these things when
24  they didn't know, didn't care about them until that last day.
25  And then, if it's harmless, if it was so irrelevant, why did
```

1 | Mr. Davidson lead off his closing argument with it?  Why did

2 | he mention it in the middle of his closing argument, and why

3 | did he mention it at the close of his argument?  To make my

4 | client look like a crook and a thief.  If they had enough

5 | evidence, they really had enough evidence, why did they need

6 | this?

7 | I just don't think -- whenever the Court says that I

8 | did a vigorous cross-examination, I know I'm in trouble

9 | because I try my best with what I could do there, but that

10 | didn't go far enough, Judge, to show the true nature of these

11 | payments.  It may have discredited the agent a little bit, but

12 | it didn't allow us to present any positive evidence, and

13 | that's what we wanted to do.

14 | THE COURT:  The Defense motion for new trial is

15 | denied.  As I stated previously, one, I believe that there was

16 | evidentiary -- sound, legal evidentiary reasons to admit this

17 | evidence; that the Defense, even if -- the evidence that the

18 | Defense is objecting to is evidence that they -- that the jury

19 | heard based upon the defense attorney's cross-examination;

20 | three, there was a vigorous cross-examination on these issues;

21 | four, the evidence, at best, was cumulative concerning the

22 | fraud in this case; and even if the jury had not heard it,

23 | there was other sufficient evidence.

24 | So the only question is if by hearing this testimony,

25 | it somehow so overwhelmingly poisoned the jury that they

1   wouldn't be able to discern between the other evidence in this

2   case, and I don't think it was.  So the Defendant's motion for

3   new trial is denied.

4           That is Docket Entry 150, Ivan?

5           THE COURTROOM DEPUTY:  Yes, Judge.

6           THE COURT:  We are now ready to proceed to sentence.

7           I do have the voluminous sentencing documents in this

8   case.  I recognize that there are several disagreements

9   between the United States and Counsel as to the advisory

10  guideline range.  I will say that at the present time, I'm

11  seeing the total offense level is 19, the criminal history

12  category of one, which means the advisory guideline range is

13  30 to 37 months.

14          Now, I'm trying to think of -- I wanted to go through

15  the actual computation so I can still understand where all of

16  the objections are because some of them have been dealt with,

17  some of them not.  And I'm going to turn to page nine of the

18  presentence report, and I'm going to go to paragraph seven,

19  and I'm going to go to each Counsel and ask -- paragraph 25.

20          Do you object to the base offense level,

21  Mr. Davidson?

22          MR. DAVIDSON:  No, Your Honor.

23          THE COURT:  Mr. Caridad, do you object to the base

24  offense level?

25          MR. CARIDAD:  No, Your Honor.

Friday, November 9, 2012

```
 1              THE COURT:  On paragraph 26, the loss amount range?

 2              MR. DAVIDSON:  Judge, the Government does not object.

 3              THE COURT:  Mr. Caridad?

 4              MR. CARIDAD:  We do object, Your Honor.

 5              THE COURT:  Now, at that paragraph, Mr. Caridad, it's

 6  been computed to be an eight level enhancement.  What do you

 7  think that that enhancement should be, if any?

 8              MR. CARIDAD:  Judge, we don't believe that there was

 9  any economic loss in the case, and there should be no

10  enhancement there.

11              THE COURT:  Okay.

12              Paragraph 27, Mr. Davidson, sophisticated means,

13  there is a two level enhancement; do you agree with that?

14              MR. DAVIDSON:  Yes.  We believe it applies.

15              THE COURT:  Mr. Caridad, do you agree with that?

16              MR. CARIDAD:  No, Your Honor.

17              THE COURT:  And you think that should be zero?

18              MR. CARIDAD:  Yes, Your Honor.

19              THE COURT:  Going down to paragraph 29, the

20  adjustment for role in the offense, abuse of public or private

21  trust; Mr. Davidson, that's a two level enhancement?

22              MR. DAVIDSON:  That is correct.  We believe it

23  applies.

24              THE COURT:  And Mr. Caridad?

25              MR. CARIDAD:  We do not, Your Honor.
```

Friday, November 9, 2012

```
 1              THE COURT:  And you believe that also should be a
 2    zero?
 3              MR. CARIDAD:  Yes.
 4              THE COURT:  That leaves the level 19.  Now,
 5    Mr. Davidson, do you believe that that adjusted offense level
 6    of 19 is the correct advisory guideline?
 7              MR. DAVIDSON:  No, Your Honor.
 8              Turning to paragraph -- I don't know where it would
 9    be, but there was the role enhancement for two levels for
10    recruiting Mr. Skwara into the scheme.
11              THE COURT:  That would probably be somewhere around
12    paragraph 29.  There is already an abuse of trust there, and
13    you think it should be another two level enhancement there?
14              MR. DAVIDSON:  Correct, Your Honor.
15              THE COURT:  And I'm going to assume, Mr. Caridad,
16    that you agree with that -- disagree with that, excuse me.
17              MR. CARIDAD:  Correct.
18              THE COURT:  Anything else that you agree?
19              So, you think, Mr. Davidson, that the adjusted
20    offense level should be 21?
21              MR. DAVIDSON:  That is correct, Your Honor.
22              THE COURT:  Anything else?
23              MR. DAVIDSON:  No.
24              THE COURT:  All right.  Why don't I start, because I
25    think it is the one that is the most -- may require the most
```

13

1    discussion, Mr. Caridad, and that is paragraph 26, which is

2    the eight level enhancement.  You think there should be

3    nothing there?

4            MR. CARIDAD:  Correct, Your Honor.

5            THE COURT:  Do you want to start arguing there?

6            MR. CARIDAD:  Yes, Your Honor.

7            THE COURT:  And I notice you have witnesses.  Are

8    there any witnesses on that issue?

9            MR. CARIDAD:  Yes.

10           THE COURT:  All right.

11           MR. CARIDAD:  Here's our position, Judge.  This fund,

12   which we know was a fictitious fund, bought shares in RLAB

13   twice.  First time, they bought four million shares on

14   March 25th, 2009, and paid Mr. Newton $20,000.  The price per

15   share was .005.  The second transaction was on April 8th,

16   2009, where they bought 2,222,222 shares at .009 for $20,000.

17   This is why we believe there was no loss.  Four million shares

18   is a lot of shares, more than a lot of shares.  In relation to

19   the volume of shares that were being traded for this stock, in

20   this period, the volume was around $100,000.  Had the fund,

21   the pension fund gone out into the market to buy free trading

22   shares, to buy four million free trading shares, their attempt

23   to do that could not be done in one fell swoop because there

24   were not four million shares out there from one person that

25   they could buy from.

Friday, November 9, 2012

```
 1          So had they gone into the market to buy free trading
 2   shares --
 3          THE COURT:  Had who gone into the market?
 4          MR. CARIDAD:  The pension fund.  The pension fund is
 5   buying.  The fictitious pension fund is buying shares of Mr.
 6   Newton's company.  They want to buy four million shares.  If
 7   they go into the market and try to buy four million
 8   free-trading shares, that's going to drive the price up a lot,
 9   because they can't get four million shares from one person
10   because nobody has that.  They have to go to different buyers,
11   and each succussive purchase would drive up the price of the
12   shares.  So they would end up paying for these four million
13   shares much more than $20,000.  So what they do is they take
14   restricted shares from Mr. Newton.
15          Now, the Government says that's the problem because
16   restricted shares means shares that cannot be sold for one
17   year, and restricted shares are less valuable than
18   free-trading shares.  So they are saying the fund got gypped.
19   We paid free trading share price, .005 per share, and got
20   restricted shares.
21          But in the real world, what would happen is, like I
22   said, if they wanted to buy four million shares, they couldn't
23   do it all at once, it would drive the price up.  So what does
24   the fund do, and what would a reasonable buyer do?  They would
25   take restricted shares all at once.
```

Friday, November 9, 2012

```
 1              They get four million shares at the free-trading
 2  price, .005.  So although, normally, Judge, restricted shares
 3  sell at a discount -- you sell them cheaper because they have
 4  a restriction on them.  You can't sell them until one year
 5  later.  That's why they are usually cheaper than free-trading
 6  shares -- the fund also has to pay a premium, and a normal
 7  buyer would be expected to pay a premium for getting all of
 8  these shares at once, so there is no loss.  Even though
 9  free-trading shares would normally trade at a discount -- sell
10  at a discount, in this case, the fund would be expected to pay
11  a premium for them because they are getting restricted shares
12  all at once.  So they got a fair price for the shares.
13              They paid $20,000 for four million shares at the
14  free-trading price, yes; but for the reason I just explained,
15  there was no loss.  They got a good deal.  They got what they
16  bargained for.  They were able to get four million shares at
17  once for $20,000 at free-trading share price.  That's why
18  we -- and the same thing happened with the second transaction,
19  the same thing happened with the transactions that Mr. Skwara
20  did, two of them.  So that's why we believe there was no loss
21  in this case.
22              THE COURT:  There is no loss because they could have
23  bought it a different way?
24              MR. CARIDAD:  No.  There is no loss because they got
25  a fair -- a fair -- they got what they paid for.  Although
```

Friday, November 9, 2012

1  they got restricted shares, which are less valuable than free

2  trading shares, they were able to get them all at once.

3  Because if they go into the market -- let's say the fund wants

4  to buy four million shares of free trading stock.  Free

5  trading stock means that you can sell it immediately, okay.

6  If they go into the market to try to buy four million shares,

7  given the fact that there are -- that the volume of trading in

8  this stock is low, they are not going to be able to find four

9  million shares from one buyer.  They have to go to successive

10 buyers.  And the fact that they are buying -- try to buy so

11 many shares at once is going to drive that price up.  So by

12 the time --

13        THE COURT:  So it doesn't drive the price up if

14 they're buying restrictive shares, right?

15        MR. CARIDAD:  Because they get them all at once.

16        THE COURT:  Okay.

17        MR. CARIDAD:  They get them all at once.

18        These are not in the market.  These are restricted

19 shares.  Mr. Newton gives them four million shares, so they've

20 got four million shares.  Although it's restricted, they were

21 able to get them all at once.  They avoided the price hike

22 that would happen if they go out into the market to try to buy

23 the free trading shares, so they have to pay a premium for

24 that, a premium for getting all of these shares at once.  So

25 there is the premium for getting all of the shares at once,

1  and there is the discount that is normally given for

2  restricted shares.  And when you put it all together, it

3  should even out.  There should be no -- no loss to anybody.

4  The fund got four million shares at a fair price, so they

5  didn't lose anything.

6         This is an economic analysis, Judge.  They did not

7  lose anything.  They did not get ripped off.  They did not get

8  gypped.  The Government's whole theory is that they had to

9  buy -- they got restricted shares at free trading price.  That

10  may be true, but that's a normal procedure in this situation

11  when it's a thinly-traded stock.

12         If you go out and try to buy free trading shares, the

13  price is going to go up.  It's going to shoot up.  In the end,

14  to get four million shares, you are going to have to pay a lot

15  more than $20,000, a lot more.  To avoid that, to avoid the

16  market, you take the restricted shares all at once.  And, yes,

17  they are restricted, that's why they are normally sold at a

18  discount, but you've got them all at once.  You've got them

19  all at once.  You've got them at the price you wanted to pay,

20  .005.  That's why there is no loss.

21         THE COURT:  Mr. Davidson.

22         MR. DAVIDSON:  Thank you, Your Honor.

23         The pension fund didn't want to by the penny stocks.

24  This was not a good deal for the pension fund because the

25  pension fund should not have been in the penny stock market.

Friday, November 9, 2012

1   The only reason this deal that Mr. Caridad said was such a

2   fair deal happened is because Mr. Newton, and then Mr. Skwara,

3   bribed somebody to make the deal happen.  If this was such a

4   good deal --

5           THE COURT:  So you are saying the actual purchase of

6   the stock, in and of itself, is the fraud?

7           MR. DAVIDSON:  Exactly, Judge.

8           THE COURT:  Is the loss, excuse me.

9           MR. DAVIDSON:  That's exactly right.  We can start

10  with the premise that this is such a bad deal for a pension

11  fund.  A pension fund that wants secure assets should not be

12  buying risky stock like the defendant's, and we know they

13  don't want to buy it because they would not have bought it

14  except for the bribe.  Mr. Newton had to bribe someone to buy

15  this stock, which means that this is not a good deal.  So we

16  can start off with that premise that Mr. Newton caused a

17  pension fund, involving people's retirement money, to get that

18  money out of safer investments and put it into an unsafe penny

19  stock.  And the probation officer properly calculated the loss

20  to be all of the money that Mr. Newton and Mr. Skwara got out

21  of the hands of the pension fund.  He shouldn't have any of

22  it.

23          But if we want to be -- walk through it and say,

24  let's assume, as we know, that Mr. Newton gave over some

25  restricted stock.  We did get something in return; and if we

Friday, November 9, 2012

1   want to sort of be generous to the defendant, there could be a

2   credit against the loss of the shares we received.  We know

3   that the restricted shares for each deal -- excuse me, the

4   free trading shares were about $20,000.  He gave us the less

5   valuable restricted shares, and as a general rule of number,

6   the restricted shares we got were about worth half of the

7   amount of free trading shares.

8           So let's just -- if the Court is inclined to give him

9   any benefit, it would be a half off because he handed over the

10  restricted shares.  We bought them at the higher free trading

11  price.  If you were inclined to give him any benefit, although

12  we don't believe you have to, the benefit would be half off.

13          There is a third reason it's not zero is the

14  defendant is giving a bribe to the fiduciary, the pension fund

15  guy.  That $6,000 for each of the four transactions for

16  $24,000 should have gone to the beneficiaries, and Mr. Newton

17  gave the bribe to the wrong person.  He gave it to the

18  fiduciary instead of the beneficiary.  And if you want to be

19  even the most generous way of reading it, the intended loss is

20  still $24,000, it is clearly not zero, Judge.

21          We believe the probation officer was right when she

22  calculated at 80,000.  If you wanted to be generous and say,

23  well, we got this restricted stock that Mr. Caridad keeps on

24  talking about, you could reasonably conclude that the intended

25  loss is $40,000.  If you wanted to go to the bare minimum, if

```
1   you wanted to be -- hold the Government to the highest
2   possible burdens of proof on this, the kickback amount of
3   $6,000 times four for $24,000 is the bare minimum level, I
4   think, that this Court, within reason, could go in calculating
5   the intended loss.  And we have an expert here today and we
6   have an agent here today who can testify about how the Court
7   should calculate the intended loss in this particular matter.
8            THE COURT:  Well, I don't think I have a doubt about
9   how it should be calculated.  I mean, the -- there is no
10  reason for this stock to have been purchased in the first
11  place.  That's the loss.  I understand you disagree with me,
12  Mr. Caridad, but that's the loss.  It's the purchase of
13  something that shouldn't have happened, and the only reason it
14  happened was the defendant started the mechanics for this
15  stock to be purchased.  So I do believe --
16           MR. CARIDAD:  I'm sorry.
17           THE COURT:  I understand you disagree, Mr. Caridad.
18           MR. CARIDAD:  But I wanted to say something, Your
19  Honor.
20           THE COURT:  I know that, but I'm just saying that I
21  recognize, your papers recognize, and I wanted to hear
22  argument just to make sure I understood what you wanted to
23  tell me.
24           That amount is correctly computed.  That's not a
25  zero.  There was a loss in this case, and I'm going to
```

Friday, November 9, 2012

1  maintain the eight levels at paragraph 26.

2         MR. CARIDAD:  Judge, that's what I think would be a

3  mistake.

4         THE COURT:  I understand you think I'm wrong.

5         MR. CARIDAD:  I think the case law requires and the

6  sentencing guidelines require the Court to offset that amount

7  by whatever let's call them victims received in this case.

8  That's true in every case of fraud.  This is not a theft case,

9  this is a fraud case.  The Court must, under the guidelines,

10  determine if that's what -- if that's the money that was sent

11  over to Mr. Newton, you have to credit that.  You have to

12  credit the value of what the, quote, victim received in

13  exchange for that $80,000.

14         So, the "but for" analysis is not proper.  It doesn't

15  end the analysis, it is only the beginning of it.  So the

16  question is what did the fund receive in exchange.  Whether it

17  should have received it or not, whether there should have been

18  the transaction or not, that's a separate issue.  We are not

19  talking not about -- not about culpability but loss, and the

20  Court has to measure what it is that the fund got in return,

21  and that's why we say what they got in return was a good

22  bargain.  They got a bunch of restricted shares, four million,

23  and they could not have gotten four million free trading

24  shares at that price.

25         The Government threw around this figure of

1   50 percent.  What they mean, Judge, is that the restricted

2   shares are 50 percent less valuable, but that's not true,

3   Judge.  Studies are all over the place on this.  There is

4   testimony that we have provided that was given by one of the

5   Government witnesses today where he testified that the range

6   of discount, in his opinion, came to anywhere from ten to

7   fifteen, to thirty, to fifty percent.

8            The pleading filed last night by the Government,

9   which attaches an article concerning the different prices, the

10  difference between free trading shares and restricted shares

11  shows that for about ten to fifteen percent of the trades

12  analyzed in that study, you had to pay a premium.  You had to

13  pay more for the restricted shares.  So, the gamut runs all

14  the way from you've got to pay more for restricted shares than

15  free trading shares to sometimes the free trading shares is

16  only worth half of the free trading shares.  There is a large

17  range, so I think if the Court stops and says it's $80,000, I

18  think that's an error.  We have got to go through the analysis

19  of how do you determine what the pension fund received.  And

20  we say they received value.  They received shares of stock in

21  a real company.

22            MR. DAVIDSON:  Judge, if I just may respond briefly.

23            The concept of credit against loss is in the

24  guidelines, but I think an analogy may be helpful.  If I steal

25  your car and I drive it off and I say, You know what, I feel

```
 1   bad for Judge Cooke, I stole her car; let me give you my boat,
 2   and I drop my boat off in your front yard.  And I say, You
 3   know what, I also feel bad, so let me give you my
 4   grandmother's wedding gown, and I drop that off in your yard
 5   also.  Those things don't help you.  The boat is probably an
 6   inconvenience for you because you have to get it off of your
 7   yard.  My grandmother's gown may smell and you don't want it
 8   either.  That's the idea here.
 9         The pension fund doesn't want these shares.  And if
10   it were to try to sell the shares, and if it were to announce
11   in public, hey, by the way, we got bribed and now we are stuck
12   with penny stocks we shouldn't have had in the first place,
13   they are harmed.  He handed over something that was toxic to
14   the pension fund, a penny stock that was highly volatile that
15   should never have been on the pension fund's books in the
16   first place.
17         So for this victim, the thing that Mr. Newton and
18   Mr. Skwara handed over was the worse thing they could possibly
19   have.  It was a boat that was rusting.  It was an
20   embarrassment, an eye sore to them; and if they went public
21   and said, oh, we have these shares, I mean just imagine what
22   Wall Street would have said if this was an actual fund, that a
23   pension fund with retirees' money was investing in something
24   so volatile as RLAB and USFM, it would have -- it would have
25   been an embarrassment to the pension fund.  And you can't
```

Friday, November 9, 2012

1   really credit handing over something toxic to somebody else
2   because somewhere it might be worth something.
3        THE COURT:  Mr. Davidson, I agree with you.
4        Not that it's not worth something, but that the
5   acquisition of it was worthless because it was nothing
6   literally that the pension fund could have legally done in
7   order to receive any value from it, Mr. Caridad.  So we just
8   have to agree to disagree here.
9        MR. CARIDAD:  Judge, I just want to say one more
10  thing.  The opinion that the Court is expressing now is no
11  different than if the Court said that the fund got nothing.
12  That's what the Court is saying.
13       THE COURT:  Essentially, yes, that is what I'm
14  saying.
15       MR. CARIDAD:  But that's not true.  But that's not
16  true, Judge, because --
17       THE COURT:  I understand that you disagree with me,
18  that you think that what I'm saying is not true.  That's why
19  we have to move on because I'm not changing my mind.
20       MR. CARIDAD:  I just want to say one more thing.
21       There was a market in this stock.  We know what the
22  market was.  The market reflected a price for this share.
23       THE COURT:  But there was no market that this entity
24  could have engaged in.  Maybe, for example, if I had owned it,
25  it might have had some infinitesimal monetary value to me to

Friday, November 9, 2012

1   trade, but not to the pension fund.

2          MR. CARIDAD:  Yes, Your Honor, they owned the stock.

3   They owned the stock that was bought at a market value.  They

4   could have sold it at a year late, and a year later --

5          THE COURT:  This would be analogous to me,

6   Mr. Caridad -- and I'm stretching it a little bit -- I receive

7   a rare stolen painting, one of the ones that was stolen out of

8   one the European museums last week.  I always wanted it.  I

9   pay to receive it, and it is a painting that is valued by all

10  accounts in the art world at millions of dollars.  I can't do

11  anything with it.  I can't -- maybe some other criminal-minded

12  person would buy it from me and reimburse me for it.

13         But I can't call up Sotheby's and say, can you

14  auction my stolen Matisse or -- so it is a valuable thing that

15  is valueless because there is no market that I -- the museum

16  could have sold it, the real owners could have sold it.  It

17  has intrinsic value, but no value for which I can receive

18  credit.

19         MR. CARIDAD:  But this does, Judge.  This stock can

20  be sold.

21         THE COURT:  But this entity that has it can't do

22  anything with it.

23         MR. CARIDAD:  Yes, they can, Judge.  They can sell it

24  in a year.

25         THE COURT:  But it's -- I don't want to say it's

Friday, November 9, 2012

1  illegal for them to have it, but it's almost illegal for them

2  to have it.

3          MR. CARIDAD:  Judge, that's a mistake.

4          THE COURT:  All right.  So hopefully, if you disagree

5  with me, which you do, and the court of appeals agrees with

6  you, they will send it back to me and tell me that I'm wrong;

7  but you, at the present time, and I disagree, so let's move on

8  to the next one.

9          MR. CARIDAD:  I need to proffer what my expert would

10  say, and I would like to have him testify.

11          THE COURT:  To tell me that it has value?  I agree

12  that you think that, but I think the preponderance of the

13  evidence, which is the standard I use for guideline

14  sentencing, would be otherwise.  It's not even a close call

15  for me, Mr. Caridad.

16          MR. CARIDAD:  I just want to make sure.

17          THE COURT:  Now, if you would like to proffer what

18  your expert would say for the record, I will allow you to do.

19          MR. CARIDAD:  I would like him to say it himself.

20          THE COURT:  All right.  Call the expert.

21          Raise your right hand to be sworn.

22            STEVE POMERANTZ, DEFENSE WITNESS, SWORN.

23          THE COURTROOM DEPUTY:  Thank you.

24          Please have a seat, adjust the microphone in front of

25  you, and state your full name for the record.

Friday, November 9, 2012

1          MR. DAVIDSON:  Judge, just for the record, we do have

2   some objections to the testimony and his qualifications as far

3   as what he is going to be testifying to.

4          THE COURT:  Thank you, Mr. Davidson.  Your objections

5   are noted for the record, but I'm going to allow Mr. Caridad

6   to make his record.

7          So, Counsel, you may proceed.

8          Of course, Mr. Davidson, you may cross-examine this

9   witness, if you choose.

10                     DIRECT EXAMINATION

11  BY MR. CARIDAD:

12  Q.  Dr. Pomerantz, what is your full name, please.

13  A.  Steve Pomerantz.

14          THE COURT:  Sir, I need you to be a little closer to

15  that microphone so we can all hear.

16  BY MR. CARIDAD:

17  Q.  Dr. Pomerantz, what is your present occupation?

18  A.  I'm currently an investment management consultant and a

19  president of Steve Pomerantz, LLC.

20  Q.  And what does that company do?

21  A.  The company provides investment management consulting as

22  well as litigation consulting.

23  Q.  What is your educational background, please?

24  A.  My last degree was a Ph.D. in mathematics from the

25  University of California at Berkeley.

Friday, November 9, 2012

1   Q.   Okay.   Now, after you went to school, what did you do?

2   Could you tell us a little bit about your work history?

3   A.   After graduating, I started work at Bank of America,

4   primarily in a -- I guess a model development capacity

5   regarding foreign exchange derivatives and other types of

6   derivatives.   I moved on from there to several other

7   investment management firms.   Morgan Stanley, Citibank,

8   numerous securities, and Weiss Peck & Greer were kind of the

9   primary employers that I worked for involved in portfolio

10   management, risk management, securities valuation, portfolio

11   strategy involving fixed income, and equity-related

12   securities.   My last position, at Weiss Peck & Greer as a

13   partner, was a director of quantitative research for the fixed

14   income and equity areas of the firm.

15          Then in 2000, I started up my own consulting firm and

16   have, since then, been providing consulting to a number of

17   investment management firms, and a few pension funds, and

18   other asset organizations, such as insurance companies,

19   pertaining to management, valuation, and risk control for

20   their portfolios.

21   Q.   Now, have you testified in court before?

22   A.   Yes.

23   Q.   Concerning what issues?

24   A.   Primarily securities-related issues, whether it be

25   valuation issues, due diligence issues, portfolio management

Friday, November 9, 2012

1  issues, investment suitability issues, pricing,

2  compensation-related issues; but all having to do with

3  securities or derivatives or investment management products.

4  Q.  Have you testified for the Government?

5  A.  Yes.  I have testified numerous times on behalf of the

6  Department of Justice and the Internal Revenue Service on

7  providing the analysis of transactions that had been entered

8  into by individual taxpayers.

9  Q.  Okay.  Have you also testified for private entities,

10  private clients?

11  A.  Yes.

12  Q.  Have you published any articles?

13  A.  I've published maybe half a dozen articles on theoretical

14  topics in the securities markets, investment management

15  compensation, a variety of statistical issues pertaining to

16  investments.

17  Q.  Okay.  And have you testified before regarding, in

18  general, securities transactions and value of stocks?

19  A.  Yes.

20  Q.  Okay.  Now, did I send you some documents in this case?

21  A.  Yes.

22  Q.  Generally, what did I send you?

23  A.  I read the Government's pleadings, I read Mr. Newton's

24  pleadings, I have seen some information pertaining to the

25  stocks that are at issue in this case, I've -- I've read some

Friday, November 9, 2012

1   of the transcripts of conversations that were held.  I have

2   reviewed what financials I could find on the specific

3   companies.  I think that's probably the bulk of it.

4   Q.  Now --

5            MR. CARIDAD:  Excuse me, Your Honor.

6   BY MR. CARIDAD:

7   Q.  Now, are you familiar with the first transaction that

8   occurred in this case in March 25th of '09 where this pension

9   fund purchased four million shares in RLAB for $20,000 at

10  .005?

11           MR. DAVIDSON:  Judge, I am going to object.  I don't

12  believe the expert has addressed whether -- the witness has

13  addressed whether or not he has done any valuation of any of

14  the stocks.

15           THE COURT:  Would you care to voir dire the witness?

16           MR. DAVIDSON:  Yes, Your Honor, just briefly.

17           THE COURT:  You may, Mr. Davidson.

18                    VOIR DIRE EXAMINATION

19  BY MR. DAVIDSON:

20  Q.  Mr. -- or Dr. Pomerantz, have you had an opportunity to

21  conduct an evaluation of RLAB or USFM?

22  A.  Well, these are publicly traded stocks and there is a

23  market for them.

24  Q.  I understand.

25  A.  And I would always prefer to --

Friday, November 9, 2012

31

```
 1             MR. CARIDAD:  If he could finish the answer.
 2             MR. DAVIDSON:  But my question was --
 3             MR. CARIDAD:  Excuse me, Judge.  If he could finish
 4  the answer, please.
 5             THE COURT:  No, because the answer is not responsive
 6  to the question.
 7             Please answer the question, sir.
 8  BY MR. DAVIDSON:
 9  Q.  Did you do an evaluation -- a valuation?  Did you look at
10  all of the materials and figure out how much the shares would
11  be worth on a particular day?
12  A.  Yes.
13  Q.  And what did you -- what was the basis or what information
14  did you use for your valuation?
15  A.  I used the publicly traded prices of those stocks in the
16  markets.
17  Q.  Did you use the financial records of either RLAB or USFM?
18  A.  I don't think that those have an affect on what the price
19  of the stock is worth.
20  Q.  So you are saying a penny stock, the only evidence of the
21  value is the traded price as opposed to the underlying
22  financials?
23  A.  Well, the underlying financials exist, the market price is
24  the existing consensus of what those financials are worth in
25  the marketplace.
```

Friday, November 9, 2012

1  Q.  Let me ask you a hypothetical here.  If the underlying

2  price does not reflect information, let's say about a

3  securities fraud scheme that hasn't come to light yet, would

4  the market price reflect an accurate valuation of the company?

5  A.  I think -- well, first of all, it is not clear to me that

6  there is a fraud in place here that is affecting --

7          THE COURT:  The question was in a hypothetical.

8          THE WITNESS:  -- of a security.

9          THE COURT:  Excuse me, sir, it was a hypothetical,

10  not in this case.

11  BY MR. DAVIDSON:

12  Q.  In other words, if there was a pump and dump going on and

13  that was not disclosed to the market, would you say that you

14  value the market price of a penny stock as evidence of the

15  company's valuation?

16          MR. CARIDAD:  Object, there is no evidence in this

17  case of any kind of pump and dump.

18          THE COURT:  It was a hypothetical.

19          THE WITNESS:  I would agree with that.  I mean, Enron

20  is an example of stock that goes to zero overnight because of

21  undisclosed fraudulent information.  So, you know, we could

22  make that argument, Counselor, for any stock that is traded on

23  the market.

24  BY MR. DAVIDSON:

25  Q.  Let me make sure I understand your testimony today.

Friday, November 9, 2012

33

1            If a company's books, let's say, shows it has a

2   million dollars, and let's, for simplicity's sake, say it has

3   a million shares, right; so in theory, the market price, the

4   valuation of that company should be one dollar per share

5   because it has a million dollars and a million shares,

6   correct?

7   A.  Yes.

8   Q.  But you are saying -- now, let's say there's a pump and

9   dump, so they move the market price from a dollar to a

10  thousand dollars in this scheme.  Your testimony earlier was,

11  well, the market price is a thousand dollars, so I rely on the

12  thousand dollars market price?

13  A.  I'm sorry, are you describing a pump and dump that moves a

14  stock from a dollar to a thousand?

15  Q.  Correct.  You said you relied --

16  A.  I never heard of that happening.

17  Q.  But my question to you earlier was that you rely on the

18  market price as the evidence for the valuation of the stock;

19  isn't that correct?

20  A.  In the absence of any evidence of fraud, I will use the

21  market price as the fair market price of a given stock.

22  Q.  When you valued RLAB and USFM -- did you watch the tapes

23  in which Mr. Newton and Mr. Skwara paid over a kickback to a

24  pension fund?

25  A.  I have observed the price history for the stocks that are

Friday, November 9, 2012

1    in question here.

2    Q.  I understand that, but my question to you:  Is when you

3    valued the stock on the days that you saw the trading, did you

4    factor in the fact that there were kickbacks that we know

5    about, because they were on tape, when you factored in the

6    value of the stock?

7    A.  I'm sorry, which tape are you referring to?  You are

8    referring to the stock tape or a videotape?

9    Q.  No, I'm sorry, the videotape.

10   A.  Okay.

11   Q.  So in other words, on the days alleged in the indictment,

12   the jury has found that Mr. Newton and Mr. Skwara paid over a

13   kickback to the pension fund.

14   A.  I understand, but that wasn't public information.

15   Q.  I understand.

16   A.  So wait, I'm sorry.  So it was not public information, the

17   market did not know about it, the market could not respond to

18   it, and there is no evidence in the stock price record that

19   what happened was even happening.

20   Q.  I understand.  So my question to you is:  Would -- if you

21   were to do a valuation of RLAB and USFM, and you wanted to do

22   a fair valuation, would you consider the fact that there was

23   this kickback payment recorded on tape to be something that

24   would be important to your valuation of a stock price?

25   A.  I think a lot of things would be relevant if my task was

Friday, November 9, 2012

1  to value the price of RLAB or any other stock.  I'm not -- I'm

2  not here to opine on the fundamentals of RLAB, I'm here to

3  opine on the stock price in the marketplace.

4          MR. DAVIDSON:  So, Judge, we move to strike the

5  testimony.  It fails under *Daubert*.  There is no relevance to

6  what the market price was showing when we acknowledged the

7  market price did not reflect the kickback and the illegal

8  scheme that was going on.  And there is a disconnect between

9  what the RLAB and USFM should have been valued at, because we

10  know about the fraud and what the market was saying, and the

11  market didn't know about the fraud.  So by his own admission,

12  this witness has acknowledged that the market price is not an

13  accurate reflection of the true value of the stock.  And

14  that's what his testimony seems to be going to, and I'm not

15  sure there is any relevance to that.

16          THE WITNESS:  There is no evidence --

17          THE COURT:  Sir, sir, there is no question pending in

18  front of you.

19          MR. CARIDAD:  Judge, that goes to weight.  It doesn't

20  go to whether this testimony is admissible on the question of

21  -- excuse me, whether the price paid -- what was the -- first

22  of all, what was the market price reflected in the market,

23  what was paid by Mr. Newton -- what was paid by --

24          THE COURT:  Mr. Caridad, you want to make a record,

25  but I'm letting you know I am not convinced.  This witness is

Friday, November 9, 2012

1  saying all I did to determine the market price was look at the

2  market price.

3          MR. CARIDAD:  That's right, Your Honor.

4          THE COURT:  But that's not what happened, and that's

5  not why the stock has value.

6          MR. CARIDAD:  There is no evidence that --

7          THE COURT:  If I had been holding Enron stock on

8  Monday, this witness would have said, on the Tuesday, the

9  fraud is announced, it's worthless; it doesn't matter -- and

10 that's essentially what this pension fund had.  Once anybody

11 knew at the time of the restrictive nature of the stock is

12 off, the stock is worthless.

13         MR. CARIDAD:  No, Your Honor, I disagree.

14         THE COURT:  I understand that you disagree.

15 Mr. Caridad, let's move on.

16         Thank you very much, sir.

17         Thank you, Mr. Caridad.

18         MR. CARIDAD:  Judge, I want to make sure my record is

19 clear.  We have proffered what Dr. Pomerantz would have

20 testified to in our pleadings, and I just want to summarize it

21 for the Court so that we are sure that there is a record of

22 this.

23         MR. DAVIDSON:  Judge, may I propose, perhaps,

24 Mr. Caridad just submit an affidavit from Mr. Pomerantz.

25         THE COURT:  If he would like his record to be

Friday, November 9, 2012

1    complete, but I just think that we are dealing with apples and

2    oranges.

3         What you are discussing and what you believe the

4    Court should focus on, I do not think comports with the facts

5    in evidence in this case.

6         MR. CARIDAD:  Judge, my final word is that the Court

7    still has to gauge what the fund received.  In the end, the

8    Court can say, you know what, it was valueless because there

9    was a fraud involved, but at least the economics of it I have

10   to get on the record.  And what Dr. Pomerantz would have

11   testified to is that -- like I explained before, the market

12   price of this stock was .005.  For the fund to buy four

13   million shares of free trading stock at that price, given the

14   lowly liquidity, it would have driven the price through the

15   roof, and they would not have been able to buy these many

16   shares for $20,000.  Instead, what a reasonable buyer would do

17   is take restricted shares, even though they are restricted,

18   because you can buy them all at once, so the discount is

19   offset by the fact that you pay have to pay a premium because

20   you are buying all the shares at once.  When you take all of

21   that into account, they got a fair price for that stock, and

22   the discount of a restricted stock varies all the way from

23   fifty percent to ten percent.  And in some instances, as a

24   study presented by the Government yesterday in its pleadings

25   show, sometimes you have to pay a premium for that.  You have

Friday, November 9, 2012

1    to pay a premium for restricted shares.  And per the trading

2    data that we submitted, which was given to us by the

3    Government for RLAB and for U.S. Farms, if you look at the

4    value of the shares one year later for RLAB, when they could

5    have been sold, they were on par with what was paid for and

6    sometimes even higher.

7           For U.S. Farms, because it is a reporting company,

8    they only had to wait six months.  And if you look at the

9    trading data submitted by the Government and you compare the

10   price of the shares when it was purchased to six months later,

11   it is equivalent.  The fund did not lose any money.  They

12   didn't lose any money when they bought RLAB, and they didn't

13   lose any money when they bought U.S. Farms.  So that's why we

14   believe that there was no loss in this case.

15          Now, the Government's other position is that -- which

16   I think has to be my fall back position -- is that because

17   they got something of value, the Court could conclude, as our

18   second alternative, that the loss here is the kickback -- what

19   the Government has termed the kickback -- and that is $24,000

20   because that money should have been gone back to the fund by

21   the Government's own admission.  So if the Court is not --

22   obviously not agreeing with us, I don't think an $80,000

23   figure is appropriate.  I think the more reasonable figure is

24   the $20,000 -- $24,000, which is the amount of money paid back

25   by Mr. Skwara and by Mr. Newton.  That should be the amount of

1  the loss, if the Court finds that it is not zero.

2          THE COURT:  Thank you very much, Mr. Caridad.

3          There is also an argument -- Mr. Davidson, your

4  argument for an increase for adjustment of role in the

5  offense.

6          MR. DAVIDSON:  Thank you, Your Honor.

7          Yes, we are seeking a two level enhancement for the

8  recruitment that Mr. Newton did here.  I think perhaps the

9  most telling portion of the trial was the 40-minute tape in

10 which Mr. Newton pleaded with the undercover agent, "I have a

11 friend, he can do these transactions also."

12         And he was begging and pleading, please do the USFM

13 deals also, please do the deals with Mr. Skwara.  Then,

14 Mr. Newton reached out to Mr. Skwara.

15         Mr. Skwara testified, almost in tears, that

16 Mr. Newton was his mentor.  He relied on Mr. Newton.  He

17 relied on Mr. Newton's insight into the market and the

18 business world, and Mr. Skwara went along with the second two

19 deals because Mr. Newton brought him into it.  And Mr. Skwara

20 testified that Mr. Newton received a portion -- a significant

21 portion of the proceeds of that -- the first USFM deal.

22         And so we look at the case law.  We see that bringing

23 another person into a conspiracy and then receiving a portion

24 of the funds -- in this case, a significant portion of the

25 first deal -- does qualify you to be a leader organizer and

Friday, November 9, 2012

1   receive a two level enhancement.  And for those reasons, Your

2   Honor, we are seeking the enhancement because Mr. Newton was

3   the prime mover, the instigator, the individual who corrupted

4   Mr. Skwara.  And that's what the guidelines want the Court to

5   take into account, that Mr. Newton ruined the life of

6   Mr. Skwara because Mr. Newton was so --

7           THE COURT:  Is that really the standard?  I mean,

8   it's, yeah, Mr. Skwara is going to be a convicted felon, he

9   has to deal with his own demons.  But other than his own

10  company, what was he recruited to do?

11          MR. DAVIDSON:  Judge, Mr. Newton, the testimony I

12  think shows, encouraged Mr. Skwara to do this.  He came into

13  the first meeting, I think it was somewhere in Eastern

14  California.  They had the lunch.  Mr. Newton was pushing the

15  idea for Mr. Skwara.  He encouraged him to go to Florida.  He

16  told Mr. Skwara what to say at the meetings.  He walked him

17  through the script about what they were going to say, and then

18  Mr. Skwara just followed those directions that Mr. Newton had

19  laid out for him.

20          That --

21          THE COURT:  So you want position of trust and leader?

22          MR. DAVIDSON:  Judge, they are looking at two

23  different issues.  If Mr. Newton had -- was not the CEO of

24  RLAB, we would have to look at the issue about role separately

25  because you can recruit -- Mr. Newton could recruit Mr. Skwara

Friday, November 9, 2012

1   independently, and I think, Judge, the issue here is, look,

2   the first few counts in the indictment dealt with RLAB.  That

3   was Mr. Newton's company, and those involve an abuse of trust

4   vis-a-vis the shareholders and the market.

5           As to this last few transactions, Mr. Skwara was the

6   person in a position of trust.  He was recruited by

7   Mr. Newton, and that's an added harm that the Court should

8   consider that Mr. Newton brought in Mr. Skwara, and that's why

9   we see the second half in the indictment involving Mr. Skwara,

10  so there are two different issues.

11          The first half is the abuse of trust.  That's where

12  Mr. Newton did everything; and in the second half, Mr. Newton

13  brought in Mr. Skwara which is why this case was -- involved

14  so many more counts because there was -- Mr. Newton brought in

15  Mr. Skwara.

16          MR. CARIDAD:  Judge, I think we have to get the

17  record straight.  The Court, I think, will remember

18  Mr. Skwara's testimony.  There was not any word at all about

19  pushing him to do anything.  There was not any word at all

20  about encouraging him to do anything.  There was no testimony

21  by Mr. Skwara that he was supposed to follow a script,

22  nothing.  All he testified to was that Mr. Newton told him

23  about this opportunity, and he went down to Florida.  That's

24  what he said.  And when he got there, he is sitting in the

25  chair, just like Mr. Newton was.  He knows what he is doing.

Friday, November 9, 2012

1   He is not being pressured by Mr. Newton.  Mr. Newton is not

2   each there, and he tells these gentlemen simply that Mr.

3   Newton has told him about this opportunity, and he wants to

4   participate.  He starts to describe how good his company is,

5   how much he cares for his shareholders, how much he is going

6   to make money for this fund that's going to invest in his

7   company.

8            All that Mr. Newton did was tell Mr. Skwara about

9   this opportunity, period.  That's all the record shows.

10           Mr. Skwara got on a plane, came down here, listened

11  to what they had to say and agreed to do it.  The first time

12  that he did it, he received $20,000.  He gave Mr. Newton

13  $6,000 of that.  He gave another $6,000 back to the undercover

14  agents.  The second time he did it, he didn't even tell

15  Mr. Newton about it, that he had done it, so no mention to

16  Mr. Newton that he had done it.

17           Mr. Newton, when he talked to the undercover agent

18  about Mr. Skwara, they even want to give him a commission for

19  telling Mr. Skwara about this, and Mr. Newton says no, I don't

20  want any money from you, and he says no.  So it is quite a

21  stretch to say that Mr. Newton was a leader of anything.

22           The factors are the exercise of decision-making

23  authority.  Mr. Newton just told Mr. Skwara, here is this

24  opportunity, if you want to do it, do it.

25           The nature of the participation in the commission of

1  the offense by the leader, Mr. Newton did this himself and

2  simply told Mr. Skwara about the opportunity.

3          The recruitment of accomplices, I don't know if you

4  can call this a recruitment.  He told Mr. Skwara about this

5  opportunity.  Mr. Skwara committed the offense himself without

6  any help or coaching from Mr. Newton.

7          The claim right to a larger share of the fruits,

8  Uh-uh, Mr. Skwara give him $6,000 and that was it.  And he did

9  it again and didn't even tell Mr. Newton about the second

10 investment.

11         The degree of participation and planning or

12 organizing the offense, that's the Government.  The Government

13 is the one who completely planned this whole thing and made

14 certain conditions firm before anybody received any money.

15 They are the ones who organized it.  Mr. Newton and

16 Mr. Skwara, if they wanted to receive this investment, they

17 just had to go along, period.  There was no planning except

18 them.

19         The degree of control and authority over others,

20 Mr. Newton had no control at all over Mr. Skwara.  He is a

21 grown man, an intelligent man.  He exercised no control over

22 Mr. Skwara at all.  There is not a shred of evidence to

23 support this enhancement, Your Honor.

24         THE COURT:  Thank you.

25         I don't believe that there is any additional evidence

Friday, November 9, 2012

44

1   of recruitment here.  Mr. Skwara did what he did because he

2   wanted to do what he wanted to do.  The involvement here,

3   other than the initial offering of the deal, was of no moment

4   as to additional recruitment, for lack of a better word, in

5   this case.  So at paragraph 29, it stays the same.  So I am

6   still at an adjusted offense level of 19 in this case.

7           Counsel for Mr. Newton, will you be arguing

8   additional 3553 factors?

9           MR. CARIDAD:  Judge, there are still a couple of

10  other issues.

11          THE COURT:  As to the guideline range?

12          MR. CARIDAD:  Yes, Your Honor, sophisticated means

13  and abuse of trust.

14          THE COURT:  That's paragraph 27, which you say should

15  not exist, and what was the other one?

16          MR. CARIDAD:  The Government has asked for an

17  enhancement for abuse of position of trust.

18          THE COURT:  Oh, yes, that's right.

19          All right.  You don't believe this involved

20  sophisticated means, Mr. Caridad.

21          MR. CARIDAD:  Correct, Your Honor.

22          THE COURT:  You may argue.

23          MR. CARIDAD:  Yes, Your Honor.

24          May have one moment?  I'm sorry to delay the Court,

25  Your Honor, if you can just give me one second.

Friday, November 9, 2012

1          Judge, sophisticated means is defined as specially

2    complex or intricate; especially complex or intricate, not

3    just complex or intricate, especially so.

4          What we had in this case, Your Honor, was whatever

5    the scheme was, it was created by the Government.  There can

6    be no doubt about this.  Through Mr. Epstein and a Government

7    agent, this was the plan.  We are going to target people, we

8    are going to offer them the opportunity to receive investment

9    in their company, and we are going to require that they sell

10   us restricted shares at the market price for free trading

11   shares.  We are going to require that if they want the money,

12   they have got to sign a consulting agreement, which we will

13   pitch to them as a phoney consulting agreement.  And we are

14   going to require that they send that consulting agreement to a

15   company that we tell them we made up.

16         All of that was devised by the Government and

17   required by the Government, if these two gentlemen, in a time

18   of economic difficultly, wanted an infusion of capital for

19   their business.

20         So if that is sophisticated, and I don't think that's

21   so sophisticated -- it is sophisticated because the Government

22   made it sophisticated.  And we are sentencing my client here

23   for what he did.  He didn't come up with any part of this

24   scheme.  All he did was receive the money, send them a check,

25   sign the consulting agreement that they demanded.  That's what

1   he did.

2          So all of this other stuff, the whole plan, what

3   might look complex, which I don't think looks complex, comes

4   from them, so how can we punish Mr. Newton for something he

5   didn't devise but something he merely agreed to?  We punish

6   people if they themselves have come up, as a defendant in a

7   case, with a devious scheme, complex things to avoid

8   detection.  When the defendant hasn't done that but has simply

9   said, okay, I'll do it, that's not -- we shouldn't punish

10  Mr. Newton for that.

11         THE COURT:  And you are saying it's not sophisticated

12  because the Government actor triggered this?

13         MR. CARIDAD:  Let's talk about whether it is

14  sophisticated in absolute terms.

15         Is it especially complex or intricate?  Not just

16  complex, especially so.  There is a degree of aggravation in

17  this -- in this definition.  It's a scheme that said, we buy

18  stock in your company, you give us a kickback, we have to hide

19  it.  That's it.  That's what the scheme was.

20         So I don't think that's especially complex, but even

21  if it is, it's their doing.  It didn't come out of

22  Mr. Newton's head.  It didn't come out of his mind.  He didn't

23  sit down and draw this up, and that's what we punish.  When

24  people sit down and out of their own mind or co-conspirator's

25  comes this plan, we punish people for being sophisticated in

1    crime.  But here the sophistication came from the Government,

2    so how can we punish Mr. Newton for simply agreeing to it.

3          MR. DAVIDSON:  Judge, a brief response.  There were

4    several ways in which this was a sophisticated scheme

5    involving covering up the tracks, and that's ultimately what

6    this Abraham opinion -- *Abramson* opinion and the commentary go

7    to.  They are concerned about fictitious entities, corporate

8    shells, offshore financial accounts, anything that could throw

9    the scent off, if the hounds were trying to track down the

10   criminals.  This case involved repeated efforts to throw off

11   the Government.

12         At a starting point, we have the fictitious

13   consulting agreements.  The defendant didn't have to sign the

14   fictitious consulting agreement, but he did.  And he did that

15   because he wanted to throw off the hounds.  Of course, he

16   didn't realize everything was being recorded, but he was

17   trying to throw off the cops in his own mind.

18         The e-mails that this Court has reviewed where the

19   defendant repeatedly came up with bogus things like great idea

20   about the jean line; all right, he sent those e-mails out as

21   his defense.  If he were ever confronted by law enforcement,

22   he could point to those e-mails and say look, he did do

23   consulting.  But fortunately, this Court now has the testimony

24   of the undercover FBI agent to realize that was all a sham.

25         And so the defendant took repeated steps to throw off

Friday, November 9, 2012

1  the scent of law enforcement.  Fortunately, we have the

2  videotapes to disprove the defenses Mr. Newton created, but

3  the guidelines try and address that conniving nature that a

4  defendant who goes around sending fake e-mails and signing

5  bogus consulting agreements is more harmful because he has it

6  in him to evade detection.  Similar to creating fictitious

7  entities, corporate shells or financial accounts offshore,

8  these are similar things to what the commentary discuss, and

9  for that reason it applies.

10         MR. CARIDAD:  Sometimes we think that we hear things

11  in the courtroom when we didn't.  The Government just said

12  that he didn't have to sign this consulting agreement.  Well,

13  in one sense, I guess that's true.  He could have left, but

14  the evidence in the case is that Mr. -- they proposed the

15  consulting agreement to Mr. Newton, and he said on tape, I'll

16  just send you guys the money, implying you don't need a

17  consulting agreement.  That's what he said.  They said no; if

18  you want this money, you have got to sign the consulting

19  agreement.  So to say that he didn't have to sign that

20  agreement, that's not really what we are talking about.

21         He was told if you want this money, you have got to

22  sign it; no ifs, ands, or buts.  He proposed a less

23  sophisticated means of doing it, just sending them the money

24  directly.  They said, no, we want to make it more complex.

25         The e-mails are just an extension of what the

Friday, November 9, 2012

1   Government required.  They required that there be a consulting

2   agreement to hide this.  And if you want this money, you've

3   got to play along with us or you don't get any money.  And

4   that's when those e-mails come from, an extension of just the

5   Government's plan to make this complicated by this consulting

6   agreement.  It is their plan, Judge, their plan.  If you want

7   to sentence them for doing this, go right ahead.  But for

8   Mr. Newton simply saying, okay, that's not, I don't think,

9   what this guideline is about.

10            THE COURT:  Let me ask this question.

11            Without someone like Mr. Newton, could this scheme

12   have worked, even with the Government actor?

13            MR. CARIDAD:  I'm sorry, say that again, Judge.

14            THE COURT:  Without someone like Mr. Newton, could

15   this scheme have worked even with the Government actor?

16            MR. CARIDAD:  Well, Judge, if you don't have someone

17   you are targeting, then there is nothing.  But a lot of people

18   agreed to this.  This is not only Mr. Newton in the world who

19   agreed to this.  There is a long line of people who were

20   hurting in that economy who, when they were confronted with

21   this, they said all you have to do is say yeah; they said

22   yeah.

23            So as I said to the jury, you know, the choice that

24   they gave Mr. Newton was not between something legal and

25   illegal, they gave him only one choice; this is it, take it or

1   leave it, buddy.  And in that situation, all he did was say,

2   yes, I will take it.

3           But even while he's saying that, Judge, and I think

4   this is going to become important before the Court sentences

5   my client, even while he's saying that, throughout this entire

6   transcript, you hear Mr. Newton and Mr. Skwara saying, "I want

7   to make money for the fund, my company is going to grow, this

8   is a good investment, I'm going to take care of these

9   investors, I have had a company for 30 years, and I'm going to

10  work hard to make money for you."

11          That's a little besides the point, but my point is,

12  to answer the Court's question, if a defendant -- if a target

13  had said no, we wouldn't be here, my point is all the target

14  said in this case was yes.

15          THE COURT:  Mr. Davidson, other than the consulting

16  agreement, which the Government actor says that they need from

17  Mr. Newton, what's the evidence of so-called sophisticated

18  means?

19          MR. DAVIDSON:  Certainly, Your Honor.

20          The e-mails were not required.  We have had instances

21  where they sign the consulting agreement, and the consulting

22  agreement was just sort of backup.

23          THE COURT:  Would you say if there had just been a

24  consulting agreement, would you be asking for this

25  enhancement?

Friday, November 9, 2012

1          MR. DAVIDSON:  Normally, Judge, in these type of

2    cases where a defendant signs a bogus consulting agreement, we

3    seek the enhancement.  If there was no --

4          THE COURT:  But what did he do that was sophisticated

5    other than sign his name?

6          MR. DAVIDSON:  Certainly, Judge, that's the starting

7    point.  If you put your pen to the paper and you sign what you

8    know is a bogus consulting agreement, the Government seeks the

9    enhancement.

10          In this case, Mr. Newton actually went above and

11    beyond that.  He started having these e-mails go out and

12    sending out the press releases.  He continued to hit the

13    undercover agent with these e-mails:  "Thank you for your

14    suggestion about" -- I think it was the West Palm Beach office

15    -- "here is a press release that is coming out."  He continued

16    to doctor and paper over the e-mails to make it sound like

17    there was consulting that was going on.

18          And you heard on the tapes, the undercover agent

19    said, "I'm a mile wide and an inch deep, "or whatever it was,

20    the expression.  The undercover agent didn't know anything.

21    He said, "I don't know anything about retail," but Mr. Newton

22    kept on sending e-mails and e-mails and e-mails:  "Thank you

23    for your idea, thank you for this; it was great talking to you

24    about all of this stuff."

25          And the agent testified, "I didn't know what he was

52

1    talking about.  I have never been to South Beach.  I don't

2    know what this idea here is."

3         The defendant was the one who repeatedly sent those

4    e-mails, and I don't think there is any evidence, Judge, that

5    said we required those e-mails.  He decided how frequently,

6    how detailed, how deceptive, how many lies to put in those

7    e-mails.  So yes, we put the consulting agreement in front of

8    him.

9         THE COURT:  You are saying the e-mails were designed

10   to further enhance his ability to get money?

11        MR. DAVIDSON:  To cover it up, yes.  By that point,

12   he already had the money, but this was all part of the

13   coverup.  Like the fictitious entities, the corporate shells,

14   that's the idea.  He is trying to throw the Government off.

15   If ever confronted, he would say -- he would point to all of

16   these e-mails:  "Oh, yes, he told me about South Beach, it was

17   wonderful, and we chatted about this.  Look, here is all the

18   documents."

19        And I think, Judge, you will remember he had the

20   itinerary at the meeting.  He's like, let's say we discussed

21   this, and he rattled off in 20 seconds all of the itinerary

22   items he could have so he could say that "we had a meeting."

23        THE COURT:  But is that sophisticated or just a

24   criminal being a criminal?

25        MR. DAVIDSON:  Well, Judge, I think what the

Friday, November 9, 2012

1   enhancement is trying to get to is the coverup; right.

2   Because a crime that involves a lie is bad, but a crime that

3   involves a lie that takes so many steps to infiltrate, that is

4   so hard to break into, those are the worse type of crimes that

5   require a higher sentence.  A crime that -- you know, where a

6   defendant uses his own driver's license, his own bank account

7   to cash a check, well, that's not that sophisticated.  If he

8   uses a fake ID, and he uses somebody else's company, well,

9   that's harder to track down where the money is going.

10          And in this case, he used his own ID, and he used his

11  own company, but he took all of these steps to cover up the

12  lack of consulting by sending those e-mails.  And that's the

13  coverup idea, the shells, the fictitious entities.  That's

14  really what the guidelines are going to, making it harder to

15  crack the case, and that's what the defendant tried to do

16  here, but for the fact that everything was on tape.

17          MR. CARIDAD:  Judge, we are talking about one e-mail.

18          THE COURT:  I just want to go to the actual 2B1.1.

19          MR. CARIDAD:  I'm sorry, Your Honor, what is the

20  Court looking for?

21          THE COURT:  I want to actually read the language.

22          MR. CARIDAD:  Page 94, Your Honor.

23          THE COURT:  Of the 11 book.

24          MR. DAVIDSON:  The blue.

25          MR. CARIDAD:  The blue book, Your Honor?

Friday, November 9, 2012

```
 1              THE COURT:  Yes.

 2              MR. CARIDAD:  Page 94.

 3              THE COURT:  2B1.1, sophisticated means enhancement

 4    under subsection B10.

 5              MR. DAVIDSON:  Correct, Judge.

 6              THE COURT:  Okay.  Now, sophisticated means means

 7    especially complex or especially intricate offense conduct

 8    pertaining to the execution or concealment of the offense.

 9              And, Mr. Davidson, your argument is the e-mails and

10    the itineraries and all of those things, so if anybody comes a

11    looking, they think, oh, this must be legitimate.

12              MR. DAVIDSON:  Correct, Judge.

13              THE COURT:  For example, in a telemarketing scheme,

14    locating the main office in the scheme of one jurisdiction but

15    soliciting operation in another; conduct such as hiding assets

16    or transactions or both, through the use of fictitious

17    entities, corporate shells, offshore accounts.

18              Okay.  Okay.  I don't believe the mere signing of the

19    consultancy agreement is sophisticated means.  I believe where

20    the sophistication comes about is the concealment, which is

21    why I wanted to actually look at what the language is, the

22    concealment, so if anyone comes knocking, it looks like it's a

23    legitimate business and you realize it's not.  So the

24    sophisticated means in paragraph 27 stays.

25              Mr. Caridad.
```

Friday, November 9, 2012

1        MR. CARIDAD:  The Government is requesting an abuse

2    of trust enhancement, Your Honor.

3        THE COURT:  And you disagree?

4        MR. CARIDAD:  Yes, Your Honor.

5        THE COURT:  You may proceed.  Excuse me just a

6    moment.

7      (An off-the-record discussion was had.)

8        THE COURT:  Counsel, if you could just hold off for a

9    moment.  We have some visitors from Denmark.  They are dressed

10   very casually, they are apologizing to all of us, but when

11   they found out -- they are just going to come in, so we are

12   not going to stop, but just so you -- I don't interrupt your

13   argument, Mr. Caridad, with a stream of Danish visitors coming

14   in.

15       MR. CARIDAD:  I don't want to test the Court's

16   patience, Your Honor.  I apologize.

17       THE COURT:  They are coming right in.

18       MR. CARIDAD:  I mean, just regarding the

19   sophisticated means, I just wanted to point out one more

20   thing.

21       THE COURT:  Okay.  Can we let our Danish people come

22   in.  They are standing outside.

23       Welcome, everyone, just take a seat.

24       Mr. Davidson, you now have additional support.

25       MR. DAVIDSON:  Thank you, Your Honor.

Friday, November 9, 2012

1           MR. CARIDAD:  Nobody ever sits on our side.

2           Judge, the question of the e-mails, and that's all we

3   are talking about, I think here, is an extension of what the

4   Government required as the price for doing business.  They

5   told him we need the consulting agreement.  He says, I don't

6   want a consulting agreement, I'll just pay you money; and they

7   say, no, you need one.  And then they scare him, they say, you

8   know, you've got to watch, you've got to watch out for the SEC

9   or the FBI, if they come knocking.

10          So Mr. Newton, on one occasion, sends them and e-mail

11  saying thanks for consulting with me or thanks for your idea

12  about the jeans.  That's it, that's all he did here, Judge.

13          When he flew back the second time, he had a list of

14  things that he wanted to talk to them about, and he went

15  through that list, but the purpose of that was to create a

16  trail, Judge.  It doesn't make sense because -- okay, you can

17  have a piece of paper, but why -- about things you want to

18  talk about, about consulting that you want to do, but why does

19  Mr. Newton throughout all of these tapes always say them, "I

20  know you told me you are a mile wide and an inch thick, but

21  I'm going to work you.  I do need your input."

22          Why would he say that, and nobody could hear that,

23  and that was not being recorded?  Why would he say those

24  things?  It is because he is a businessman, and he has got

25  somebody in South Florida that he is paying $6,000 to, and he

Friday, November 9, 2012

1    wants to get something out of him, at least something, at

2    least some information, some consulting, something that will

3    help him with his business.  Otherwise, there is no way to

4    explain why he is talking about these things, when it is not

5    going to be recorded.  He is not going to be able to show that

6    conversation to anybody else to explain what he is doing to

7    cover it up.

8            So we are talking about an e-mail, Judge, that's an

9    extension of what the Government has demanded of him, which he

10   didn't want to do in the first place.  All he wanted to do was

11   send them money.  He didn't want to have a consulting

12   agreement.  So I ask the Court to really conclude that this is

13   not especially intricate.  His participation is not especially

14   intricate.  That's all it was that he did.

15           THE COURT:  What's your next argument, Mr. Caridad?

16           MR. CARIDAD:  Yes, Your Honor.

17           The Government is asking for an abuse of trust

18   enhancement, and I believe what they are saying is that

19   because Mr. Newton was the CEO of RLAB, he abused his position

20   of trust as respects the shareholders in RLAB.

21           They can't argue that he abused his position of trust

22   as to the fund because, first of all, those people didn't

23   exist.  And the person who abused any kind of duty was the

24   fiduciary to them.  So they are stretching to say, well, okay,

25   we can't go there, so let's go over here.

```
 1            Mr. Newton owed some duty to his shareholders and
 2    because did he this thing, he violated his duty to them.
 3            Well, I don't think that the case law extends to
 4    them.  First of all, they are not victims in any sense of the
 5    word.  They are passive shareholders that we know nothing
 6    about.  We don't know who they are.  None of them have
 7    complained.  As a matter of fact, the only one we have heard
 8    from is Mr. Moffit, whose letter I submitted to the Court, who
 9    said -- who knows all about this offense and is a shareholder
10    of RLAB and doesn't think he got defrauded, but aside from
11    them, it is too much of a stretch to say that the shareholders
12    in Mr. Newton's company were victims, that their trust was
13    abused.
14            That's not what this case is about.  This case is
15    about abusing the trust that was placed in that fiduciary, and
16    clearly, Mr. Newton had nothing to do with that relationship.
17    So we ask -- and I have not found one case in the Eleventh
18    Circuit that has held that the shareholders of a company are
19    abused when the CEO of a company does something.
20            The only case cited by the Government was a case
21    involving bribery of Haiti government officials by the CEO of
22    a company, and they found that that CEO abused the trust that
23    the Haitian government had put in him; and by the way, he
24    might have abused the trust of his own shareholders, but
25    that's all we have.
```

Friday, November 9, 2012

1          Case law is squarely on the side that there has to be

2     a victim here, and you have to abuse the trust put in you by

3     the victim.  And that's not what we have here.

4          MR. DAVIDSON:  Judge, a CEO holds a special position

5     in our system.  He is supposed to watch out for the

6     shareholders.  He is supposed to do what is best for the

7     company, increase its revenues legitimately so that all of the

8     shareholders may benefit.

9          In this case, Mr. Newton paid a bribe, he engaged in

10    securities fraud, and he violated the trust that the

11    shareholders put in him.  That violation could have harmed

12    everyone who invested in RLAB.  It could have destroyed the

13    company.  If word got out that the CEO was bribing a pension

14    fund for investment purposes, it could have devastated the

15    company.  That's the violation of the trust.  That's the abuse

16    of trust and why he deserves the four level enhancement.  When

17    you have a special relationship with other people, they trust

18    you; and when you violate the trust, you deserve to go to jail

19    for a longer period of time.  That's what the guidelines

20    encourage this Court to consider when imposing the abuse of

21    trust enhancement, and that's why we seek it.

22         I recognize the authority that we cite is from other

23    circuits, but those other circuits have found that CEOs who do

24    this type of fraud deserve the abuse of trust enhancement

25    because their shareholders could potentially have been

Friday, November 9, 2012

1    damaged.

2          MR. CARIDAD:  Judge, there is no case that holds

3    that.

4          MR. DAVIDSON:  Judge, we cited --

5          MR. CARIDAD:  The only case is the one I referred to

6    just now, Your Honor.  That didn't consider this.  It is like

7    saying the CEO of a company committed a crime and it brings

8    disrepute on the company because --

9          THE COURT:  That's exactly what happened.

10         MR. CARIDAD:  But then every single case where a CEO

11   commits a crime is an abuse of trust?

12         THE COURT:  No.  I think when you have a CEO that

13   commits a crime that is related to the actual company, that's

14   an abuse of trust.  Why do you think board of directors go out

15   of their way to hire a particular CEO?  Why do you see when

16   there are changes in CEOs in a company, volatility in the

17   stock price.  You don't want to hire a CEO that you think is a

18   crook and is going to manipulate your stock or somehow,

19   through bribery or other means, hurt the integrity of your

20   company.  That's -- to me, this is almost a guideline that

21   doesn't need an explanation when you are dealing with a CEO.

22   That's why you have -- would this argument carry more weight,

23   Mr. Caridad, if this were a lower placed person in the company

24   who people or investors didn't look to?  But that's not what

25   happened here.

Friday, November 9, 2012

```
 1              People buy stock in a particular company for a
 2   reason, many reasons, but one of them is you're hoping that
 3   the CEO is operating in the best interest of the company,
 4   that's not going to bring the company into disrepute, that's
 5   not going to be in a situation where the company is going to
 6   be under indictment by the federal government, where he is not
 7   going to be under indictment for financial issues.  That is
 8   definitely a position of trust, and your client abused that
 9   trust in engaging in this conduct.
10              MR. CARIDAD:  Judge, there has never been a case
11   extending this kind of enhancement for the CEO of a company,
12   vis-a-vis the shareholders, when the CEO has done something
13   incorrect.  They are not victims of this, Your Honor.  They
14   are simply shareholders in this company.  Now --
15              THE COURT:  But the shareholders are the ones who
16   suffer by virtue of plummeting stock price, by virtue of a
17   fraud, so they now are holding something that is valueless.
18   Now it may not be an extension, and I might be thinking of
19   your argument a little differently, if all of the shareholders
20   were here asking for victim restitution, but that's not what
21   we are talking about.  We are talking about the behavior of
22   your client in executing this fraud.
23              MR. CARIDAD:  Yes, Your Honor, but that's too broad
24   because anything that a CEO does --
25              THE COURT:  I'm not saying -- if the record should be
```

Friday, November 9, 2012

```
 1   clear, I'm not saying anything.  I'm saying the behavior in
 2   this case.  There might be some other case looking at the
 3   criminal conduct of the individual where I might rule
 4   differently, Mr. Caridad, but your client's behavior here, I
 5   think, falls square within the guideline.
 6           MR. CARIDAD:  Judge, I respectfully disagree, and I
 7   point the Court finally to a press release issued by the
 8   Securities Exchange Commission where Mr. Newton was charged
 9   civilly, and they are talking about the sting operation.  And
10   they say, quote, the operation was conducted in such a way
11   that no investor suffered harm.
12           The Government itself is saying no investor suffered
13   harm.
14           THE COURT:  But that's not the test.  The test isn't
15   harm, the test is whether or not you abuse a position of
16   trust, and harm is not required to abuse the position.
17           MR. CARIDAD:  Judge, every case that I have read
18   identifies the people who gave the trust as the victims of the
19   trust in some way.  They were stolen.  They were victimized.
20   They were defrauded.  That didn't happen here because they
21   were just passive investors in a company.  So this is beyond
22   what is normally done, I believe, in these situations.  These
23   people were not victims.  The victims, by the Government's own
24   indictment, was the fund, the pension fund, not these
25   investors, not the shareholders of RLAB.
```

Friday, November 9, 2012

1          THE COURT:  Thank you very much, Mr. Caridad.

2          Are there any other objections that the Court needs

3     to deal with before you go to your 3553 factors?

4          MR. DAVIDSON:  No objection from the Government, Your

5     Honor.

6          THE COURT:  So at the present time, the advisory

7     guideline range is 30 to 37 months with a total offense level

8     of 19.

9          Mr. Caridad, your arguments, please -- and I will

10    say, for the record, that I do have copies of your filings and

11    attachments.

12         MR. CARIDAD:  Yes, Your Honor.

13         I would like to call -- ask Mr. Larry Lowan to say a

14    few words.

15         THE COURT:  Sir, would you come forward and stand at

16    the lecturn, please.  And for the record, will you tell me

17    your full name.

18         MR. LOWAN:  Your Honor, my name is Lawrence Lowan.

19         THE COURT:  And you want to tell me about your

20    knowledge of Mr. Newton?

21         MR. LOWAN:  I do.

22         THE COURT:  Please proceed.

23         MR. LOWAN:  Your Honor, I am an attorney.  I have

24    been practicing law for 40 years.  I met Mr.

25    Newton approximately 35 years ago.  We were introduced by my

Friday, November 9, 2012

1  former law partner who had gone to Colombia University with

2  you Mr. Newton, and Mr. Newton had started a business and

3  needed an attorney, and I was a young lawyer, I needed a

4  client.

5        I represented him for many years thereafter, and that

6  representation included business-related issues, negotiating

7  leases for a very successful retail business that he

8  established with Billy Martin, who was a well-known baseball

9  coach on Madison Avenue in New York; relationships with

10  craftsmen all over the United States who were producing

11  western-themed goods for Doug's store; and those negotiations

12  with landlords when times became tough.

13        All through that period of time, all through those 35

14  years, I can stand before you, because I am here standing up

15  for Mr. Newton, and say that never once did we ever face a

16  situation or did he ever propose a situation that was outside

17  the parameters of acceptable, legal, normal business

18  interaction between businessmen.

19        I'm not privy to all the details of Mr. Newton's

20  conviction, so I can't speak to that; but the behavior that he

21  was accused of and convicted of based upon not just a single

22  moment in time, but on a -- really a lifetime of knowledge of

23  his behavior is totally inconsistent with what I knew of him

24  as an attorney and also as what he became to me, which is a

25  friend.  It just appears to be totally aberrant and

1  inconsistent with anything that I know of him at all.

2          During the period of time that I have known Doug, I

3  have found him, among other things, to be an extremely

4  charitable person, and I just wanted to give the Court two

5  quick examples of what I mean by that.

6          Doug got involved, while he was living in New York --

7  which, by the way, is where I practice, New York and New

8  Jersey -- with a charity that helps young children who are

9  suffering from terminal cancer.  And there was a camp

10  established for them in Texas; and over the life of this

11  particular charity, Doug literally contributed hundreds and

12  hundreds of cowboy boots to these children, which he paid for,

13  with no publicity, with no expectation of any business

14  advantage whatsoever.

15          THE COURT:  Take a moment, sir.

16          MR. LOWAN:  I'm sorry.

17          THE COURT:  That's okay.

18          MR. LOWAN:  It is probably going to be hard for me to

19  get through the next one.

20          THE COURT:  That's all right.  Just take your time.

21          Mr. Caridad, can you get the witness some water.

22  There should be some on your table.

23          MR. CARIDAD:  Of course.

24          MR. LOWAN:  I'm going to finish the second one, if I

25  can, and then I'll wrap it up.  The second one is on a more

1  personal level.

2          Along the way, I got married, and my wife's family,

3  they were not people of means, and Doug was able to help them

4  afford a very important event.

5          So he is now facing a terrible moment of trial, and I

6  hope that I can convey to you, in all sincerity, that he has a

7  lifetime of behavior that I hope you can somehow find a way to

8  balance with his conviction on this charge.

9          I thank you for that.

10         THE COURT:  And thank you for your honesty, sir.

11         MR. LOWAN:  Thank you.

12         MR. CARIDAD:  Judge, I think what Mr. Lowan couldn't

13  complete was that the event was his own wedding.  They could

14  not afford a wedding, and Doug pulled some strings with

15  friends and was able to get Mr. Lowan and his wife a proper

16  ceremony.

17         Judge, I know the Court has said that it read our

18  submissions concerning charity work and letters from other

19  persons.  I would just like to briefly note those.

20         Former representative Bob Michael wrote a letter

21  saying, "Over the many years I have known him, I have

22  participated in a number of charitable events organized by him

23  benefiting many charitable and civic organizations in the Palm

24  Springs area.

25         "Over the years, Doug earned a good name acting as

Friday, November 9, 2012

1  sports agent to a number of professional athletes.  I have

2  always known Doug to be a man of integrity and honesty with

3  great respect for the law."

4        That comes from a former representative of the United

5  States.

6        Tom Railsback, another representative, said among

7  other things:  "What impressed me about Doug was his attitude

8  of caring for others.  When a friend or acquaintance was ill,

9  Doug would visit him or her in the hospital.  I served with

10  him on the board of trustees of Big Brothers and Big Sisters

11  of the Desert.  He was one of the best fund raisers for that

12  organization.  He was also active in fund-raising for many

13  charitable causes.  He is very well-liked and respected in our

14  community."

15        Finally, a general -- retired general from the Air

16  Force, Seth McKee, said, among other things:  "I do know in

17  all of my associations with Doug, he was very open about

18  everything.  I never heard -- I never knew of or heard an

19  accusation that would lead me to believe that he was not the

20  same way with anyone.  He was exceedingly generous, and his

21  willingness to commit time or financial support to worthy

22  causes was demonstrated on many occasions."

23        And we have offered proof of that type of conduct,

24  Your Honor, a life of respect for the law; and since the early

25  '70s, when he was even the coach of East Harlem little league

1  baseball team, to the present time where he still donates

2  time, he has been a man who given his success in business, and

3  just his personality, has been willing to give to others.

4          And I would like to say a little bit about this case,

5  Your Honor, because to me, this is horrible.  I know we saw

6  Mr. Newton agree to take this money; but, Judge, when you step

7  back and think about the 3553 factors, this is, from my point

8  of view what happened.

9          The economy was very bad, 2008, 2009, as we know.

10  Mr. Newton had a successful business for 30 years; but like

11  everybody else, things started to go a little bit more

12  difficult and he was looking for financing.  There is no

13  evidence he manipulated the price of this stock, that he

14  committed any securities fraud at all before any of this

15  happened.

16          Unfortunately, he gets hooked up with Mr. Epstein who

17  has committed a real fraud, and Mr. Epstein wants to get out

18  of jail.  Mr. Epstein makes a deal with the Government to

19  start suggesting this scheme that they think up to these

20  people, one of them is Mr. Newton.

21          Now, the scheme, I have to tell you, is not something

22  that would ever happen in real life.  You heard the Government

23  say that a pension fund would never ever invest in penny

24  stocks.  If that's the case, Judge, then the deterrent value

25  of sending Mr. Newton to jail is zero because if this would

Friday, November 9, 2012

```
 1   never happen in real life, then who are we deterring?  If
 2   nobody is really going out there to a real pension fund and
 3   asking them to invest in their penny stock company and
 4   offering a bribe, if that's not really happening, if that will
 5   never happen, what are we doing here?  Who are we deterring?
 6   Who are we protecting?
 7          And that's what happened here.  He meets up with
 8   Epstein; Epstein says, here, this how I'm going to get you
 9   financing.  The Government thinks up the whole plan.  They
10   tell him, if you want this money, which you seem to
11   desperately need, you have got to sign on the dotted line; and
12   I know you don't want to use the consulting agreement, I know
13   you just want to give us money, but we can't do it that way.
14          By this time, Mr. Newton, as our e-mails between him
15   and Epstein shows, was putting all of his eggs in one basket.
16   He was putting it in Mr. Epstein's basket, and his hope was to
17   get a line of financing that would allow him to keep his
18   business going and expand.  Unfortunately, he says yes to
19   Mr. Epstein, and we know the rest.
20          He used the money, we believe the evidence shows, for
21   legitimate business purposes.  He didn't buy a Cadillac.  He
22   didn't buy his wife jewelry.  And here he is today, so we have
23   a man who is in his sixties, who has got no prior record, who
24   has a history of charitable work, who didn't come looking for
25   a crime, this was presented to him.  All he had to do was
```

1    sign.  What do we do with a man like that?  First of all, we

2    don't need to send a signal because, as the Government says,

3    this crime would never happen in the real world.  Second of

4    all, he has been through the ringer already.  This has been

5    going on for two to three years that he has had to deal with

6    the shame and this guilt of being publically prosecuted and

7    convicted.  I do not see any sense in punishing Mr. Newton any

8    further.

9          He is never going to get near anything like this

10   again.  He has lived an exemplary life.  He has got no

11   criminal record.  I do not see a need to send him to jail.  I

12   know Mr. Newton would like to say something to the Court, Your

13   Honor.

14          THE COURT:  Sir.

15          THE DEFENDANT:  Here?

16          Your Honor, I have never spoken to you before.  I

17   have never spoken to Mr. Davidson.  In one of his pleadings,

18   he said that I lived a very comfortable life, and that's an

19   exaggeration.  My wife and I are 67 years old each.  I have

20   worked hard all of my life, put myself through school, as has

21   my wife.  She was a flight attendant for United Airlines for

22   many years and put herself through college and worked, as I

23   did, when I put myself through college.  She has a job.  She

24   is making about fourteen to fifteen dollars an hour.  She

25   sells shoes in Rancho Mirage area where we live and has been

1    doing that for the last ten years.

2         She couldn't be here today because the season has

3    started in the desert at the hotel where she works.  She had

4    planned to be here and took some time off to be here at the

5    sentencing previously, but of course, the date happened to

6    fall on a Jewish holiday, and so it needed to be postponed.

7         Besides being married to her, I want to say I have

8    had a life that's been full of a lot of blessings.  And no

9    matter what's in store for me or ahead for me, that's a very

10   important thing.  Besides my wife, I appreciate that Miguel

11   has vouched for my sincerity, and that Larry Lowan has also

12   said the things he said.

13        I have been fortunate to have friendships with some

14   great people, Your Honor, who have supported me, and I think,

15   as you've read in some of the letters that have been

16   submitted.  One or two of the names you may know.  One is

17   Congressman Railsback.  He was the author of the Railsback

18   Amendment, which was mentioned often in the trial, Your Honor,

19   that you had in the Padilla case.  Another good friend was the

20   minority leader of Congress for 14 years, Bob Michael, who

21   wrote a great letter for me, which I greatly appreciate.  He

22   was a member of Congress for 38 years.  A much older person,

23   who is in his nineties now, is General Seth McKee who has

24   known me, and General McKee [sic] for 77 years.  I believe

25   today he is the second, by rank, highest ranking survivor of

Friday, November 9, 2012

1   World War II.  Over the years, those people had been helpful

2   to me in a lot of the charity work that I have done.  I guess

3   I have always done that, and I really haven't publicized it,

4   but Miguel wanted me to make sure that we let the Court know

5   that.

6         Congressman Railsback got me interested in the work

7   of Big Brothers Big Sisters, and I did a lot of volunteer work

8   for them over the years and eventually became a trustee or

9   member of their board in the Big Brothers Big Sisters

10  organization of the desert.

11        But long before that, Miguel had mentioned my work

12  that I had been a volunteer for the East Harlem little league

13  team, and I was the coach.  And then one day, I brought to the

14  field and to the team Billy Martin, who was a famous manager

15  at the time of the New York Yankees, a –– before that, he was

16  the Detroit Tigers manager, and he did work for the Texas

17  Rangers.  And believe me, bringing him there and another

18  client that I had worked carefully with, Elston Howard, those

19  kids, their lives were always –– they have never been the

20  same.  And bringing a baseball manager and coach of the New

21  York Yankees to this team, they thought that was quite

22  something.

23        The "Billy Martin" name sort of brings me to the next

24  thing I wanted to say, Your Honor, which concerns that my work

25  and the way it all started was that in 1978, Billy and I

Friday, November 9, 2012

```
 1    opened a western business selling western-style duds to mostly
 2    eastern dudes, and it was a big success.  And as Larry Lowan
 3    had mentioned, we had the benefit of having a lot of mom and
 4    pop suppliers and operators all over the country provide us
 5    with goods.
 6         Billy and I were partners, but he died in 1989 in a
 7    one car wreck, in an accident, but his name and I carried on
 8    in that business, and it operated for an uninterrupted 30
 9    years in New York City.
10         Then, in January of 2011, Your Honor, I got a call
11    from the FBI.  It was Agent Wright, who is here, who actually
12    called me to tell me that my friend Yan Skwara and I would be
13    charged criminally for selling stock illegally and paying off
14    a bribe to an undercover FBI agent.
15         I was able to find an attorney, a criminal attorney
16    in Miami by the name of Mr. Garvin, who agreed to represent me
17    for one day for $2500.  I was given -- we were given a plea
18    agreement.  It was really no negotiation with it.  Mr. Garvin
19    suggested that I sign it.  I got back home and soon
20    thereafter, had not really been familiar with or understood
21    these same terms that I know Mr. Caridad has mentioned and
22    been discussing with you, as has Mr. Davidson, "abuse of
23    trust, sophisticated means," the amount of "intended loss,"
24    and the definition of "intended loss" or why that has to --
25    why that's different from "actual loss," because these people
```

Friday, November 9, 2012

1   actually didn't exist, these pensioners, but had they existed.

2   So now, we have to talk about that, and I realized that I

3   couldn't put in front of you, Your Honor, my hand and swear

4   that I intended to cause a loss that that plea agreement

5   provided for at the level of $60,000.  I couldn't do that.

6        Later, I even had to turn down the Government's offer

7   to limit that loss at 24,000, which was the amount of the

8   kickback, and the kickback money is 12,000, and it was paid by

9   me to this individual Rob, whom I thought actually could do

10  some work for my company, based on the same representations,

11  many that he made in the tape, about his very powerful

12  connections and talents.  And even though he did say, on

13  several occasions, "I'm a mile wide and an inch deep," I know

14  later why he said that.  But even if the intended loss for me

15  was the 12,000 that I paid in two payments, and the two

16  payments that Mr. Skwara paid of 24,000, I couldn't, at that

17  level, say that that was my intention to harm anyone.

18        I said earlier that my life has been full of many

19  advantages and some great people, and the most I have gotten,

20  I've been able to get some great help from so many of those

21  people along the way, and I am thankful each day, Judge, and I

22  will keep being thankful no the matter what is the sentence in

23  my case and whatever the years hold for me.

24        Most people don't get a do-over.  I just want you to

25  know I have always tried to do right in my entire life, and it

1    was never in my heart to do wrong.

2             Thank you, Your Honor.

3             THE COURT:  Mr. Davidson, do you have anything you

4    wish to add?  I'm sorry, Mr. Caridad, was there more?

5             MR. CARIDAD:  No, Your Honor.

6             MR. DAVIDSON:  Just briefly, Your Honor.  The

7    Government is recommending a sentence of three years.  That

8    would be at the high end of the guideline range as calculated

9    by this Court.  What I think is frightening and justifies a

10   high level sentence in this case is that even today, the

11   defendant cannot admit to you that he put himself above

12   others.

13            He continues to try to convince this Court that he is

14   a charitable man who did not violate the law despite the

15   jury's conclusions.  This Court knows the truth.  This Court

16   knows that the defendant risked the financial health of other

17   people.  He didn't have a gun, he didn't have drugs, but he

18   really intended to risk the investments of the people he

19   thought were investing in that pension fund.  He was willing

20   to take their money away from secure investments and put it

21   into his risky company, and he did that because he wanted

22   money.

23            He did it because he couldn't admit that his company

24   was struggling.  He couldn't admit that his Trump Plaza

25   location was going to close and his company would have to be

Friday, November 9, 2012

1   shut down, and he couldn't get it in his head that it is

2   better to just fold and admit that you were wrong than it is

3   to try and take away from other people.  And that pattern

4   continues today, that failure to admit.

5          When considering the 3553 factors, Judge, I think you

6   have to consider the tenacity of this defendant.  For 40

7   minutes, he was on the phone with the undercover agent, please

8   do the second deal, please continue to do securities fraud,

9   and the agent was pushing back.  The agent was saying no, but

10  the defendant continued to ask for those additional deals.

11         His greed ruined not only his own life, but the life

12  of Mr. Skwara, his friend.

13         And finally, Judge, I just have a few points to

14  respond to what Mr. Newton addressed to you today.

15         This Court has seen many different defendants appear

16  before Your Honor.  There are many defendants who come from

17  more unfortunate circumstances.  This defendant is living in a

18  $350,000 house, according to the PSI.  That's comfortable,

19  Judge.  That's very different from the other defendants who

20  really have no choice.

21         This defendant, by his own admission, had high level

22  contacts.  He had a business.  He had money.  He was not

23  forced to turn to crime.  And you have seen other defendants

24  who didn't have the options and opportunities that this

25  defendant has.

Friday, November 9, 2012

1          He made the choice to accept the deal that was put

2     before him, and I think that makes him worse than other

3     defendants who really do not have as much backup opportunities

4     as this defendant has.  He did it and he turned to crime.  And

5     I just think it's hard that even today, he tries to mislead

6     this Court into thinking that he was trying to do what was

7     best for the pension fund, when we know the truth that he was

8     looking out for his own interests.  And for that reason, Your

9     Honor, we are seeking the high end of the guideline range

10    because he needs time to realize, he needs time to think about

11    what did he was wrong.  And it's going to take him time to

12    figure out that society needs him to be honest and truthful

13    and to prevent harm to others, which is what he did in this

14    case.

15          MR. CARIDAD:  Judge, that's much too harsh, much too

16    harsh for a person who has led a life of charity, and note, no

17    arrests.

18          No one was at risk here, Judge.  You got to realize

19    that this was all a fabrication by the Government.  No one was

20    at risk.  This is not something that would have happened in

21    real life.

22          Mr. Epstein took advantage of not only the

23    defendant's situation but other defendants by dangling in

24    front of them easy money when they needed it most, when they

25    were most vulnerable.  That's what happened here.

Friday, November 9, 2012

1           No one's lives have been ruined.  If Mr. Skwara

2  decided to do this, it's because he decided to do it.  And he

3  did it for the same reason that Mr. Newton did it, because

4  they were faced with an opportunity to get some infusion of

5  capital.

6           To say that Mr. Newton turned to crime is a gross

7  exaggeration.  The man does not even have a parking ticket.

8  And in his late sixties, he grabs onto a lifeline that is

9  thrown to him.  I'll remember Mr. Davidson said, when I have

10  another sentencing before Your Honor, where he said other

11  defendants really have no choice.  Everybody's got a choice,

12  everybody.  Mr. Newton had a choice.  Other defendants have

13  had a choice so...  But what was the choice in this case?  The

14  choice was to accept an offer from the Government.

15           There is simply, I think, no need at all to deter

16  this type of crime.  It doesn't happen in the real life, Your

17  Honor.

18           Thank you.

19           THE COURT:  Mr. Davidson, if you had to contrast

20  the behavior and criminal culpability of Mr. Skwara and

21  Mr. Newton, how would you do that?

22           MR. DAVIDSON:  Certainly, Your Honor, several

23  factors.  Mr. Skwara immediately knew that he had done

24  something wrong, and he apologized.  He came to this Court,

25  and he tried to do what was right.  Mr. Newton could not get

Friday, November 9, 2012

1   it through his head that he did something wrong; and even

2   today, he tries to convince this Court that he was actually

3   looking out for the best interest of others instead of

4   himself.  That's a huge disparity.

5           Mr. Skwara ruined his own life by accepting that

6   deal, but he didn't go further.  He didn't try and recruit

7   other people into the fraud.  And that's what Mr. Newton did.

8   Mr. Newton actively pursued recruiting other people, including

9   Mr. Skwara.

10          Mr. Newton was captured on tape being so tenacious in

11  trying to pursue more deals; and Mr. Skwara, in stark

12  contrast, just sort of resigned himself to the fact that the

13  deal was over, and he left it.  He left it and walked away,

14  but Mr. Newton couldn't do that.

15          So I think those are just three easy areas where

16  we can see a significant difference between Mr. Skwara and

17  Mr. Newton.

18          MR. CARIDAD:  Judge, Mr. Skwara didn't serve a day in

19  jail.

20          THE COURT:  Mr. Skwara didn't go to trial.

21          MR. CARIDAD:  I understand.

22          THE COURT:  Mr. Skwara pled guilty.  Mr. Skwara

23  cooperated with the Government.  Mr. Skwara testified at

24  trial.  Mr. Skwara was not unlike Mr. Newton, desperate

25  financially, but recognized that what he did was wrong.

Friday, November 9, 2012

1          MR. CARIDAD:  I understand that, but everything --

2    90 percent of what the Court has said is something that

3    happened after the crime was over, and I'm not saying that's

4    irrelevant.  I'm not saying that's irrelevant; but as far as

5    the offense, Mr. Skwara did the same thing, the exact same

6    thing.  The only difference is that Mr. Newton --

7          THE COURT:  Without Mr. Newton, is Mr. Skwara ever

8    even in this scheme?

9          MR. CARIDAD:  Well, no, because Mr. Newton knew

10   Mr. Skwara, but given the rapidity with which Mr. Skwara --

11         THE COURT:  So if the issue here is that Mr.

12   Skwara -- excuse me, Mr. Newton is desperate, financial times

13   are desperate, he probably didn't use his best judgment, then

14   it's all about him.

15         MR. CARIDAD:  Judge, but Mr. Skwara -- if there had

16   been a Mr. Epstein in Mr. Skwara's life, of course Mr. Skwara

17   would have done it.  Look how easily he agreed to do it.  He

18   came down here, when Mr. Newton just told him to come down and

19   talk to these people, they want to invest in your company.  He

20   comes down, he sits in the same chair, and he agrees very

21   quickly.  He did the same thing.

22         So how do we -- what do we do to someone who, in his

23   own heart, believes he did not intend to harm someone, but the

24   Court believes and the jury has found that he did?

25         Well, you know, as Mr. Newton said, he was offered

Friday, November 9, 2012

1    two plea agreements:  One when he was represented by Mr.

2    Garvin, one where he was represented by me.  They got better.

3    The second one was better than the first.

4         MR. DAVIDSON:  Judge, I'm going to object under Rule

5    11 as to making all of these arguments based on the plea

6    agreement.  The defendant didn't accept the plea agreement.

7    Those are negotiations between the parties.  It is improper

8    consideration.

9         MR. CARIDAD:  Mr. Newton has mentioned them, Judge.

10   He has a right to talk about them.

11        THE COURT:  I'm going to allow it.  Continue,

12   Counsel.

13        MR. CARIDAD:  Even faced with that, Judge, faced with

14   a guideline range that I think would have been a fraction of

15   this, a fraction of this, he told me, "I just cannot go in

16   front of this Judge and say that I intended to defraud people,

17   that my intention was to hurt them, to cause them harm."

18        And, Judge, if you listen to the tape, we see, of

19   course, Mr. Newton agreeing to receive this money, agreeing to

20   the consulting agreement, but we also see a Mr. Newton who

21   says, "I'm going to work you hard.  I want to get something

22   out of you, and you are going to like this company because we

23   are going to make a good product.  We are going to make it a

24   patriotic American product, and you are going to be happy that

25   you invested in this company."

Friday, November 9, 2012

1          He meant that because why would he say that to

2    people, the fiduciary, for example, Chris and Rob who tell

3    him, we don't care about your company.  But he did care, and

4    he told them in response to that, he said, "I care, it's a

5    real company.  I'm going to make it grow, and you will see."

6          So, Judge, in his mind, in the end, he was getting an

7    opportunity.  He was getting money.  He was also getting an

8    opportunity to make this company grow, and you shouldn't

9    punish a man for believing in his heart that he did not intend

10   to harm somebody.  How can you possibly punish a man for what

11   he is thinking.  You punish him for what he has done, but you

12   can't punish him for what he is thinking.  You can't punish

13   him because he disagrees with the Government that he intended

14   to harm somebody.  Punish the act and take into account his

15   prior life.

16         Thank you.

17         THE COURT:  I'll ask the defendant and his attorney

18   to stand.

19         Sentencing is a little easier when you are dealing

20   with someone who, in addition to making a bad decision that

21   results in criminal culpability is also a bad person.  I

22   recognize that Mr. Newton is not that defendant.  He has done

23   charitable work.  He has done good things, and I think other

24   than this incident, he is probably a good man.  But some

25   decisions are so -- lack such poor judgment that criminal

Friday, November 9, 2012

 1   culpability is necessary, and I believe that's the case here.

 2         Do I think the high end of the guidelines is

 3   appropriate in this case?  No.

 4         I think the guideline range in this case reflects the

 5   3553 factors, reflects what this defendant's appropriate

 6   criminal culpability is, but I believe the low end of the

 7   guidelines is quite appropriate given this behavior.

 8         The total offense level is 19, the criminal history

 9   category is one, the advisory guideline range is 30 to 37

10   months, and I will be sentencing the defendant within the

11   advisory guideline range.

12         It is the judgment of the Court the defendant is

13   hereby sustained to the Bureau of Prisons for a term of 30

14   months on Count 1.  It is further ordered that he shall pay a

15   fine in the amount of two thousand dollars.  Fine is payable

16   to the clerk of the court.

17         Upon release from imprisonment, the defendant shall

18   be placed on supervised release for a term of one year for

19   Counts 1 through 7, all such to run concurrent.

20         He is to report to the probation office in the

21   district where he is released within 72 hours.  While on

22   supervised release, the defendant shall not commit any crimes,

23   shall be prohibited from possessing a firearm or other

24   dangerous device, shall not possess a controlled substance,

25   shall cooperate in the collection of DNA and comply with the

Friday, November 9, 2012

 1  standard condition of supervised release, including the

 2  following special conditions:  Financial disclosure

 3  requirement, the related concern requirement -- restriction,

 4  excuse me.  All are more specifically outlined in part G of

 5  the presentence report, and pay the special assessment of

 6  $700.  That's $100 as to each of the counts contained in the

 7  indictment.

 8          Now that sentence has been imposed, does the

 9  defendant or his counsel object to the Court's finding of fact

10  or the manner in which the sentence was pronounced?

11          MR. CARIDAD:  Judge, we object to the following

12  rulings by the Court concerning the guideline calculation, the

13  loss amount, the abuse of position of trust, and sophisticated

14  means.  I believe that's the three grounds, but we object to

15  all guideline determinations made against us.

16          THE COURT:  Your objections are considered preserved

17  for the record.

18          MR. DAVIDSON:  Judge.

19          THE COURT:  Yes.

20          MR. DAVIDSON:  Sorry to interrupt.  The Government

21  preserves our objection as to role.

22          And for clarification, perhaps I misheard you.  The

23  30 months was for Counts 1 through 7 to run concurrent?

24          THE COURT:  Yes.  And I may not have said concurrent,

25  but I meant concurrent.

Friday, November 9, 2012

1          MR. DAVIDSON:  Thank you, Judge.

2          MR. CARIDAD:  And one final thing, Judge.  I know the

3     Court ruled on Mr. Pomerantz's testimony.  I would like to

4     leave of the Court to just submit an affidavit by him.

5          THE COURT:  You may.  I will allow you to do that to

6     complete the record.

7          MR. CARIDAD:  Thank you.

8          THE COURT:  Sir, if you are you unable to pay -- you

9     must file any notice of appeal within 14 days.  If you are

10    unable to pay the cost of an appeal, you may apply for leave

11    to appeal in forma pauperis.

12         Mr. Caridad, what is your client's bond at the

13    present time?

14         MR. CARIDAD:  He had to -- when he was convicted, he

15    had to file an additional thousand dollars with the court --

16    deposit with the court.  That's been deposited.  It's a

17    personal surety bond obligation with a thousand dollar deposit

18    with the court, and we ask the Court give him a surrender

19    date.  He lives in California.  I believe he would be a good

20    candidate for a camp.

21         THE COURT:  What are his contacts with his probation

22    officer?

23         MR. CARIDAD:  Sees him twice a month in person and

24    must call him every week.

25         THE COURT:  Mr. Davidson, is there an objection?

Friday, November 9, 2012

1          MR. DAVIDSON:  Yes, Judge.  I think remand may be

2    appropriate here.  The defendant has just gone before Your

3    Honor and insisted that he had no intention of defrauding the

4    pension fund when you see the tapes, you know otherwise,

5    Judge.  The fact that he had the audacity to suggest otherwise

6    to you today and continues to be unable to accept that what he

7    did was wrong, I think makes him a strong candidate for

8    remand.

9          MR. CARIDAD:  Judge, the audacity of a man to believe

10   he is innocent is not indication that he is going to flee.

11         THE COURT:  I'm going to allow the defendant to

12   remain free until his institution is designated, but I am

13   going to change the reporting requirements to once per week in

14   person for his probation officer.  And I'm going to order that

15   he report to his designated institution by 2:00 p.m. on

16   Wednesday, January 9th.

17         Mr. Newton, you should understand that you remain on

18   bond.  If you fail to abide the terms and conditions of this

19   bond, because you are already sentenced, you will be arrested

20   and begin serving your sentence immediately.  Do you

21   understand that?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Thank you very much.

24      (PROCEEDINGS ADJOURNED AT 12:12 p.m.)

25

Friday, November 9, 2012

1          **C–E–R–T–I–F–I–C–A–T–E**

2          I hereby certify that the foregoing is an accurate

3    transcription and proceedings in the above–entitled matter.

4    **12/3/12**                    **/s/DIANE MILLER**
     DATE                     DIANE MILLER, RMR, CRR
5                             Official United States Court Reporter
                              Wilkie D. Ferguson Jr. U.S. Courthouse
6                             400 North Miami Avenue,  Rm 8S28
                              Miami, FL  33128
7                             305- 523-5152   (fax) 305-523-5639

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Friday, November 9, 2012

USA vs. Newton

**$**

$100 [1]  84/6
$100,000 [1]  13/20
$20,000 [11]  13/14 13/16 14/13 15/13 15/17
 17/15 19/4 30/9 37/16 38/24 42/12
$24,000 [5]  19/16 19/20 20/3 38/19 38/24
$2500 [1]  73/17
$350,000 [1]  76/18
$40,000 [1]  19/25
$6,000 [6]  19/15 20/3 42/13 42/13 43/8
 56/25
$60,000 [1]  74/5
$700 [1]  84/6
$80,000 [3]  21/13 22/17 38/22

**'**

'09 [1]  30/8
'70s [1]  67/25

**.**

.005 [6]  13/14 14/19 15/2 17/20 30/10 37/12
.009 [1]  13/16

**/**

/s/DIANE [1]  87/4

**1**

104 [1]  1/7
11 [2]  53/23 81/5
11-2 [1]  1/23
11-CR-60150-MGC [1]  1/2
12 [1]  87/4
12,000 [2]  74/8 74/15
12/3/12 [1]  87/4
12:12 [1]  86/24
14 [2]  71/20 85/9
150 [1]  1/18 10/4
19 [6]  10/11 12/4 12/6 44/6 63/8 83/8
1978 [1]  72/25
1989 [1]  73/6

**2**

2,222,222 [1]  13/16
20 [1]  52/21
2000 [1]  28/15
2008 [1]  68/9
2009 [3]  13/14 13/16 68/9
2011 [1]  73/10
2012 [1]  1/4
21 [1]  12/20
24,000 [2]  74/7 74/16
25 [1]  10/19
25th [2]  13/14 30/8
26 [3]  11/1 13/1 21/1
27 [3]  11/12 44/14 54/24
29 [3]  11/19 12/12 44/5
2:00 p.m [1]  86/15
2B1.1 [2]  53/18 54/3

**3**

30 [9]  8/1 10/13 50/9 63/7 68/10 73/8 83/9
 83/13 84/23
305 [2]  1/24 87/7
305-523-5639 [1]  87/7
33128 [2]  1/23 87/6
33130 [1]  1/19
33132 [1]  1/16

35 [2]  63/25 64/13
3553 [5]  44/8 63/3 68/7 76/5 83/5
37 [3]  10/13 63/7 83/9
38 [1]  71/22

**4**

40 [2]  63/24 76/6
40-minute [1]  39/9
400 [2]  1/23 87/6

**5**

50 percent [2]  22/1 22/2
5152 [1]  87/7
523-5152 [1]  87/7
523-5251 [1]  1/24
5251 [1]  1/24
5639 [1]  87/7

**6**

67 [1]  70/19

**7**

72 [1]  83/21
77 [1]  71/24

**8**

80,000 [1]  19/22
8S28 [1]  87/6
8th [1]  13/15

**9**

90 percent [1]  80/2
94 [2]  53/22 54/2
99 [1]  1/15
9th [1]  86/16

**A**

aberrant [1]  64/25
abide [1]  86/18
ability [1]  52/10
able [11]  10/1 15/16 16/2 16/8 16/21 37/15
 57/5 66/3 66/15 73/15 74/20
about [76]  5/8 5/9 5/17 6/6 7/3 7/5 7/13
 8/24 19/4 19/6 19/24 20/6 20/8 21/19 21/19
 22/11 28/2 32/2 34/5 34/17 35/10 35/11
 40/17 40/24 41/18 41/20 41/23 42/3 42/8
 42/15 42/18 42/19 43/2 43/4 43/9 45/6
 46/13 47/7 47/20 48/20 49/9 51/14 51/21
 51/24 52/1 52/16 52/17 53/17 54/20 56/3
 56/12 56/14 56/17 56/18 56/18 57/4 57/8
 58/6 58/9 58/14 58/15 61/21 61/21 62/9
 63/19 67/7 67/17 68/4 68/7 70/24 74/2
 74/11 77/10 80/14 81/10 82/3
above [3]  51/10 75/11 87/3
above-entitled [1]  87/3
Abraham [1]  47/6
Abramson [1]  47/6
absence [1]  33/20
absolute [1]  46/14
abuse [18]  11/20 12/12 41/3 41/11 44/13
 44/17 55/1 57/17 59/2 59/15 59/20 59/24
 60/11 60/14 62/15 62/16 73/22 84/13
abused [8]  57/19 57/21 57/23 58/13 58/19
 58/22 58/24 61/8
abusing [1]  58/15
accept [4]  77/1 78/14 81/6 86/6
acceptable [1]  64/17
accepting [1]  79/5

accident [1]  73/7
accomplices [1]  43/3
according [1]  76/18
account [5]  4/14 37/21 40/5 53/6 82/14
accounts [4]  25/10 47/8 48/7 54/17
accurate [3]  32/4 35/13 87/2
accusation [1]  67/19
accused [1]  64/21
acknowledged [2]  35/6 35/12
acquaintance [1]  67/8
acquisition [1]  24/5
act [1]  82/14
acting [1]  66/25
active [1]  67/12
actively [1]  79/8
actor [4]  46/12 49/12 49/15 50/16
actual [6]  10/15 18/5 23/22 53/18 60/13
 73/25
actually [7]  51/10 53/21 54/21 73/11 74/1
 74/9 79/2
add [1]  75/4
added [1]  41/7
addition [2]  2/17 82/20
additional [6]  43/25 44/4 44/8 55/24 76/10
 85/15
address [1]  48/3
addressed [3]  30/12 30/13 76/14
ADJOURNED [1]  86/24
adjust [1]  26/24
adjusted [3]  12/5 12/19 44/6
adjustment [2]  11/20 39/4
admissible [2]  6/2 35/20
admission [4]  7/8 35/11 38/21 76/21
admit [6]  9/16 75/11 75/23 75/24 76/2 76/4
admitted [1]  3/23
advantage [2]  65/14 77/22
advantages [1]  74/19
advisory [6]  10/9 10/12 12/6 63/6 83/9
 83/11
affect [1]  31/18
affecting [1]  32/6
affidavit [2]  36/24 85/4
afford [2]  66/4 66/14
AFPD [1]  1/17
after [4]  6/5 28/1 28/3 80/3
again [3]  43/9 49/13 70/10
against [3]  19/2 22/23 84/15
agent [26]  2/5 3/5 4/7 5/9 5/13 5/16 5/19
 6/21 7/2 7/6 9/11 20/6 39/10 42/17 45/7
 47/24 51/13 51/18 51/20 51/25 67/1 73/11
 73/14 76/7 76/9 76/9
agents [1]  42/14
aggravation [1]  46/16
ago [1]  63/25
agree [9]  11/13 11/15 12/16 12/18 24/3 24/8
 26/11 32/19 68/6
agreed [6]  42/11 46/5 49/18 49/19 73/16
 80/17
agreeing [4]  38/22 47/2 81/19 81/19
agreement [30]  6/2 45/12 45/13 45/14
 45/25 47/14 48/12 48/15 48/17 48/19 48/20
 49/2 49/6 50/16 50/21 50/22 50/24 51/2
 51/8 52/7 54/19 56/5 56/6 57/12 69/12
 73/18 74/4 81/6 81/6 81/20
agreements [3]  47/13 48/5 81/1
agrees [2]  26/5 80/20
ahead [2]  49/7 71/9

USA vs. Newton

**A**

Air [1]  67/15
Airlines [1]  70/21
all [97]
alleged [1]  34/11
alleges [1]  5/2
allow [7]  9/12 26/18 27/5 69/17 81/11 85/5
 86/11
allowed [1]  4/2
allowing [1]  5/21
almost [4]  6/20 26/1 39/15 60/20
along [5]  39/18 43/17 49/3 66/2 74/21
already [6]  5/3 6/2 12/12 52/12 70/4 86/19
also [17]  2/6 2/13 4/15 12/1 15/6 23/3 23/5
 29/9 39/3 39/11 39/13 64/24 67/12 71/11
 81/20 82/7 82/21
alternative [1]  38/18
although [4]  15/2 15/25 16/20 19/11
always [7]  25/8 30/25 56/19 67/2 72/3
 72/19 74/25
am [8]  8/20 30/11 35/25 44/5 63/23 64/14
 74/21 86/12
Amendment [1]  71/18
AMERICA [2]  1/3 28/3
American [1]  81/24
among [3]  65/3 67/6 67/16
amount [11]  11/1 19/7 20/2 20/24 21/6
 38/24 38/25 73/23 74/7 83/15 84/13
analogous [1]  25/5
analogy [1]  22/24
analysis [5]  17/6 21/14 21/15 22/18 29/7
analyzed [1]  22/12
ands [1]  48/22
announce [1]  23/10
announced [1]  36/9
another [10]  4/3 5/14 12/13 39/23 42/13
 54/15 67/6 71/19 72/17 78/10
answer [7]  5/21 6/18 31/1 31/4 31/5 31/7
 50/12
anticipate [1]  4/19
any [40]  8/13 8/14 9/12 11/7 11/9 13/8
 18/21 19/9 19/11 24/7 29/12 30/13 30/13
 32/17 32/22 33/20 35/1 35/15 38/11 38/12
 38/13 41/18 41/19 42/20 43/6 43/14 43/25
 45/23 49/3 52/4 57/23 58/4 63/2 65/13
 68/14 68/14 70/7 70/7 83/22 85/9
anybody [5]  17/3 36/10 43/14 54/10 57/6
anyone [3]  54/22 67/20 74/17
anything [17]  12/18 12/22 17/5 17/7 25/11
 25/22 41/19 41/20 42/21 47/8 51/20 51/21
 61/24 62/1 65/1 70/9 75/3
anyway [1]  6/10
anywhere [1]  22/6
apartment [2]  4/5 4/16
apologize [1]  55/16
apologized [1]  78/24
apologizing [1]  5/12
appeal [3]  85/9 85/10 85/11
appeals [1]  26/5
appear [1]  76/15
APPEARANCES [1]  1/13
appearing [2]  2/2 2/10
appears [1]  64/25
apples [1]  37/1
applies [3]  11/14 11/23 48/9
apply [1]  85/10

appreciate [2]  71/10 71/21
appropriate [5]  38/23 83/3 83/5 83/7 86/2
approximately [1]  63/25
April [1]  13/15
April 8th [1]  13/15
are [113]
area [2]  66/24 70/25
areas [2]  28/14 79/15
argue [3]  5/6 44/22 57/21
arguing [1]  13/5 44/7
argument [12]  9/1 9/2 9/3 20/22 32/22 39/3
 39/4 54/9 55/13 57/15 60/22 61/19
arguments [2]  63/9 81/5
around [2]  12/11 13/20 21/25 48/4
arrested [1]  86/19
arrests [1]  77/17
art [1]  25/10
article [1]  29/12 29/13
articles [2]  29/12 29/13
as [58]  3/4 3/16 4/5 4/6 4/18 5/3 5/23 9/15
 10/9 18/24 19/5 23/24 27/2 27/3 27/21
 27/22 28/12 28/18 31/21 32/14 33/18 33/21
 37/23 38/17 41/5 44/4 44/11 45/1 45/13
 46/6 47/20 49/23 54/15 56/4 57/20 57/22
 58/7 62/18 64/24 64/24 66/25 68/9 69/14
 70/2 70/20 70/22 71/15 73/2 73/22 75/8
 77/3 77/4 80/4 80/4 80/25 81/5 84/6 84/21
aside [1]  58/10
ask [10]  6/12 10/19 32/1 49/10 57/12 58/17
 63/13 76/10 82/17 85/18
asked [3]  4/8 5/9 44/16
asking [4]  50/24 57/17 61/20 69/3
assessment [1]  84/5
asset [1]  2/12
assets [2]  18/11 54/15
Assistant [1]  2/12
association [4]  5/1 5/5 5/7 6/11
associations [1]  67/17
assume [3]  7/7 12/15 18/24
athletes [1]  67/1
attaches [1]  22/9
attachments [1]  63/11
attempt [1]  13/22
attendant [1]  70/21
attitude [1]  67/7
attorney [7]  1/15 63/23 64/3 64/24 73/15
 73/15 82/17
attorney's [1]  9/19
auction [1]  25/14
audacity [2]  86/5 86/9
AUSA [2]  1/14 1/14
author [1]  71/17
authority [2]  42/23 43/19 59/22
Avenue [1]  1/23 64/9 87/6
avoid [3]  17/15 17/15 46/7
avoided [1]  16/21
away [3]  75/20 76/3 79/13

**B**

B10 [1]  54/4
back [9]  26/6 38/16 38/20 38/24 42/13
 56/13 68/7 73/19 76/9
background [1]  77/23
backup [2]  50/22 77/3
bad [7]  18/10 23/1 23/3 53/2 68/9 82/20
 82/21
balance [1]  66/8

bank [5]  4/14 4/25 4/25 28/3 53/6
bare [3]  8/7 19/25 20/3
bargain [1]  21/22
bargained [1]  15/16
base [2]  10/20 10/23
baseball [3]  64/8 68/1 72/20
based [6]  4/3 7/17 9/19 64/21 74/10 81/5
basically [1]  8/11
basis [2]  4/21 31/13
basket [2]  69/15 69/16
be [92]
Beach [3]  51/14 52/1 52/16
became [3]  64/12 64/24 72/8
because [75]  2/23 6/3 6/10 8/17 8/19 9/9
 10/16 12/24 13/23 14/9 14/10 14/15 15/3
 15/11 15/22 15/24 16/3 16/15 17/24 18/2
 18/13 19/9 23/6 24/2 24/5 24/16 24/19
 25/15 31/5 32/20 33/5 34/5 37/3 37/18
 37/19 38/7 38/16 38/20 39/19 40/2 40/6
 40/25 41/14 44/1 45/21 46/12 47/15 48/5
 53/2 56/16 56/24 57/19 57/22 58/2 59/25
 60/8 61/24 62/20 64/14 68/5 68/25 70/2
 71/2 73/25 75/21 75/23 77/10 78/2 78/3
 80/9 81/22 82/1 82/13 86/19
become [1]  50/4
been [41]  4/4 6/19 10/16 11/6 17/25 20/10
 21/17 23/15 23/25 28/16 29/7 35/9 36/7
 37/15 38/5 38/20 50/23 52/1 59/25 61/10
 63/24 68/2 68/3 70/4 70/25 70/25 71/8 71/13
 71/15 72/1 72/12 72/19 73/20 73/22 74/18
 74/20 78/1 80/16 81/14 84/8 85/16
before [23]  1/10 2/17 3/6 4/24 6/21 6/23
 8/16 8/22 28/21 29/17 37/11 43/14 50/4
 63/3 64/14 68/14 70/16 72/11 72/15 76/16
 77/2 78/10 86/2
began [1]  6/20
begging [1]  39/12
begin [1]  86/20
beginning [1]  21/15
behalf [5]  2/5 2/10 2/12 7/19 29/5
behavior [9]  8/3 61/21 62/1 62/4 64/20
 64/23 66/7 78/20 83/7
behind [1]  2/6
being [10]  13/19 42/1 46/25 47/16 52/24
 56/23 70/6 71/7 74/22 79/10
believe [34]  3/13 4/19 4/20 6/18 7/25 9/15
 11/8 11/14 11/22 12/1 12/5 13/17 15/20
 19/12 19/21 20/15 30/12 37/3 38/14 43/25
 44/19 54/18 54/19 57/18 62/22 67/19 69/20
 71/24 72/17 83/1 83/6 84/14 85/19 86/9
believes [2]  80/23 80/24
believing [1]  82/9
beneficiaries [1]  19/16
beneficiary [1]  19/18
benefit [6]  5/2 19/9 19/11 19/12 59/8 73/3
benefiting [1]  66/23
Berkeley [1]  27/25
besides [3]  50/11 71/7 71/10
best [9]  4/6 9/9 9/21 59/6 61/3 67/11 77/7
 79/3 80/13
better [4]  44/4 76/2 81/2 81/3
between [9]  10/1 10/9 22/10 35/8 49/24
 64/18 69/14 79/16 81/7
beyond [3]  3/24 51/11 62/21
big [7]  67/10 67/10 72/7 72/7 72/9 72/9
 73/2
Billy [6]  3/21 64/8 72/14 72/23 72/25 73/6

USA vs. Newton

## B

bit [5]  9/11 25/6 28/2 68/4 68/11
blessings [1]  71/8
blue [2]  53/24 53/25
board [3]  60/14 67/10 72/9
boat [4]  23/1 23/2 23/5 23/19
Bob [2]  66/20 71/20
bogus [4]  47/19 48/5 51/2 51/8
bond [4]  85/12 85/17 86/18 86/19
bones [1]  8/7
book [2]  53/23 53/25
books [2]  23/15 33/1
boots [1]  65/12
both [1]  54/16
bought [9]  13/12 13/13 13/16 15/23 18/13
 19/10 25/3 38/12 38/13
break [1]  53/4
bribe [7]  18/14 18/14 19/14 19/17 59/9 69/4
 73/14
bribed [2]  18/3 23/11
bribery [2]  58/21 60/19
bribing [1]  59/13
brief [2]  6/17 47/3
briefly [5]  2/23 22/22 30/16 66/19 75/6
bring [1]  61/4
bringing [3]  39/22 72/17 72/20
brings [2]  60/7 72/23
broad [1]  61/23
Brothers [3]  67/10 72/7 72/9
brought [5]  39/19 41/8 41/13 41/14 72/13
buddy [1]  50/1
bulk [1]  30/3
bunch [1]  21/22
burdens [1]  20/2
Bureau [1]  83/13
business [21]  7/16 7/25 8/1 8/2 39/18 45/19
 54/23 56/4 57/3 64/2 64/6 64/7 64/17 65/13
 68/2 68/10 69/18 69/21 73/1 73/8 76/22
business-related [1]  64/6
businessman [1]  56/24
businessmen [1]  64/18
buts [1]  48/22
buy [23]  13/21 13/22 13/25 14/1 14/6 14/7
 14/22 16/4 16/6 16/10 16/22 17/9 17/12
 18/13 18/14 25/12 37/12 37/15 37/18 46/17
 61/1 69/21 69/22
buyer [4]  14/24 15/7 16/9 37/16
buyers [2]  14/10 16/10
buying [6]  14/5 14/5 16/10 16/14 18/12
 37/20
buying shares [1]  14/5

## C

C-E-R-T-I-F-I-C-A-T-E [1]  87/1
Cadillac [1]  69/21
calculate [1]  20/7
calculated [4]  18/19 19/22 20/9 75/8
calculating [1]  20/4
calculation [1]  84/12
California [4]  3/9 27/25 40/14 85/19
call [9]  8/18 21/7 25/13 26/14 26/20 43/4
 63/13 73/10 85/24
called [4]  3/4 8/18 50/17 73/12
calls [1]  5/10
came [7]  22/6 40/12 42/10 47/1 47/19 78/24
 80/18

camp [2]  65/9 85/20
can [32]  5/11 5/14 6/25 10/15 16/5 18/9
 18/16 20/6 25/13 25/17 25/19 25/23 25/23
 27/15 37/8 37/18 39/11 40/25 43/4 44/25
 45/5 46/4 47/25 51/21 56/16 64/14 65/21
 65/25 66/6 66/7 79/16 82/10
can't [14]  5/20 14/9 15/4 23/25 25/10 25/11
 25/13 25/21 57/21 57/25 64/20 69/13 82/12
 82/12
cancer [1]  65/9
candidate [2]  85/20 86/7
cannot [3]  14/16 75/11 81/15
capacity [1]  28/4
capital [2]  45/18 78/5
captured [1]  79/10
car [3]  22/25 23/1 73/7
care [7]  2/21 8/24 30/15 50/8 82/3 82/3 82/4
carefully [1]  72/18
cares [1]  42/5
CARIDAD [39]  1/17 2/12 2/17 4/25 5/15
 5/17 7/1 10/23 11/3 11/5 11/15 11/24 12/15
 13/1 18/1 19/23 20/12 20/17 24/7 25/6
 26/15 27/5 35/24 36/15 36/17 36/24 39/2
 44/20 54/25 55/13 57/15 60/23 62/4 63/1
 63/9 65/21 73/21 75/4 85/12
Caridad's [1]  5/20
caring [1]  67/8
carried [1]  73/7
carry [1]  60/22
case [60]  1/2 7/9 7/11 9/22 10/2 10/8 11/9
 15/10 15/21 20/25 21/5 21/7 21/8 21/8 21/9
 29/20 29/25 30/8 32/10 32/17 37/5 38/14
 39/22 39/24 41/13 44/5 44/6 45/4 46/7
 47/10 48/14 50/14 51/10 53/10 53/15 58/3
 58/14 58/14 58/17 58/20 58/20 59/1 59/9
 60/2 60/5 60/10 61/10 62/2 62/2 62/17 68/4
 68/24 71/19 74/23 75/10 77/14 78/13 83/1
 83/3 83/4
cases [1]  51/2
cash [1]  53/7
casually [1]  55/10
category [2]  10/12 83/9
caught [2]  6/1 8/16
cause [2]  74/4 81/17
caused [1]  18/16
causes [2]  67/13 67/22
CEO [17]  40/23 57/19 58/19 58/21 58/22
 59/4 59/13 60/7 60/10 60/12 60/15 60/17
 60/21 61/3 61/11 61/12 61/24
CEOs [2]  59/23 60/16
ceremony [1]  66/16
certain [1]  43/14
Certainly [3]  50/19 51/6 78/22
certify [1]  87/2
chair [2]  41/25 80/20
change [1]  86/13
changes [1]  60/16
changing [1]  24/19
charge [1]  66/8
charged [2]  62/8 73/13
charitable [7]  65/4 66/22 66/23 67/13 69/24
 75/14 82/23
charity [5]  65/8 65/11 66/18 72/2 77/16
chatted [2]  52/17
cheaper [2]  15/3 15/5
check [5]  3/20 3/22 5/5 45/24 53/7
checks [10]  3/16 3/17 3/18 4/4 4/25 6/10 7/3

7/5 8/7 8/7
children [2]  65/8 65/12
choice [10]  49/23 49/25 76/20 77/1 78/11
 78/11 78/12 78/13 78/13 78/14
choose [1]  27/9
chose [1]  8/15
Chris [1]  82/2
Circuit [2]  5/11 58/18
circuits [2]  59/23 59/23
circumstances [1]  76/17
cite [1]  59/22
cited [2]  58/20 60/4
Citibank [1]  28/7
City [1]  73/9
civic [1]  66/23
civilly [1]  62/9
claim [1]  43/7
clarification [1]  84/22
clear [4]  4/24 32/5 36/19 62/1
cleared [1]  4/20
clearly [2]  19/20 58/16
clerk [1]  83/16
client [9]  7/19 7/23 9/4 45/22 50/5 61/8
 61/22 64/4 72/18
client's [6]  2/18 4/4 4/15 7/25 62/4 85/12
clients [1]  29/10
close [3]  9/3 26/14 75/25
closer [1]  27/14
closing [2]  9/1 9/2
club [9]  3/9 3/10 3/10 3/20 3/22 3/25 4/1
 4/10 4/13
co [1]  46/24
co-conspirator's [1]  46/24
coach [2]  64/9 67/25 72/13 72/20
coaching [1]  43/6
collection [1]  83/25
college [2]  70/22 70/23
Colombia [1]  64/1
come [13]  32/3 45/23 46/6 46/21 46/22 49/4
 55/11 55/21 56/9 63/15 69/24 76/16 80/18
comes [7]  46/3 46/25 54/10 54/20 54/22
 67/4 80/20
comfortable [2]  70/18 76/18
coming [3]  51/15 55/13 55/17
commentary [2]  47/6 48/8
commission [3]  42/18 42/25 62/8
commit [2]  67/21 83/22
commits [2]  60/11 60/13
committed [4]  43/5 60/7 68/14 68/17
community [1]  67/14
companies [2]  28/18 30/3
company [56]  3/11 3/19 3/21 4/4 4/12 4/15
 4/17 14/6 22/21 27/20 27/21 32/4 33/4 38/7
 40/10 41/3 42/4 42/7 45/9 45/15 46/18 50/7
 50/9 53/8 53/11 58/12 58/18 58/19 58/22
 59/7 59/13 59/15 60/7 60/8 60/13 60/16
 60/20 60/23 61/1 61/3 61/4 61/5 61/11
 61/14 62/21 69/3 74/10 75/21 75/23 75/25
 80/19 81/22 81/25 82/3 82/5 82/8
company's [2]  32/15 33/1
compare [1]  38/9
compensation [2]  29/2 29/15
compensation-related [1]  29/2
complained [1]  58/7
complaining [1]  5/17
complete [3]  37/1 66/13 85/6
completely [1]  43/13

**C**

complex [11]  45/2 45/2 45/3 46/3 46/3 46/7
46/15 46/16 46/20 48/24 54/7
complicated [1]  49/5
comports [1]  37/4
computation [1]  10/15
computed [2]  11/6 20/24
concealment [3]  54/8 54/20 54/22
concept [1]  22/23
concern [1]  84/3
concerned [1]  47/7
concerning [5]  9/21 22/9 28/23 66/18 84/12
concerns [1]  72/24
conclude [3]  19/24 38/17 57/12
conclusions [1]  75/15
concurrent [4]  83/19 84/23 84/24 84/25
condition [1]  84/1
conditions [3]  43/14 84/2 86/18
condominium [1]  4/10
conduct [7]  6/25 30/21 54/7 54/15 61/9
62/3 67/23
conducted [5]  3/6 5/10 7/4 7/6 62/10
confronted [3]  47/21 49/20 52/15
Congress [2]  71/20 71/22
Congressman [2]  71/17 72/6
connections [1]  74/12
conniving [1]  48/3
consensus [1]  31/24
consider [6]  7/10 34/22 41/8 59/20 60/6
76/6
consideration [1]  81/8
considered [1]  84/16
considering [1]  76/5
conspiracy [1]  39/23
conspirator's [1]  46/24
consultancy [1]  54/19
consultant [1]  27/18
consulting [35]  27/21 27/22 28/15 28/16
45/12 45/13 45/14 45/25 47/13 47/14 47/23
48/5 48/12 48/15 48/17 48/18 49/1 49/5
50/15 50/21 50/21 50/24 51/2 51/8 51/17
52/7 53/12 56/5 56/6 56/11 56/18 57/2
57/11 69/12 81/20
consumed [1]  6/6
contacts [2]  76/22 85/21
contained [1]  84/6
continue [2]  76/8 81/11
continued [3]  51/12 51/15 76/10
continues [3]  75/13 76/4 86/6
contrast [2]  78/19 79/12
contributed [1]  65/11
control [4]  28/19 43/19 43/20 43/21
controlled [1]  83/24
conversation [1]  57/6
conversations [3]  3/5 8/9 30/1
convey [1]  66/6
convict [1]  6/16
convicted [4]  40/8 64/21 70/7 85/14
conviction [2]  64/20 66/8
convince [2]  75/13 79/2
convinced [1]  35/25
COOKE [2]  1/10 23/1
cooperate [1]  83/25
cooperated [1]  79/23
copies [1]  63/10

cops [1]  47/17
corporate [4]  47/7 48/7 52/13 54/17
correct [13]  8/4 11/22 12/6 12/14 12/17
12/21 13/4 33/6 33/15 33/19 44/21 54/5
54/12
correctly [1]  20/24
corrupted [1]  40/3
cost [1]  85/10
could [43]  4/6 4/8 5/6 6/10 9/9 13/23 13/25
15/22 19/1 19/24 20/4 21/23 23/18 24/6
24/24 25/4 25/16 25/16 28/2 30/2 31/1 31/3
32/21 34/17 38/4 38/17 40/25 47/8 47/22
48/13 49/11 49/14 52/22 52/22 55/8 56/22
59/11 59/12 59/14 59/25 66/13 74/9 78/25
couldn't [10]  14/22 66/12 71/2 74/3 74/5
74/16 75/23 75/24 76/1 79/14
counsel [7]  10/9 10/19 27/7 44/7 55/8 81/12
84/9
Counselor [1]  32/22
Count [1]  83/14
country [9]  3/9 3/10 3/10 3/20 3/22 3/25 4/9
4/13 73/4
counts [5]  41/2 41/14 83/19 84/6 84/23
couple [1]  44/9
course [6]  27/8 47/15 65/23 71/5 80/16
81/19
court [64]  1/1 1/22 2/17 2/22 4/8 5/3 6/12
9/7 19/8 20/4 20/6 21/6 21/9 21/20 22/17
24/10 24/11 24/12 26/5 28/21 36/21 37/4
37/6 37/8 38/17 38/21 39/1 40/4 41/7 41/17
44/24 47/18 47/23 50/4 53/20 57/12 58/8
59/20 62/7 63/2 65/4 66/17 70/12 72/4 75/9
75/13 75/15 75/15 76/15 77/6 78/24 79/2
80/2 80/24 83/12 83/16 84/12 85/3 85/4
85/15 85/16 85/18 85/18 87/5
Court's [3]  50/12 55/15 84/9
Courthouse [1]  87/5
courtroom [1]  48/11
cover [3]  52/11 53/11 57/7
covering [1]  47/5
coverup [3]  52/13 53/1 53/13
cowboy [1]  65/12
CR [1]  1/2
crack [1]  53/15
craftsmen [1]  64/10
create [1]  56/15
created [2]  45/5 48/2
creating [1]  48/6
credit [6]  19/2 21/11 21/12 22/23 24/1
25/18
crime [14]  47/1 53/2 53/2 53/5 60/7 60/11
60/13 69/25 70/3 76/23 77/4 78/6 78/16
80/3
crimes [2]  53/4 83/22
criminal [12]  10/11 25/11 52/24 52/24 62/3
70/11 73/15 78/20 82/21 82/25 83/6 83/8
criminal-minded [1]  25/11
criminally [1]  73/13
criminals [1]  47/10
crook [2]  9/4 60/18
cross [10]  4/6 5/13 5/15 5/16 7/6 7/10 9/8
9/19 9/20 27/8
cross-examination [5]  5/15 7/6 9/8 9/19
9/20
cross-examine [2]  5/13 27/8
cross-examined [2]  5/16 7/10
cross-examining [1]  4/6

CRR [2]  1/22 87/4
culpability [5]  21/19 78/20 82/21 83/1 83/6
cumulative [3]  7/9 7/22 9/21
currently [1]  27/18

**D**

damaged [1]  60/1
dangerous [1]  83/24
dangling [1]  77/23
Danish [2]  55/13 55/21
data [2]  38/2 38/9
database [1]  5/14
date [3]  71/5 85/19 87/4
Daubert [1]  35/5
DAVIDSON [25]  1/14 2/4 2/8 4/22 9/1
10/21 11/12 11/21 12/5 12/19 17/21 24/3
27/4 27/8 30/17 39/3 50/15 54/9 55/24
70/17 73/22 75/3 78/9 78/19 85/25
day [11]  6/21 6/23 7/2 8/16 8/22 8/24 31/11
72/13 73/17 74/21 79/18
days [5]  6/5 6/7 34/3 34/11 85/9
deal [21]  4/6 15/15 17/24 18/1 18/2 18/3
18/4 18/10 18/15 19/3 39/21 39/25 40/9
44/3 63/3 68/18 70/5 76/8 77/1 79/6 79/13
dealing [3]  37/1 60/21 82/19
deals [5]  39/13 39/13 39/19 76/10 79/11
dealt [2]  10/16 41/2
deceptive [1]  52/6
decided [3]  52/5 78/2 78/2
decision [2]  42/22 82/20
decision-making [1]  42/22
decisions [1]  82/25
deep [2]  51/19 74/13
defendant [39]  1/7 1/17 5/6 5/12 5/22 5/25
6/16 19/1 19/14 20/14 46/6 46/8 47/13
47/19 47/25 48/4 50/12 51/12 52/3 53/6
53/15 75/11 75/16 76/6 76/10 76/17 76/21
76/25 77/4 81/6 82/17 82/22 83/10 83/12
83/17 83/22 84/9 86/2 86/11
defendant's [5]  5/24 10/12 18/17 77/23 83/5
defendants [8]  76/15 76/16 76/19 76/23
77/3 77/23 78/11 78/12
Defender [2]  1/18 2/12
defense [7]  7/3 9/14 9/17 9/18 9/19 26/22
47/21
defenses [1]  48/2
defined [1]  45/1
definitely [1]  61/8
definition [2]  46/17 73/24
defraud [1]  81/16
defrauded [2]  58/10 62/20
defrauding [1]  86/3
degree [4]  27/24 43/11 43/19 46/16
delay [1]  44/24
demanded [2]  45/25 57/9
demons [1]  40/9
demonstrated [1]  67/22
denied [2]  9/15 10/3
Denmark [1]  55/9
deny [1]  6/13
Department [1]  29/6
deposit [2]  85/16 85/17
deposited [1]  85/16
derivatives [3]  28/5 28/6 29/3
describe [2]  4/1 42/4
describing [1]  33/13
desert [3]  67/11 71/3 72/10

USA vs. Newton

# D

deserve [2] 59/18 59/24
deserves [1] 59/16
designated [2] 86/12 86/15
designed [1] 52/9
desperate [3] 79/24 80/12 80/13
desperately [1] 69/11
despite [1] 75/14
destroyed [1] 59/12
detailed [1] 52/6
details [1] 64/19
detection [2] 46/8 48/6
deter [1] 78/15
determinations [1] 84/15
determine [3] 21/10 22/19 36/1
determined [1] 3/9
deterrent [1] 68/24
deterring [2] 69/1 69/5
Detroit [1] 72/16
devastated [1] 59/14
development [1] 28/4
device [1] 83/24
devious [1] 46/7
devise [1] 46/5
devised [1] 45/16
diane [4] 1/22 1/24 87/4 87/4
did [73] 4/15 5/16 7/10 8/18 8/25 9/1 9/3
 9/5 9/8 15/20 17/6 17/7 17/7 18/25 21/16
 28/1 29/20 29/22 31/9 31/9 31/13 31/14
 31/17 33/22 34/3 34/17 35/7 36/1 38/11
 39/8 41/12 42/8 42/12 42/14 43/1 43/8 44/1
 44/1 45/23 45/24 46/1 47/14 47/14 47/22
 50/1 51/4 56/12 57/14 58/2 64/15 64/16
 70/23 72/7 72/16 74/12 75/14 75/21 75/23
 77/4 77/11 77/13 78/3 78/3 79/1 79/7 79/25
 80/5 80/21 80/23 80/24 82/3 82/9 86/7
didn't [48] 3/15 4/18 8/13 8/17 8/19 8/20
 8/24 8/24 9/10 9/12 17/5 17/23 35/11 38/12
 38/12 42/14 43/9 45/23 46/5 46/21 46/22
 46/22 47/13 47/16 48/11 48/12 48/19 51/20
 51/25 57/10 57/11 57/22 60/6 60/24 62/20
 69/21 69/22 69/24 74/1 75/17 75/17 76/24
 79/6 79/6 79/18 79/20 80/13 81/6
died [1] 73/6
difference [3] 22/10 79/16 80/6
different [10] 7/1 14/10 15/23 22/9 24/11
 40/23 41/10 73/25 76/15 76/19
differently [2] 61/19 62/4
difficult [1] 68/12
difficultly [1] 45/18
diligence [1] 28/25
dire [2] 30/15 30/18
DIRECT [1] 27/10
directions [1] 40/18
directly [1] 48/24
director [1] 28/13
directors [1] 60/14
disagree [12] 7/20 12/16 20/11 20/17 24/8
 24/17 26/4 26/7 36/13 36/14 55/3 62/6
disagreements [1] 10/8
disagrees [1] 82/13
discern [1] 10/1
disclosed [1] 32/13
disclosure [1] 84/2
disconnect [1] 35/8
discount [8] 15/3 15/9 15/10 17/1 17/18

22/6 37/18 37/22
discovery [1] 3/18
discredited [1] 9/11
discuss [2] 2/21 48/8
discussed [1] 52/20
discussing [2] 37/3 73/22
discussion [2] 13/1 55/7
disparity [1] 79/4
disprove [1] 48/2
disrepute [2] 60/8 61/4
district [4] 1/1 1/1 1/11 83/21
DNA [1] 83/25
do [93]
do-over [1] 74/24
Docket [1] 10/4
doctor [1] 51/16
documents [3] 10/7 29/20 52/18
does [12] 7/23 11/2 14/23 25/19 27/20 32/2
 39/25 56/18 58/19 61/24 78/7 84/8
doesn't [9] 16/13 21/14 23/9 35/19 36/9
 56/16 58/10 60/21 78/16
doing [8] 41/25 46/21 48/23 49/7 56/4 57/6
 69/5 71/1
dollar [4] 33/4 33/9 33/14 85/17
dollars [9] 25/10 33/2 33/5 33/10 33/11
 33/12 70/24 83/15 85/15
don't [43] 4/7 6/8 6/18 7/25 9/7 10/2 11/8
 12/8 12/24 18/13 19/12 20/8 23/5 23/7
 25/25 30/11 31/18 38/22 42/19 43/3 43/25
 44/19 45/20 46/3 46/20 48/16 49/3 49/8
 49/16 51/21 52/1 52/4 54/18 55/12 55/15
 56/5 58/3 58/6 60/17 69/12 70/2 74/24 82/3
donates [1] 68/1
done [16] 8/16 13/23 24/6 30/13 42/15
 42/16 46/8 61/12 62/22 72/2 72/3 78/23
 80/17 82/11 82/22 82/23
dotted [1] 69/11
doubt [2] 20/8 45/6
Doug [10] 65/2 65/6 65/11 66/3 66/14 66/25
 67/2 67/7 67/9 67/17
Doug's [1] 64/11
DOUGLAS [1] 1/6
down [12] 11/19 41/23 42/10 46/23 46/24
 47/9 53/9 74/6 76/1 80/18 80/18 80/20
dozen [1] 73/13
Dr [3] 2/13 27/17 37/10
Dr. [3] 27/12 30/20 36/19
Dr. Pomerantz [3] 27/12 30/20 36/19
draw [1] 46/23
dressed [1] 55/9
drive [6] 14/8 14/11 14/23 16/11 16/13
 22/25
driven [1] 37/14
driver's [1] 53/6
drop [2] 23/2 23/4
drugs [1] 75/17
dudes [1] 73/2
duds [1] 73/1
due [1] 28/25
dues [1] 3/11
dump [4] 32/12 32/17 33/9 33/13
during [2] 8/9 65/2
duty [3] 57/23 58/1 58/2

# E

e-mail [3] 53/17 56/10 57/8
e-mails [22] 47/18 47/20 47/22 48/4 48/25

49/4 50/20 51/11 51/13 51/16 51/22 51/22
 51/22 52/4 52/5 52/7 52/9 52/16 53/12 54/9
 56/2 69/14
each [8] 10/19 14/11 19/3 19/15 42/2 70/19
 74/21 84/6
earlier [3] 33/10 33/17 74/18
early [2] 8/14 67/24
earned [1] 66/25
easier [1] 82/19
easily [1] 80/17
East [2] 67/25 72/12
eastern [2] 40/13 73/2
easy [2] 77/24 79/15
economic [3] 11/9 17/6 45/18
economics [1] 37/9
economy [2] 49/20 68/9
educational [1] 27/23
efforts [1] 47/10
eggs [1] 69/15
eight [3] 11/6 13/2 21/1
either [2] 23/8 31/17
Eleventh [2] 5/11 58/17
else [5] 12/18 12/22 24/1 57/6 68/11
else's [1] 53/8
Elston [1] 72/18
embarrassment [2] 23/20 23/25
employers [1] 28/9
encourage [1] 59/20
encouraged [2] 40/12 40/15
encouraging [1] 41/20
end [10] 4/7 14/12 17/13 21/15 37/7 75/8
 77/9 82/6 83/2 83/6
ends [2] 6/23 8/23
enforcement [2] 47/21 48/1
engaged [2] 24/24 59/9
engaging [3] 5/2 6/1 61/9
enhance [1] 52/10
enhancement [24] 11/6 11/7 11/10 11/13
 11/21 12/9 12/13 13/2 39/7 40/1 40/2 43/23
 44/17 50/25 51/3 51/9 53/1 54/3 55/2 57/18
 59/16 59/21 59/24 61/11
enough [4] 4/7 9/4 9/5 9/10
Enron [2] 32/19 36/7
entered [1] 29/7
entertains [1] 4/12
entire [2] 50/5 74/25
entities [7] 3/19 29/9 47/7 48/7 52/13 53/13
 54/17
entitled [1] 87/3
entity [3] 4/2 24/23 25/21
Entry [1] 10/4
Epstein [10] 45/6 68/16 68/17 68/18 69/8
 69/8 69/15 69/19 77/22 80/16
Epstein's [1] 69/16
equipment [1] 4/16
equity [2] 28/11 28/14
equity-related [1] 28/11
equivalent [1] 38/11
error [3] 7/7 7/22 22/18
especially [9] 45/2 45/3 46/15 46/16 46/20
 54/7 54/7 57/13 57/13
essentially [2] 24/13 36/10
established [2] 64/8 65/10
European [1] 25/8
evade [1] 48/6
evaluation [2] 30/21 31/9
even [31] 3/1 6/4 7/9 7/22 9/17 9/22 15/8

USA vs. Newton

**E**

even... [24]  17/3 19/19 26/14 34/19 37/17
  38/6 42/14 42/18 43/9 46/20 49/12 49/15
  50/3 50/5 67/25 74/6 74/12 74/14 75/10
  77/5 78/7 79/1 80/8 81/13
event [2]  66/4 66/13
events [1]  66/22
eventually [1]  72/8
ever [8]  47/21 52/15 56/1 64/15 64/16 68/22
  68/23 80/7
every [4]  21/8 60/10 62/17 85/24
everybody [2]  68/11 78/12
Everybody's [1]  78/11
everyone [2]  2/16 55/23 59/12
everything [5]  41/12 47/16 53/16 67/18
  80/1
evidence [45]  3/14 3/19 3/23 3/24 4/9 4/19
  5/12 6/3 6/4 6/9 6/16 6/22 7/9 7/11 7/18
  7/21 7/22 7/23 7/25 9/5 9/5 9/12 9/17 9/17
  9/18 9/21 9/23 10/1 26/13 31/20 32/14
  32/16 33/18 33/20 34/18 35/16 36/6 37/5
  43/22 43/25 48/14 50/17 52/4 68/13 69/20
evidentiary [2]  9/16 9/16
exact [1]  80/5
exactly [4]  5/15 18/7 18/9 60/9
exaggeration [2]  70/19 78/7
examination [7]  5/15 7/6 9/8 9/19 9/20
  27/10 30/18
examine [2]  5/13 27/8
examined [2]  5/16 7/10
examining [1]  4/6
example [6]  3/8 3/20 24/24 32/20 54/13
  82/2
examples [1]  65/5
exceedingly [1]  67/20
except [2]  18/14 43/17
exchange [4]  21/13 21/16 28/5 62/8
excuse [10]  12/16 18/8 19/3 30/5 31/3 32/9
  35/21 55/5 80/12 84/4
executing [1]  61/22
execution [1]  54/8
exemplary [1]  70/10
exercise [1]  42/22
exercised [1]  43/21
exist [4]  31/23 44/15 57/23 74/1
existed [1]  74/1
existing [1]  31/24
expand [1]  69/18
expectation [1]  65/13
expected [2]  15/7 15/10
expert [5]  20/5 26/9 26/18 26/20 30/12
explain [4]  3/17 4/9 57/4 57/6
explained [2]  15/14 37/11
explanation [1]  60/21
expressing [1]  24/10
expression [1]  51/20
extending [1]  61/11
extends [1]  58/3
extension [5]  48/25 49/4 56/3 57/9 61/18
extent [1]  6/15
extremely [1]  65/3
eye [1]  23/20

**F**

fabrication [1]  77/19
face [1]  64/15

faced [3]  78/4 81/13 81/13
facing [1]  66/5
fact [10]  16/7 16/10 34/4 34/22 37/19 53/16
  58/7 79/12 84/9 86/5
factor [1]  34/4
factored [1]  34/5
factors [7]  42/22 44/8 63/3 68/7 76/5 78/23
  83/5
facts [1]  37/4
fail [1]  86/18
fails [1]  65/5
failure [1]  76/4
fair [8]  15/12 15/25 15/25 17/4 18/2 33/21
  34/22 37/21
faith [1]  5/4
fake [2]  48/4 53/8
fall [2]  38/16 71/6
falls [1]  62/5
familiar [2]  30/7 73/20
family [1]  66/2
famous [1]  72/14
far [3]  9/10 27/2 80/4
Farms [3]  38/3 38/7 38/13
fault [1]  5/20
faulty [1]  5/14
fax [1]  87/7
FBI [5]  2/5 47/24 56/9 73/11 73/14
federal [2]  2/12 61/6
feel [2]  22/25 23/3
fees [1]  4/14
fell [1]  13/23
felon [1]  40/8
Ferguson [1]  87/5
few [6]  6/7 28/17 41/2 41/5 63/14 76/13
fictitious [9]  13/12 14/5 47/7 47/12 47/14
  48/6 52/13 53/13 54/16
fiduciary [5]  19/14 19/18 57/24 58/15 82/2
field [1]  72/14
fifteen [3]  22/7 22/11 70/24
fifty [2]  22/7 37/23
fifty percent [1]  22/7
figure [5]  21/25 31/10 38/23 38/23 77/12
file [2]  85/9 85/15
filed [3]  2/24 2/24 22/8
filings [1]  63/10
final [2]  37/6 85/2
finally [5]  5/23 6/7 62/7 67/15 76/13
financial [8]  31/17 47/8 48/7 61/7 67/21
  75/16 80/12 84/2
financially [1]  79/25
financials [4]  30/2 31/22 31/23 31/24
financing [3]  68/12 69/9 69/17
find [7]  8/18 8/19 8/21 16/8 30/2 66/7 73/15
finding [1]  84/9
finds [1]  39/1
fine [2]  83/15 83/15
finish [3]  31/1 31/3 65/24
firearm [1]  83/23
firm [3]  28/14 28/15 43/14
firms [2]  28/7 28/17
first [19]  5/24 13/13 20/10 23/12 23/16 30/7
  32/5 35/21 39/21 39/25 40/13 41/2 41/11
  42/11 57/10 57/22 58/4 70/1 81/3
fixed [2]  28/11 28/13
FL [2]  1/23 87/6
Flagler [1]  1/18
flee [1]  86/10

flew [1]  56/13
flight [1]  70/21
FLORIDA [7]  1/1 1/5 1/16 1/19 40/15
  41/23 56/25
flsd.uscourts.gov [1]  1/24
focus [1]  37/4
fold [1]  76/2
follow [1]  41/21
followed [1]  40/18
following [2]  84/2 84/11
Force [1]  67/16
forced [1]  76/23
foregoing [1]  87/2
foreign [1]  28/5
foreseeable [3]  5/7 6/11 6/14
forma [1]  85/11
former [3]  64/1 66/20 67/4
fortunate [1]  71/13
fortunately [2]  47/23 48/1
forward [1]  63/15
found [11]  5/3 7/2 7/17 7/21 34/12 55/11
  58/17 58/22 59/23 65/3 80/24
four [27]  9/21 13/13 13/17 13/22 13/24 14/6
  14/7 14/9 14/12 14/22 15/1 15/13 15/16
  16/4 16/6 16/8 16/19 16/20 17/4 17/14
  19/15 20/3 21/22 21/23 30/9 37/12 59/16
four million [7]  13/13 13/17 13/22 14/7
  15/13 21/22 21/23
fourteen [1]  70/24
fraction [2]  81/14 81/15
fraud [22]  5/3 6/1 7/18 9/22 18/6 21/8 21/9
  32/3 32/6 33/20 35/10 35/11 36/9 37/9
  59/10 59/24 61/17 61/22 68/14 68/17 76/8
  79/7
fraudulent [2]  8/4 32/21
free [28]  13/21 13/21 14/1 14/8 14/18 14/19
  15/1 15/5 15/9 15/14 15/17 16/1 16/4 16/4
  16/23 17/9 17/12 19/4 19/7 19/10 21/23
  22/10 22/15 22/15 22/16 37/13 45/10 86/12
free-trading [7]  14/8 14/18 15/1 15/5 15/9
  15/14 15/17
frequently [1]  52/5
friend [8]  2/14 2/15 39/11 64/25 67/8 71/19
  73/12 76/12
friends [1]  66/15
friendships [1]  71/13
frightening [1]  75/9
front [7]  23/2 26/24 35/18 52/7 74/3 77/24
  81/16
fruits [1]  43/7
full [5]  26/25 27/12 63/17 71/8 74/18
fund [53]  13/11 13/12 13/20 13/21 14/4
  14/4 14/5 14/18 14/24 15/6 15/10 16/3 17/4
  17/23 17/24 17/25 18/11 18/11 18/17 18/21
  19/14 21/16 21/20 22/19 23/9 23/14 23/22
  23/23 23/25 24/6 24/11 25/1 30/9 33/24
  34/13 36/10 37/7 37/12 38/11 38/20 42/6
  50/7 57/22 59/14 62/24 62/24 67/11 67/12
  68/23 69/2 75/19 77/7 86/4
fund's [1]  23/15
fund-raising [1]  67/12
fundamentals [1]  35/2
funds [3]  8/10 28/17 39/24
further [4]  52/10 70/8 79/6 83/14

**G**

gamut [1]  22/13

USA vs. Newton

**G**

Garvin [3]  73/16 73/18 81/2
gauge [1]  37/7
gave [10]  4/24 18/24 19/4 19/17 19/17
42/12 42/13 49/24 49/25 62/18
general [6]  19/5 29/18 67/15 67/15 71/23
71/24
Generally [1]  29/22
generous [4]  19/1 19/19 19/22 67/20
gentlemen [2]  42/2 45/17
get [33]  4/8 14/9 15/1 15/16 16/2 16/15
16/17 16/21 17/7 17/7 17/14 18/17 18/25
23/6 37/10 41/16 49/3 52/10 53/1 57/1
65/19 65/21 66/15 68/17 69/8 69/17 70/9
74/20 74/24 76/1 78/4 78/25 81/21
gets [2]  6/21 68/16
getting [7]  15/7 15/11 16/24 16/25 82/6
82/7 82/7
give [12]  19/8 19/11 23/1 23/3 42/18 43/8
44/25 46/18 65/4 68/3 69/13 85/18
given [12]  7/9 16/7 17/1 22/4 33/21 37/13
38/2 68/2 73/17 73/17 80/10 83/7
gives [1]  16/19
giving [1]  19/14
go [33]  6/22 7/11 9/10 10/14 10/18 10/19
14/7 14/10 16/3 16/6 16/9 16/22 17/12
17/13 19/25 20/4 22/18 35/20 40/15 43/17
47/6 49/7 51/11 53/18 57/25 57/25 59/18
60/14 63/3 68/11 79/6 79/20 81/15
goes [3]  32/20 35/19 48/4
going [71]  4/9 4/10 5/1 5/4 8/9 8/17 10/17
10/18 10/19 11/19 12/15 14/8 16/8 16/11
17/13 17/13 17/14 20/25 27/3 27/5 30/1
32/12 35/8 35/14 40/8 40/17 42/5 42/6 45/7
45/8 45/9 45/11 45/14 50/4 50/7 50/9 50/9
51/17 53/9 53/14 55/11 55/12 56/21 57/5
57/5 60/18 61/4 61/5 61/5 61/7 65/18 65/24
69/2 69/8 69/18 70/5 70/9 75/25 77/11 81/4
81/11 81/21 81/22 81/23 81/23 81/24 82/5
86/10 86/11 86/13 86/14
golf [1]  4/1
gone [7]  13/21 14/1 14/3 19/16 38/20 64/1
86/2
good [16]  2/2 2/4 2/11 15/15 17/24 18/4
18/15 21/21 42/4 50/8 66/25 71/19 81/23
82/23 82/24 85/19
goods [2]  64/11 73/5
got [50]  3/15 6/9 14/18 14/19 15/12 15/15
15/15 15/24 15/25 16/1 16/20 17/4 17/9
17/18 17/18 17/19 18/20 19/6 19/23 21/20
21/21 21/22 22/14 22/18 23/11 24/11 37/21
38/17 41/24 42/10 45/12 48/18 48/21 49/3
56/8 56/8 56/24 58/10 59/13 65/6 66/2
69/11 69/23 70/10 72/6 73/10 73/19 77/18
78/11 81/2
gotten [4]  3/8 6/6 21/23 74/19
government [61]  2/24 3/4 3/18 5/4 5/8 5/21
6/3 6/18 6/25 7/1 8/8 8/15 11/2 14/15 20/1
21/25 22/5 22/8 29/4 37/24 38/3 38/9 38/19
43/12 43/12 44/16 45/5 45/6 45/16 45/17
45/21 46/12 47/1 47/11 48/11 49/1 49/12
49/15 50/16 51/8 52/14 55/1 56/4 57/9
57/17 58/20 58/21 58/23 61/6 62/12 63/4
68/18 68/22 69/9 70/2 75/7 77/19 78/14
79/23 82/13 84/20
Government's [7]  17/8 29/23 38/15 38/21
49/5 62/23 74/6
gown [2]  23/4 23/7
grabs [1]  78/8
graduating [1]  28/3
grandmother's [2]  23/4 23/7
great [8]  5/4 47/19 51/23 67/3 71/14 71/21
74/19 74/20
greatly [1]  71/21
greed [1]  76/11
Greer [2]  28/8 28/12
gross [1]  78/6
grounds [2]  3/7 84/14
grow [3]  50/7 82/5 82/8
grown [1]  43/21
guess [3]  28/4 48/13 72/2
guests [2]  4/13 4/13
guideline [17]  10/10 10/12 12/6 26/13 44/11
49/9 60/20 62/5 63/7 75/8 77/9 81/14 83/4
83/9 83/11 84/12 84/15
guidelines [9]  21/6 21/9 22/24 40/4 48/3
53/14 59/19 83/2 83/7
guilt [1]  70/6
guilty [1]  79/22
gun [1]  75/17
guy [1]  19/17
guys [1]  48/16
gypped [2]  14/18 17/8

**H**

had [84]  3/1 3/5 3/8 3/11 3/16 4/4 4/20 6/1
6/3 6/16 7/1 7/3 7/5 7/9 8/1 8/15 8/16 9/4
9/5 9/22 13/20 14/1 14/3 17/8 18/14 22/12
22/12 23/12 24/24 24/25 29/7 30/20 36/7
36/10 38/8 40/14 40/18 40/23 42/11 42/15
42/16 43/17 43/20 45/4 50/9 50/13 50/20
50/23 52/12 52/19 52/22 55/7 56/13 58/16
58/23 64/1 64/2 68/10 69/25 70/5 71/3 71/8
71/19 72/1 72/11 72/12 72/18 73/3 73/3
73/20 74/1 74/6 76/21 76/22 76/22 78/12
78/13 78/19 78/23 80/15 85/14 85/15 86/3
86/5
Haiti [1]  58/21
Haitian [1]  58/23
half [8]  19/6 19/9 19/12 22/16 29/13 41/9
41/11 41/12
Halperd [1]  2/6
hand [2]  26/21 74/3
handed [3]  19/9 23/13 23/18
handing [1]  24/1
hands [1]  18/21
happen [9]  14/21 16/22 18/3 62/20 68/22
69/1 69/5 70/3 78/16
happened [16]  15/18 15/19 18/2 20/13
20/14 34/19 36/4 60/9 60/25 68/8 68/15
69/7 71/5 77/20 77/25 80/3
happening [3]  33/16 34/19 69/4
happy [1]  81/24
hard [6]  50/10 53/4 65/18 70/20 77/5 81/21
harder [2]  53/9 53/14
Harlem [2]  67/25 72/12
harm [11]  41/7 62/11 62/13 62/15 62/16
74/17 77/13 80/23 81/17 82/10 82/14
harmed [2]  23/13 59/11
harmful [1]  48/5
harmless [2]  7/8 8/25
harsh [2]  77/15 77/16
has [72]  2/24 5/11 5/12 6/18 8/1 14/10 15/6
21/20 25/17 25/21 26/11 30/12 30/12 30/13
33/1 33/2 33/5 34/12 35/12 36/5 37/7 38/16
38/19 40/9 42/3 44/16 46/8 47/18 47/23
48/5 56/24 57/9 58/18 59/1 61/10 61/12
66/6 66/17 68/2 68/3 68/17 69/23 69/24
70/4 70/4 70/5 70/10 70/10 70/20 70/23
70/25 71/2 71/11 71/11 71/23 73/21 73/22
73/24 74/18 76/15 76/25 77/4 77/16 80/2
80/24 81/9 81/10 82/11 82/22 82/23 84/8
86/2
hasn't [2]  32/3 46/8
have [176]
haven't [1]  72/3
having [3]  29/2 51/11 73/3
he [284]
he's [3]  50/3 50/5 52/20
head [3]  46/22 76/1 79/1
health [1]  75/16
hear [5]  20/21 27/15 48/10 50/6 56/22
heard [8]  9/19 9/22 33/16 51/18 58/7 67/18
67/18 68/22
hearing [3]  1/10 7/13 9/24
hearsay [7]  3/8 3/13 3/14 3/24 4/5 4/19 5/19
heart [3]  75/1 80/23 82/9
held [2]  30/1 58/18
help [5]  23/5 43/6 57/3 66/3 74/20
helpful [3]  8/12 22/24 72/1
helps [1]  65/8
her [3]  23/1 67/9 71/7
here [49]  2/6 20/5 20/6 23/8 24/8 32/1 32/6
34/1 35/2 35/23 38/9 39/8 41/1 42/10 42/23
44/1 44/2 45/22 47/1 50/13 51/15 52/2
52/17 53/16 56/3 56/12 57/25 59/2 59/3
60/25 61/20 62/4 62/20 64/14 69/5 69/7
69/8 69/22 70/15 71/2 71/4 71/4 73/11
77/18 77/25 80/11 80/18 83/1 86/2
Here's [1]  13/11
hereby [2]  83/13 87/2
herself [1]  70/22
hey [1]  23/11
hide [2]  46/18 49/2
hiding [1]  54/15
high [5]  75/8 75/10 76/21 77/9 83/2
higher [3]  19/10 38/6 53/5
highest [2]  20/1 71/25
highly [1]  23/14
hike [1]  16/21
him [55]  5/22 19/8 19/11 26/10 26/19 39/19
40/15 40/16 40/19 41/19 41/20 41/22 42/3
42/18 43/8 48/6 49/25 52/8 56/5 56/7 57/1
57/3 57/9 58/23 59/11 64/5 64/23 65/1 65/3
66/21 66/22 67/9 67/10 69/10 69/14 69/17
69/25 70/11 72/17 77/2 77/2 77/11 77/12
78/9 80/14 80/18 82/3 82/11 82/12 82/13
85/4 85/18 85/23 85/24 86/7
himself [7]  5/2 26/19 43/1 43/5 75/11 79/4
79/12
hire [2]  60/15 60/17
his [81]  3/6 4/3 4/16 4/17 5/6 5/9 5/18 8/16
9/1 9/2 9/3 22/6 27/2 27/6 35/11 35/14
36/25 39/16 40/9 40/9 42/4 42/5 42/6 46/22
47/17 47/21 51/5 52/10 53/6 53/6 53/10
53/10 57/3 57/13 57/19 57/21 58/1 58/2
58/24 64/23 66/8 66/13 66/15 67/7 67/20
68/2 68/3 69/15 69/16 69/17 69/22 69/23
70/17 71/23 73/7 74/11 75/21 75/23 75/24
75/25 76/1 76/11 76/11 76/12 76/21 77/8

USA vs. Newton

## H

his... [15]  78/8 79/1 79/5 80/13 80/22 82/6
82/9 82/14 82/17 84/9 85/21 85/21 86/12
86/14 86/15
history [5]  10/11 28/2 33/25 69/24 83/8
hit [1]  51/12
hold [3]  20/1 55/8 74/23
holding [2]  36/7 61/17
holds [2]  59/4 60/2
holiday [1]  71/6
home [1]  73/19
homeowners' [4]  5/1 5/5 5/7 6/11
honest [1]  77/12
honesty [2]  66/10 67/2
Honor [71]  2/4 2/11 2/20 4/21 4/23 5/23 6/8
6/12 7/24 8/6 10/22 10/25 11/4 11/16 11/18
11/25 12/7 12/14 12/21 13/4 13/6 17/22
20/19 25/2 30/5 30/16 36/3 36/13 39/6 40/2
43/23 44/12 44/21 44/23 44/25 45/4 50/19
53/19 53/22 53/25 55/2 55/4 55/16 55/25
57/16 60/6 61/13 61/23 63/5 63/12 63/18
63/23 67/24 68/5 70/13 70/16 71/14 71/18
72/24 73/10 74/3 75/2 75/5 75/6 76/16 77/9
78/10 78/17 78/22 86/3 86/22
HONORABLE [1]  1/10
hooked [1]  68/16
hope [3]  66/6 66/7 69/16
hopefully [1]  26/4
hoping [1]  61/2
horrible [1]  68/5
hospital [1]  67/9
hotel [1]  71/3
hounds [2]  47/9 47/15
hour [1]  70/24
hours [1]  83/21
house [1]  76/18
how [19]  8/20 20/6 20/9 22/19 31/10 42/4
42/5 42/5 46/4 47/2 52/5 52/6 52/6 52/6
69/8 78/21 80/17 80/22 82/10
Howard [1]  72/18
huge [1]  79/4
hundreds [2]  65/11 65/12
hurt [2]  60/19 81/17
hurting [1]  49/20
hypothetical [4]  32/1 32/7 32/9 32/18

## I

I'll [6]  46/9 48/15 56/6 65/25 78/9 82/17
I'm [54]  2/8 2/9 8/23 9/8 10/10 10/14 10/17
10/18 10/19 12/15 20/16 20/20 20/25 21/4
24/13 24/18 24/19 25/6 26/6 27/5 27/18
33/13 34/7 34/9 34/16 35/1 35/1 35/2 35/14
35/25 44/24 49/13 50/8 50/9 51/19 53/19
56/21 61/25 62/1 62/1 64/19 65/16 65/24
69/8 74/13 75/4 80/3 80/4 81/4 81/11 81/21
82/5 86/11 86/14
I've [4]  29/13 29/25 29/25 74/20
ID [2]  53/8 53/10
idea [9]  7/3 23/8 40/15 47/19 51/23 52/2
52/14 53/13 56/11
identifies [1]  62/18
ifs [1]  48/22
II [1]  72/1
ill [1]  67/8
illegal [4]  26/1 26/1 35/7 49/25
illegally [1]  73/13

imagine [2]  5/4 23/21
immediately [3]  16/5 78/23 86/20
implying [1]  48/16
important [4]  34/24 50/4 66/4 71/10
imposed [1]  84/8
imposing [1]  59/20
impressed [1]  67/7
imprisonment [1]  83/17
improper [2]  6/15 81/7
improperly [1]  8/10
inch [3]  51/19 56/20 74/13
incident [1]  82/24
inclined [2]  19/8 19/11
included [1]  64/6
including [2]  79/8 84/1
income [2]  28/11 28/14
inconsistent [1]  64/23 65/1
inconvenience [1]  23/6
incorrect [1]  61/13
increase [2]  39/4 59/7
independently [1]  41/1
indication [1]  86/10
indictment [10]  5/1 7/14 8/11 34/11 41/2
41/9 61/6 61/7 62/24 84/7
individual [4]  29/8 40/3 62/3 74/9
infiltrate [1]  53/3
infinitesimal [1]  24/25
information [7]  29/24 31/13 32/2 32/21
34/14 34/16 57/2
infusion [2]  45/18 78/4
initial [1]  44/3
innocent [1]  86/10
input [1]  56/21
insight [1]  39/17
insisted [1]  86/3
instances [1]  3/13 37/23 50/20
instead [3]  19/18 37/16 79/3
instigator [1]  40/3
institution [2]  86/12 86/15
insurance [1]  28/18
integrity [2]  60/19 67/2
intelligent [1]  43/21
intend [2]  80/23 82/9
intended [1]  19/19 19/24 20/5 20/7 73/23
73/24 74/4 74/14 75/18 81/16 82/13
intention [3]  74/17 81/17 86/3
interaction [1]  64/18
interest [2]  61/3 79/3
interested [1]  72/6
interests [1]  77/8
Internal [1]  29/6
interrupt [2]  55/12 84/20
intricate [7]  45/2 45/2 45/3 46/15 54/7
57/13 57/14
intrinsic [1]  25/17
introduce [2]  5/5 5/11
introduced [2]  3/18 63/25
invest [4]  42/6 68/23 69/3 80/19
invested [2]  59/12 81/25
investigating [1]  6/19
investigation [8]  4/3 5/9 5/13 6/25 7/4 8/16
8/21 8/22
investigations [1]  3/6
investing [1]  23/23 75/19
investment [13]  7/16 27/18 27/21 28/7
28/17 29/1 29/3 29/14 43/10 43/16 45/8
50/8 59/14

investments [4]  18/18 29/16 75/18 75/20
investor [2]  62/11 62/12
investors [4]  50/9 60/24 62/21 62/25
involve [1]  41/3
involved [6]  28/9 37/9 41/13 44/19 47/10
65/6
involvement [1]  44/2
involves [2]  53/2 53/3
involving [5]  18/17 28/11 41/9 47/5 58/21
irrelevant [3]  8/25 80/4 80/4
is [309]
isn't [2]  33/19 62/14
issue [9]  5/25 6/6 6/9 13/8 21/18 29/25
40/24 41/1 80/11
issued [1]  62/7
issues [15]  2/18 9/20 28/23 28/24 28/25
28/25 29/1 29/2 29/15 40/23 41/10
44/10 61/7 64/6
it [208]
it's [26]  8/25 11/5 16/20 17/11 17/13 19/13
20/12 22/17 24/4 25/25 25/25 26/1 26/14
36/9 40/8 46/11 46/17 46/21 54/22 54/23
77/5 77/11 78/2 80/14 82/4 85/16
items [1]  52/22
itineraries [1]  54/10
itinerary [2]  52/20 52/21
its [3]  6/25 37/24 59/7
itself [3]  8/3 18/6 62/12
Ivan [1]  10/4

## J

jail [5]  59/18 68/18 68/25 70/11 79/19
January [2]  73/10 86/16
January 9th [1]  86/16
jean [1]  47/20
jeans [1]  56/12
Jersey [1]  65/8
jewelry [1]  69/22
Jewish [1]  71/6
job [1]  70/23
Jr [1]  87/5
JUDGE [85]  1/11 2/9 2/23 6/17 9/10 10/5
11/2 11/8 13/11 15/2 17/6 18/7 19/20 21/2
22/1 22/3 22/22 23/1 24/9 24/16 25/19
25/23 26/3 27/1 30/11 31/13 35/4 35/19
36/18 36/23 37/6 40/11 40/22 41/1 41/16
44/9 45/1 47/3 49/6 49/13 49/16 50/3 51/1
51/6 52/4 52/19 52/25 53/17 54/5 54/12
56/2 56/12 56/16 57/8 59/4 60/2 60/4 61/10
62/6 62/17 66/12 66/17 68/6 68/24 74/21
76/5 76/13 76/19 77/15 77/18 79/18 80/15
81/4 81/9 81/13 81/16 81/18 82/6 84/11
84/18 85/1 85/2 86/1 86/5 86/9
judgment [3]  80/13 82/25 83/12
jurisdiction [1]  54/14
jury [14]  6/5 6/8 6/15 7/10 7/11 7/13 7/17
7/21 9/18 9/22 9/25 34/12 49/23 80/24
jury's [1]  75/15
just [64]  2/23 3/15 8/7 8/11 9/7 15/14 19/8
20/20 20/22 22/22 23/21 24/7 24/9 24/20
26/16 27/1 30/16 36/20 36/24 37/1 40/18
41/25 42/23 43/17 44/25 45/3 46/15 48/11
48/16 48/23 48/25 49/4 50/22 50/23 52/22
53/18 55/5 55/8 55/11 55/12 55/18 55/19
55/23 56/6 60/6 62/21 64/21 64/25 65/4
65/20 66/19 68/3 69/13 74/24 75/6 76/2
76/13 77/5 79/12 79/15 80/18 81/15 85/4

USA vs. Newton

**J**

just... [1] 86/2
Justice [1] 29/6
justifies [1] 75/9

**K**

keep [2] 69/17 74/22
keeps [1] 19/23
kept [1] 51/22
kickback [10] 20/2 33/23 34/13 34/23 35/7
 38/18 38/19 46/18 74/8 74/8
kickbacks [1] 34/4
kids [1] 72/19
kind [4] 28/8 32/17 57/23 61/11
knew [6] 7/5 36/11 64/23 67/18 78/23 80/9
knocking [2] 54/22 56/9
know [55] 6/7 7/2 8/17 8/19 8/20 8/20 8/23
 8/24 9/8 12/8 13/12 18/12 18/24 19/2 20/20
 22/25 23/3 24/21 32/21 34/4 34/17 35/10
 35/11 35/25 37/8 43/3 49/23 51/8 51/20
 51/21 51/25 52/2 53/5 56/8 56/20 58/5 58/6
 65/1 66/17 67/16 68/5 68/9 69/12 69/12
 69/19 70/12 71/16 72/4 73/21 74/13 74/25
 77/7 80/25 85/2 86/4
knowledge [2] 63/20 64/22
known [5] 64/8 65/2 66/21 67/2 71/24
knows [4] 41/25 58/9 75/15 75/16

**L**

lack [3] 44/4 53/12 82/25
laid [1] 40/19
landlords [1] 64/12
language [2] 53/21 54/21
large [1] 22/16
larger [1] 43/7
Larry [4] 2/14 63/13 71/11 73/2
last [11] 3/4 6/21 6/23 8/15 8/24 22/8 25/8
 27/24 28/12 41/5 71/1
late [2] 25/4 78/8
later [6] 15/5 25/4 38/4 38/10 74/6 74/14
law [11] 21/5 39/22 47/21 48/1 58/3 59/1
 63/24 64/1 67/3 67/24 75/14
Lawrence [1] 63/18
lawyer [1] 64/3
lead [2] 9/1 67/19
leader [5] 39/25 40/21 42/21 43/1 71/20
league [2] 67/25 72/12
leap [1] 5/4
leases [1] 64/7
least [1] 37/9 57/1 57/2
leave [3] 50/1 85/4 85/10
leaves [1] 12/4
lecturn [1] 63/16
led [1] 77/16
left [3] 48/13 79/13 79/13
legal [3] 9/16 49/24 64/17
legally [1] 24/6
legitimate [3] 54/11 54/23 69/21
legitimately [1] 59/7
less [5] 14/17 16/1 19/4 22/2 48/22
let [9] 3/17 8/2 23/1 23/3 32/1 32/25 49/10
 55/21 72/4
let's [16] 4/24 7/7 7/7 16/3 18/24 19/8 21/7
 26/7 32/2 33/1 33/2 33/8 36/15 46/13 52/20
 57/25
letter [3] 58/8 66/20 71/21

letters [2] 66/18 71/15
letting [1] 35/25
level [23] 10/11 10/20 10/24 11/6 11/13
 11/21 12/4 12/5 12/13 12/20 13/2 20/3 39/7
 40/1 44/6 59/16 63/7 66/1 74/5 74/17 75/10
 76/21 83/8
levels [2] 12/9 21/1
license [1] 53/6
lie [2] 53/2 53/3
lies [1] 52/6
life [19] 40/5 65/10 67/24 68/22 69/1 70/10
 70/18 70/20 71/8 74/18 74/25 76/11 76/11
 77/16 77/21 78/16 79/5 80/16 82/15
lifeline [1] 78/8
lifetime [3] 2/14 64/22 66/7
light [1] 32/3
like [28] 5/1 7/24 9/4 14/21 18/12 26/10
 26/17 26/19 36/25 37/11 41/25 47/19 49/11
 49/14 51/16 52/13 52/20 54/22 60/6 63/13
 66/19 68/4 68/10 70/1 70/9 70/12 81/22
 85/3
liked [1] 67/13
limit [1] 74/7
line [4] 47/20 49/19 69/11 69/17
liquidity [1] 37/14
list [2] 56/13 56/15
listen [1] 81/18
listened [1] 42/10
literally [3] 6/21 24/6 65/11
litigation [1] 27/22
little [11] 9/11 25/6 27/14 28/2 50/11 61/19
 67/25 68/4 68/11 72/12 82/19
live [1] 70/25
lived [2] 70/10 70/18
lives [3] 72/19 78/1 85/19
living [2] 65/6 76/17
LLC [1] 27/19
locating [1] 54/14
location [1] 75/25
long [3] 2/15 49/19 72/11
long-time [1] 2/15
longer [1] 59/19
look [14] 9/4 31/9 36/1 38/3 38/8 39/22
 40/24 41/1 46/3 47/22 52/17 54/21 60/24
 80/17
looking [8] 40/22 53/20 54/11 62/2 68/12
 69/24 77/8 79/3
looks [2] 46/3 54/22
lose [5] 17/5 17/7 38/11 38/12 38/13
loss [32] 11/1 11/9 13/17 15/8 15/15 15/20
 15/22 15/24 17/3 17/20 18/8 18/19 19/2
 19/19 19/25 20/5 20/7 20/11 20/12 20/25
 21/19 22/23 38/14 38/18 39/1 73/23 73/24
 73/25 74/4 74/7 74/14 84/13
lot [11] 13/18 13/18 14/8 17/14 17/15 34/25
 49/17 71/8 72/2 72/7 73/3
low [2] 16/8 83/6
Lowan [7] 2/14 63/13 63/18 66/12 66/15
 71/11 73/2
Lowan and [1] 66/15
Lowan couldn't [1] 66/12
lower [1] 60/23
lowly [1] 37/14
LUIS [1] 1/14
lunch [1] 40/14

**M**

made [8] 5/10 6/10 43/13 45/15 45/22 74/11

77/1 84/15
Madison [1] 64/9
mail [3] 53/17 56/10 57/8
mails [22] 47/18 47/20 47/22 48/4 48/25
 49/4 50/20 51/11 51/13 51/16 51/22 51/22
 51/22 52/4 52/5 52/7 52/9 52/16 53/12 54/9
 56/2 69/14
main [1] 54/14
maintain [1] 21/1
make [21] 9/3 18/3 20/22 26/16 27/6 32/22
 32/25 35/24 36/18 42/6 48/24 49/5 50/7
 50/10 51/16 56/16 72/4 81/23 81/23 82/5
 82/8
makes [3] 68/18 77/2 86/7
making [6] 4/16 42/22 53/14 70/24 81/5
 82/20
man [12] 43/21 43/21 67/2 68/2 69/23 70/1
 75/14 78/7 82/9 82/10 82/24 86/9
management [10] 27/18 27/21 28/7 28/10
 28/10 28/17 28/19 28/25 29/3 29/14
manager [3] 72/14 72/16 72/20
manipulate [1] 60/18
manipulated [1] 68/13
manner [1] 84/10
many [7] 16/11 37/15 41/14 52/6 53/3
 61/2 64/5 66/21 66/23 67/12 67/22 70/22
 74/11 74/18 74/20 76/15 76/16
March [2] 13/14 30/8
March 25th [2] 13/14 30/8
MARCIA [1] 1/10
market [44] 13/21 14/1 14/3 14/7 16/3 16/6
 16/18 16/22 17/16 17/25 24/21 24/22 24/22
 24/23 25/3 25/15 30/23 31/23 32/4 32/13
 32/14 32/23 33/3 33/9 33/11 33/12 33/18
 33/21 33/21 34/17 34/17 35/6 35/7 35/10
 35/11 35/12 35/22 35/22 36/1 36/2 37/11
 39/17 41/4 45/10
marketplace [2] 31/25 35/3
markets [2] 29/14 31/16
married [2] 66/2 71/7
Martin [4] 3/21 64/8 72/14 72/23
materials [1] 31/10
mathematics [1] 27/24
Matisse [1] 25/14
matter [6] 20/7 36/9 58/7 71/9 74/22 87/3
may [21] 2/16 9/11 12/25 17/10 22/22 22/24
 23/7 27/7 27/8 30/17 36/23 44/22 44/24
 55/5 59/8 61/18 71/16 84/24 85/5 85/10
 86/1
maybe [4] 8/2 24/24 25/11 29/13
McKee [3] 67/16 71/23 71/24
me [64] 2/5 2/7 3/17 8/2 8/10 8/23 12/16
 18/8 19/3 20/11 20/23 23/1 23/3 24/17
 24/25 25/5 25/12 25/12 26/5 26/6 26/6
 26/11 26/15 30/5 31/3 32/1 32/5 32/9 32/25
 35/21 44/25 49/10 52/16 55/5 56/11 56/20
 60/20 63/16 63/19 64/24 65/18 67/7 67/19
 68/5 71/9 71/9 71/14 71/21 71/24 72/2 72/4
 72/6 72/17 72/23 73/12 73/12 73/16 74/9
 74/14 74/23 80/12 81/2 81/15 84/4
mean [8] 6/24 20/9 22/1 23/21 32/19 40/7
 55/18 65/5
means [20] 10/12 11/12 14/16 16/5 18/15
 44/12 44/20 45/1 48/23 50/18 54/3 54/6
 54/6 54/19 54/24 55/19 60/19 66/3 73/23
 84/14
meant [2] 82/1 84/25

USA vs. Newton

**M**

measure [1]  21/20
mechanics [1]  20/14
meeting [3]  40/13 52/20 52/22
meetings [1]  40/16
meets [1]  69/7
member [3]  3/25 71/22 72/9
mention [3]  9/2 9/3 42/15
mentioned [6]  8/9 71/18 72/11 73/3 73/21
 81/9
mentor [1]  39/16
mere [1]  54/18
merely [1]  46/5
met [1]  63/24
MGC [1]  1/2
MIAMI [8]  1/5 1/16 1/19 1/23 1/23 73/16
 87/6 87/6
Michael [2]  66/20 71/20
microphone [2]  26/24 27/15
middle [1]  9/2
might [8]  7/12 24/2 24/25 46/3 58/24 61/18
 62/2 62/3
MIGUEL [5]  1/17 2/11 71/10 72/4 72/11
mile [3]  51/19 56/20 74/13
miller [4]  1/22 1/24 87/4 87/4
million [27]  13/13 13/17 13/22 13/24 14/6
 14/7 14/9 14/12 14/22 15/1 15/13 15/16
 16/4 16/6 16/9 16/19 16/20 17/4 17/14
 21/22 21/23 30/9 33/2 33/3 33/5 33/5 37/13
millions [1]  25/10
mind [5]  24/19 46/22 46/24 47/17 82/6
minded [1]  25/11
minimum [2]  19/25 20/3
minority [1]  71/20
minute [1]  39/9
minutes [1]  76/7
Mirage [1]  70/25
misheard [1]  84/22
mislead [1]  77/5
mistake [2]  21/3 26/3
model [1]  28/4
Moffit [1]  58/8
mom [1]  73/3
moment [7]  44/3 44/24 55/6 55/9 64/22
 65/15 66/5
Monday [1]  36/8
monetary [1]  24/25
money [42]  5/6 6/7 7/14 18/17 18/18 18/20
 21/10 23/23 38/11 38/12 38/13 38/20 38/24
 42/6 42/20 43/14 45/11 45/24 48/16 48/18
 48/21 48/23 49/2 49/3 50/7 50/10 52/10
 52/12 53/9 56/6 57/11 68/6 69/10 69/13
 69/20 74/8 75/20 75/22 76/22 77/24 81/19
 82/7
month [1]  85/23
months [8]  4/24 10/13 38/8 38/10 63/7
 83/10 83/14 84/23
more [22]  4/20 6/4 13/18 14/13 17/15 17/15
 22/13 22/14 24/9 24/20 38/23 41/14 48/5
 48/24 55/19 60/22 65/25 68/11 75/4 76/17
 79/11 84/4
Morgan [1]  28/7
morning [3]  2/2 2/4 2/11
most [8]  12/25 12/25 19/19 39/9 74/19
 74/24 77/24 77/25
mostly [1]  73/1

motion [7]  2/18 4/21 5/24 6/13 6/14 9/14
 10/2
move [5]  24/19 26/7 33/9 35/4 36/15
moved [1]  28/6
mover [1]  40/3
moves [1]  33/13
Mr [96]
Mr. [174]
Mr. Caridad [31]  2/17 4/25 5/15 5/17 7/1
 10/23 11/3 11/5 11/15 11/24 12/15 13/1
 18/1 19/23 20/12 24/7 25/6 26/15 27/5
 35/24 36/15 36/17 36/24 39/2 44/20 54/25
 55/13 60/23 62/4 63/1 63/9
Mr. Caridad's [1]  5/20
Mr. Davidson [14]  4/22 9/1 10/21 11/2
 11/21 12/5 24/3 27/4 27/8 30/17 39/3 50/15
 54/9 55/24
Mr. Larry [1]  63/13
Mr. Moffit [1]  58/8
Mr. Newton [76]  2/10 5/2 6/19 13/14 14/14
 16/19 18/2 18/14 18/16 18/20 18/24 19/16
 21/11 23/17 33/23 34/12 35/23 38/25 39/8
 39/10 39/14 39/16 39/16 39/19 39/20 40/2
 40/5 40/6 40/11 40/14 40/18 40/23 40/25
 41/7 41/8 41/12 41/12 41/14 41/25 42/1
 42/1 42/8 42/12 42/15 42/16 42/17 42/19
 42/21 42/23 43/1 43/6 43/9 43/15 43/20
 44/7 46/4 46/10 47/2 48/2 48/15 49/8 49/11
 49/14 49/18 49/24 50/16 51/10 51/21
 56/10 56/19 57/19 58/1 58/16 59/9 62/8
Mr. Newton's [5]  29/23 39/17 41/3 46/22
 58/12
Mr. Pomerantz [1]  36/24
Mr. Skwara [41]  12/10 15/19 18/2 18/20
 23/18 33/23 34/12 38/25 39/13 39/14 39/15
 39/18 39/19 40/4 40/6 40/8 40/12 40/15
 40/16 40/18 40/25 41/5 41/8 41/9 41/13
 41/15 41/21 42/8 42/10 42/18 42/19 42/23
 43/2 43/4 43/5 43/8 43/16 43/20 43/22 44/1
 50/6
Mr. Skwara's [1]  41/18
Mr. Sputo [1]  5/18
Mr. Sputo's [1]  5/17
much [14]  6/3 14/13 31/10 36/16 39/2 42/5
 42/5 58/11 63/1 71/22 77/3 77/15 77/15
 86/23
museum [1]  25/15
museums [1]  25/8
must [4]  21/9 54/11 85/9 85/24
my [50]  4/4 4/11 4/14 7/25 9/3 9/9 23/1
 23/2 23/3 23/7 24/19 25/14 26/9 27/24
 28/12 28/15 31/2 33/17 34/2 34/20 34/25
 36/18 37/6 38/16 45/22 50/5 50/7 50/11
 50/13 63/18 63/25 66/2 67/17 68/7 70/19
 70/20 70/21 71/10 71/11 72/11 72/24 73/12
 74/3 74/10 74/17 74/18 74/23 74/25 75/1
 81/17
myself [3]  8/4 70/20 70/23

**N**

name [10]  8/8 26/25 27/12 51/5 63/17 63/18
 66/25 72/23 73/7 73/16
names [1]  71/16
nature [4]  9/10 36/11 42/25 48/3
NE [1]  1/15
near [1]  70/9
necessary [1]  83/1

need [13]  9/5 26/9 27/14 48/16 50/16 56/5
 56/7 56/21 60/21 69/11 70/2 70/11 78/15
needed [4]  64/3 64/3 71/6 77/24
needs [4]  63/2 77/10 77/10 77/12
negotiating [1]  64/6
negotiation [1]  73/18
negotiations [2]  64/11 81/7
never [17]  8/9 23/15 33/16 52/1 61/10
 64/15 67/18 67/18 68/23 69/1 69/5 70/3
 70/9 70/16 70/17 72/19 75/1
new [10]  2/19 9/14 10/3 64/9 65/6 65/7 65/7
 72/15 72/20 73/9
NEWTON [115]
Newton approximately [1]  63/25
Newton had [1]  64/2
Newton's [8]  2/15 14/6 29/23 39/17 41/3
 46/22 58/12 64/19
next [4]  26/8 57/15 65/19 72/23
night [2]  3/6 22/8
nine [1]  10/17
nineties [1]  71/23
no [75]  1/2 5/3 7/3 10/22 10/25 11/9 11/16
 12/7 12/23 13/17 15/8 15/15 15/20 15/22
 15/24 15/24 17/3 17/3 17/20 20/9 24/10
 24/23 25/15 25/17 31/5 32/16 34/9 34/18
 35/5 35/16 35/17 36/6 36/13 38/14 41/20
 42/15 42/19 42/20 43/17 43/20 43/21 44/3
 45/6 48/17 48/22 48/24 50/13 51/3 56/7
 57/3 60/2 60/12 62/11 62/12 63/4 65/13
 65/13 68/12 69/23 70/10 71/8 73/18 74/22
 75/5 76/9 76/20 77/16 77/18 77/19 78/1
 78/11 78/15 80/9 83/3 86/3
nobody [4]  14/10 56/1 56/22 69/2
None [2]  8/14 58/6
normal [3]  15/6 17/10 64/17
normally [6]  15/2 15/9 17/1 17/17 51/1
 62/22
North [1]  87/6
not [133]
note [2]  66/19 77/16
noted [1]  27/5
nothing [8]  8/12 13/3 24/5 24/11 41/22
 49/17 58/5 58/16
notice [2]  13/7 85/9
NOVEMBER [1]  1/4
now [29]  5/8 5/17 10/6 10/14 11/5 12/4
 14/15 23/11 24/10 26/17 28/1 28/21 29/20
 30/4 30/7 33/8 38/15 47/23 54/6 55/24 60/6
 61/14 61/17 61/18 66/5 68/21 71/23 74/2
 84/8
number [4]  19/5 28/16 66/22 67/1
numerous [2]  28/8 29/5
nutshell [1]  3/3

**O**

object [10]  10/20 10/23 11/2 11/4 30/11
 32/16 81/4 84/9 84/11 84/14
objected [3]  3/7 3/11 4/5
objecting [1]  9/18
objection [3]  63/4 84/21 85/25
objections [5]  10/16 27/2 27/4 63/2 84/16
obligation [1]  85/17
observed [1]  33/25
obviously [1]  38/22
occasion [1]  56/10
occasions [2]  67/22 74/13
occupation [1]  27/17

USA vs. Newton

## O

occurred [1]  30/8
off [21]  9/1 17/7 18/16 19/9 19/12 22/25
23/2 23/4 23/6 36/12 47/9 47/10 47/15
47/17 47/25 52/14 52/21 55/7 55/8 71/4
73/13
off-the-record [1]  55/7
offense [17]  10/11 10/20 10/24 11/20 12/5
12/20 39/5 43/1 43/5 43/12 44/6 54/7 54/8
58/9 63/7 80/5 83/8
offer [3]  45/8 74/6 78/14
offered [2]  67/23 80/25
offering [2]  44/3 69/4
office [5]  1/15 1/18 51/14 54/14 83/20
officer [4]  18/19 19/21 85/22 86/14
Official [1]  1/22 87/5
officials [1]  58/21
offset [2]  21/6 37/19
offshore [3]  47/8 48/7 54/17
often [1]  71/18
oh [3]  23/21 44/18 52/16 54/11
okay [17]  11/11 16/5 16/16 28/1 29/9 29/17
29/20 34/10 46/9 49/8 54/6 54/18 54/18
55/21 56/16 57/24 65/17
old [1]  70/19
older [1]  71/22
once [20]  14/23 14/25 15/8 15/12 15/17
16/2 16/11 16/15 16/17 16/21 16/24 16/25
17/16 17/18 17/19 36/10 37/18 37/20 64/15
86/13
one [56]  4/3 6/17 7/20 9/15 10/12 12/25
13/23 13/24 14/9 14/16 15/4 16/9 22/4 24/9
24/20 25/7 25/8 26/8 33/4 38/4 43/13 44/15
44/24 44/25 48/13 49/25 52/3 53/17 54/14
55/19 56/7 56/10 58/7 58/17 60/5 61/2
65/19 65/24 65/25 67/11 68/20 69/15 70/17
71/16 71/16 72/13 73/7 73/17 77/18 77/19
81/1 81/2 81/3 83/9 83/18 85/2
one's [1]  78/1
ones [3]  25/7 43/15 61/15
only [15]  9/24 18/1 20/13 21/5 22/16 31/20
38/8 49/18 49/25 58/7 58/20 60/5 76/11
77/22 80/6
open [1]  67/17
opened [1]  73/1
opening [1]  8/13
operated [1]  73/8
operating [1]  61/3
operation [3]  54/15 62/9 62/10
operators [1]  73/4
opine [2]  35/2 35/3
opinion [4]  22/6 24/10 47/6 47/6
opportunities [2]  76/24 77/3
opportunity [11]  30/20 41/23 42/3 42/9
42/24 43/2 43/5 45/8 78/4 82/7 82/8
opposed [1]  31/21
options [1]  76/24
oranges [1]  37/2
order [2]  24/7 86/14
ordered [1]  83/14
organization [2]  67/12 72/10
organizations [2]  28/18 66/23
organized [2]  43/15 66/23
organizer [1]  39/25
organizing [1]  43/12
original [2]  6/13 6/14

other [42]  3/13 4/2 7/22 9/23 10/1 25/11
28/5 28/6 28/18 32/12 34/11 35/1 38/15
40/9 44/3 44/10 44/15 46/2 50/15 51/5
59/17 59/22 59/23 60/19 62/2 63/2 65/3
66/18 67/7 67/16 75/16 76/3 76/19 76/23
77/2 77/23 78/10 78/12 79/7 79/8 82/3
83/23
others [6]  43/19 67/8 68/3 75/12 77/13 79/3
otherwise [4]  26/14 57/3 86/4 86/5
our [12]  4/21 5/23 13/11 36/20 38/17 55/21
56/1 59/5 66/17 67/13 69/14 84/21
out [36]  5/23 8/18 8/18 8/19 8/21 13/21
13/24 16/22 17/3 17/12 18/18 18/20 25/7
31/10 39/14 40/19 46/21 46/22 46/24 47/20
51/11 51/12 51/15 55/11 55/19 56/8 57/1
59/5 59/13 60/14 68/17 69/2 77/8 77/12
79/3 81/22
outlined [1]  84/4
outside [2]  55/22 64/16
over [24]  18/24 19/9 21/11 22/3 23/13
23/18 24/1 33/23 34/12 43/19 43/20 43/21
51/16 57/25 64/10 65/10 66/21 66/25 72/1
72/8 73/4 74/24 79/13 80/3
overnight [1]  32/20
overruled [1]  3/12
overwhelming [3]  6/9 6/16 7/20
overwhelmingly [1]  9/25
owed [1]  58/1
own [20]  5/18 28/15 35/11 38/21 40/9 40/9
46/24 47/17 53/6 53/6 53/10 53/11 58/24
62/23 66/13 76/11 76/21 77/8 79/5 80/23
owned [3]  24/24 25/2 25/3
owners [1]  25/16

## P

p.m [2]  86/15 86/24
Padilla [1]  71/19
page [3]  10/17 53/22 54/2
Pages [1]  1/7
paid [19]  3/11 4/14 4/17 13/14 14/19 15/13
15/25 33/23 34/12 35/21 35/23 35/23 38/5
38/24 59/9 65/12 74/8 74/15 74/16
painting [2]  25/7 25/9
Palm [2]  51/14 66/23
paper [3]  56/17 51/16 56/17
papers [1]  20/21
par [1]  38/5
paragraph [13]  10/18 10/19 11/1 11/5
11/12 11/19 12/8 12/12 13/1 21/1 44/5
44/14 54/24
parameters [1]  64/17
parking [1]  78/7
part [4]  4/17 45/23 52/12 84/4
participate [1]  42/4
participated [1]  66/22
participation [3]  42/25 43/11 57/13
particular [5]  20/7 31/11 60/15 61/1 65/11
parties [1]  81/7
partner [2]  28/13 64/1
partners [1]  73/6
passive [2]  58/5 62/21
patience [1]  55/16
patriotic [1]  81/24
pattern [1]  76/3
pauperis [1]  85/11
pay [20]  5/6 15/6 15/7 15/10 16/23 17/14
17/19 22/12 22/13 22/14 25/9 37/19 37/19

37/25 38/1 56/6 83/14 84/5 85/8 85/10
payable [1]  83/15
payee [1]  8/8
paying [3]  14/12 56/25 73/13
payment [1]  34/23
payments [8]  3/21 4/9 4/10 7/5 7/13 9/11
74/15 74/16
Peck [2]  28/8 28/12
pen [1]  51/7
pending [2]  2/17 35/17
penny [9]  17/23 17/25 18/18 23/12 23/14
31/20 32/14 68/23 69/3
pension [32]  13/21 14/4 14/14 14/5 17/23
17/24 17/25 18/10 18/11 18/17 18/21 19/14
22/19 23/9 23/14 23/15 23/23 23/25 24/6
25/1 28/17 30/8 33/24 34/13 36/10 59/13
62/24 68/23 69/2 75/19 77/7 86/4
pensioners [1]  74/1
people [29]  45/7 46/6 46/24 46/25 49/17
49/19 55/21 57/22 59/17 60/24 61/1 62/18
62/23 66/3 68/20 71/14 72/1 73/25 74/19
74/21 74/24 75/17 75/18 76/3 79/7 79/8
80/19 81/16 82/2
people's [1]  18/17
per [5]  13/14 14/19 33/4 38/1 86/13
percent [7]  22/1 22/2 22/7 22/11 37/23
37/23 80/2
PEREZ [1]  1/14
perhaps [3]  36/23 39/8 84/22
period [6]  13/20 42/9 43/17 59/19 64/13
65/2
person [14]  13/24 14/9 19/17 25/12 39/23
41/6 57/23 60/23 65/4 71/22 77/16 82/21
85/23 86/14
personal [2]  66/1 85/17
personality [1]  68/3
persons [1]  66/19
pertaining [4]  28/19 29/15 29/24 54/8
Ph.D [1]  27/24
phone [4]  3/9 3/15 5/10 76/7
phoney [1]  45/13
piece [1]  56/17
pitch [1]  45/13
place [6]  20/11 22/3 23/12 23/16 32/6 57/10
placed [3]  58/15 60/23 83/18
Plaintiff [2]  1/4 1/14
plan [7]  45/7 46/2 46/25 49/5 49/6 49/6
69/9
plane [1]  42/10
planned [2]  43/13 71/4
planning [2]  43/11 43/17
play [1]  49/3
Plaza [1]  75/24
plea [6]  6/2 73/17 74/4 81/1 81/5 81/6
pleaded [1]  39/10
pleading [2]  22/8 39/12
pleadings [7]  2/24 2/25 29/23 29/24 36/20
37/24 70/17
please [12]  26/24 27/12 27/23 31/4 31/7
39/12 39/13 63/9 63/16 63/22 76/7 76/8
pled [1]  79/22
plummeting [1]  61/16
point [11]  47/12 47/22 50/11 50/11 50/13
51/7 52/11 52/15 55/19 62/7 68/7
points [2]  6/10 76/13
poisoned [1]  9/25
Pomerantz [10]  2/14 26/22 27/12 27/13

USA vs. Newton

**P**

Pomerantz... [6]  27/17 27/19 30/20 36/19
 36/24 37/10
Pomerantz's [1]  85/3
poor [1]  82/25
pop [1]  73/4
portfolio [3]  28/9 28/10 28/25
portfolios [1]  28/20
portion [5]  39/9 39/20 39/21 39/23 39/24
posed [1]  5/22
position [14]  13/11 28/12 38/15 38/16
 40/21 41/6 44/17 57/19 57/21 59/4 61/8
 62/15 62/16 84/13
positive [1]  9/12
possess [1]  83/24
possessing [1]  83/23
possible [1]  20/2
possibly [2]  23/18 82/10
postpone [1]  4/8
postponed [1]  71/6
potential [1]  4/13
potentially [1]  59/25
powerful [1]  74/11
practice [1]  65/7
practicing [1]  63/24
prefer [1]  30/25
prejudice [2]  7/12 7/23
premise [2]  18/10 18/16
premium [10]  15/6 15/7 15/11 16/23 16/24
 16/25 22/12 37/19 37/25 38/1
preponderance [1]  26/12
present [9]  2/13 2/13 9/12 10/10 26/7 27/17
 63/6 68/1 85/13
presented [2]  37/24 69/25
presentence [2]  10/18 84/5
preserved [1]  84/16
preserves [1]  84/21
president [1]  27/19
press [3]  51/12 51/15 62/7
pressured [1]  42/1
presume [1]  8/21
pretrial [1]  8/9
prevent [1]  77/13
previously [2]  9/15 71/5
price [54]  13/14 14/8 14/11 14/19 14/23
 15/2 15/12 15/14 15/17 17/12 18/18 51/7
 17/4 17/9 17/13 17/19 19/11 21/24 24/22
 31/18 31/21 31/23 32/2 32/4 32/14 33/3
 33/9 33/11 33/12 33/18 33/21 33/21 33/25
 34/18 34/24 35/1 35/3 35/6 35/7 35/12
 35/21 35/22 36/1 36/2 37/12 37/13 37/14
 37/21 38/10 45/10 56/4 60/17 61/16 68/13
prices [2]  22/9 31/15
pricing [1]  29/1
primarily [2]  28/4 28/24
primary [1]  28/9
prime [1]  40/3
prior [2]  69/23 82/15
Prisons [1]  83/13
private [3]  11/20 29/9 29/10
privy [1]  64/19
probably [6]  12/11 23/5 30/3 65/18 80/13
 82/24
probation [5]  18/19 19/21 83/20 85/21
 86/14
problem [6]  3/4 4/2 4/18 6/19 6/24 14/15

procedure [1]  17/10
proceed [4]  10/6 27/7 55/5 63/22
proceedings [3]  2/1 86/24 87/3
proceeds [3]  39/21
producing [1]  64/10
product [2]  81/23 81/24
products [1]  29/3
professional [1]  67/1
Professor [1]  2/6
proffer [2]  26/9 26/17
proffered [1]  36/19
prohibited [1]  83/23
pronounced [1]  84/10
proof [2]  20/2 67/23
proper [4]  4/16 6/15 21/14 66/15
properly [1]  18/19
propose [2]  36/23 64/16
proposed [2]  48/14 48/22
prosecuted [1]  70/6
protecting [1]  69/6
prove [1]  8/10
provide [1]  73/4
provided [4]  3/18 5/19 22/4 74/5
provides [1]  27/21
providing [2]  28/16 29/7
proving [1]  5/8
PSI [1]  76/18
public [7]  1/18 2/12 11/20 23/11 23/20
 34/14 34/16
publically [1]  70/6
publicity [1]  65/13
publicized [1]  72/3
publicly [2]  30/22 31/15
published [2]  72/12 29/13
pulled [1]  66/14
pump [4]  32/12 32/17 33/8 33/13
punish [12]  46/4 46/5 46/9 46/23 46/25
 47/2 82/9 82/10 82/11 82/12 82/12 82/14
punishing [1]  70/7
purchase [1]  14/11 18/5 20/12
purchased [4]  20/10 20/15 30/9 38/10
purpose [1]  56/15
purposes [2]  59/14 69/21
pursue [1]  79/11
pursued [1]  79/8
pushing [3]  40/14 41/19 76/9
put [18]  4/11 5/23 8/15 17/2 18/18 51/7
 52/6 52/7 58/23 59/2 59/11 70/20 70/22
 70/23 74/3 75/11 75/20 77/1
putting [2]  69/15 69/16

**Q**

qualifications [1]  27/2
qualify [1]  39/25
quantitative [1]  28/13
question [17]  5/21 7/12 9/24 21/16 31/2
 31/6 31/7 32/7 33/17 34/1 34/2 34/20 35/17
 35/20 49/10 50/12 56/2
questions [3]  5/18 5/20 6/14
quick [1]  65/5
quickly [1]  80/21
quite [3]  42/20 72/21 83/7
quote [2]  21/12 62/10

**R**

Railsback [4]  67/6 71/17 71/17 72/6
Raise [1]  26/21

raised [1]  2/18
raisers [1]  67/11
raising [1]  67/12
Rancho [1]  70/25
range [13]  10/10 10/12 11/1 22/5 22/17
 44/11 63/7 75/8 77/9 81/14 83/4 83/9 83/11
Rangers [1]  72/17
rank [1]  71/25
ranking [1]  71/25
rapidity [1]  80/10
rare [1]  25/7
rattled [1]  52/21
reached [1]  39/14
read [8]  7/14 29/23 29/23 29/25 53/21
 62/17 66/17 71/15
reading [1]  19/19
ready [1]  10/6
real [11]  14/21 22/21 25/16 68/17 68/22
 69/1 69/2 70/3 77/21 78/16 82/5
realize [5]  47/16 47/24 54/23 77/10 77/18
realized [1]  74/2
really [17]  5/25 9/5 24/1 40/7 48/20 53/14
 57/12 64/22 69/2 69/4 72/3 73/18 73/20
 75/18 76/20 77/3 78/11
reason [10]  15/14 18/1 19/13 20/4 20/10
 20/13 48/9 61/2 77/8 78/3
reasonable [3]  14/24 37/16 38/23
reasonably [1]  19/24
reasons [4]  6/12 9/16 40/1 61/2
recall [1]  3/16
receive [10]  21/16 24/7 25/6 25/9 25/17
 40/1 43/16 45/8 45/24 81/19
received [11]  19/2 21/7 21/12 21/17 22/19
 22/20 22/20 37/7 39/20 42/12 43/14
receiving [1]  39/23
recognize [6]  7/19 10/8 20/21 20/21 59/22
 82/22
recognized [1]  79/25
recommending [1]  75/7
record [22]  5/10 26/18 26/25 27/1 27/5 27/6
 34/18 35/24 36/18 36/21 36/25 37/10 41/17
 42/9 55/7 61/25 63/10 63/16 69/23 70/11
 84/17 85/6
recorded [4]  34/23 47/16 56/23 57/5
records [3]  4/25 4/25 31/17
recruit [3]  40/25 40/25 79/6
recruited [2]  40/10 41/6
recruiting [2]  12/10 79/8
recruitment [5]  39/8 43/3 43/4 44/1 44/4
referred [1]  60/5
referring [2]  34/7 34/8
reflect [3]  32/2 32/4 35/7
reflected [2]  24/22 35/22
reflection [1]  35/13
reflects [2]  83/4 83/5
regarding [2]  28/5 29/17 55/18
reimburse [1]  25/12
related [6]  28/11 28/24 29/2 60/13 64/6
 84/3
relation [1]  13/18
relationship [2]  58/16 59/17
relationships [1]  64/9
release [6]  51/15 62/7 83/17 83/18 83/22
 84/1
released [1]  83/21
releases [1]  51/12
relevance [2]  35/5 35/15

USA vs. Newton

**R**

relevant [1] 34/25
relied [3] 33/15 39/16 39/17
rely [2] 33/11 33/17
remain [2] 86/12 86/17
remand [2] 86/1 86/8
remember [3] 41/17 52/19 78/9
rent [1] 4/17
rented [1] 4/4
repeated [2] 47/10 47/25
repeatedly [2] 47/19 52/3
reply [1] 6/17
report [4] 10/18 83/20 84/5 86/15
Reported [1] 1/22
Reporter [2] 1/22 87/5
reporting [2] 38/7 86/13
represent [1] 73/16
representation [1] 64/6
representations [1] 74/10
representative [3] 66/20 67/4 67/6
represented [3] 64/5 81/1 81/2
requesting [1] 55/1
require [6] 12/25 21/6 45/9 45/11 45/14
53/5
required [7] 45/17 49/1 49/1 50/20 52/5
56/4 62/16
requirement [2] 84/3 84/3
requirements [1] 86/13
requires [1] 21/5
research [1] 28/13
resigned [1] 79/12
respect [2] 67/3 67/24
respected [1] 67/13
respectfully [1] 62/6
respects [1] 57/20
respond [3] 22/22 34/17 76/14
responded [1] 2/24
response [3] 5/20 47/3 82/4
responses [2] 5/18 5/24
responsive [1] 31/5
rest [1] 69/19
restitution [1] 61/20
restricted [30] 14/14 14/16 14/17 14/20
14/25 15/2 15/11 16/1 16/18 16/20 17/2
17/9 17/16 17/17 18/25 19/3 19/5 19/6
19/10 19/23 21/22 22/13 22/13 22/14
37/17 37/17 37/22 38/1 45/10
restriction [2] 15/4 84/3
restrictive [2] 16/14 36/11
result [1] 7/23
resulted [1] 7/13
results [1] 82/21
retail [2] 51/21 64/7
retired [1] 67/15
retirees' [1] 23/23
retirement [1] 18/17
return [3] 18/25 21/20 21/21
reveal [1] 8/13
revealed [1] 8/14
Revenue [1] 29/6
revenues [1] 59/7
reviewed [2] 30/2 47/18
right [23] 2/16 5/12 12/24 13/10 16/14 18/9
19/21 26/4 26/20 26/21 33/3 36/3 43/7
44/18 44/19 47/20 49/7 53/1 55/17 65/20
74/25 78/25 81/10

ringer [1] 70/4
ripped [1] 17/7
risk [5] 28/10 28/19 75/18 77/18 77/20
risked [1] 75/16
risky [2] 18/12 75/21
RLAB [23] 3/11 3/21 3/25 13/12 23/24 30/9
30/21 31/17 33/22 34/21 35/1 35/2 35/9
38/3 38/4 38/12 40/24 41/2 57/19 57/20
58/10 59/12 62/25
Rm [1] 87/6
RMR [2] 1/22 87/4
Rob [2] 74/9 82/2
role [5] 11/20 12/9 39/4 40/24 84/21
RON [2] 1/14 2/4
roof [1] 37/15
Room [1] 1/23
ruined [4] 40/5 76/11 78/1 79/5
rule [3] 19/5 62/3 81/4
ruled [1] 85/3
rulings [1] 84/12
run [2] 83/19 84/23
running [2] 7/16 7/17
runs [1] 22/13
rusting [1] 23/19

**S**

safer [1] 18/18
said [46] 3/8 3/20 3/22 5/11 6/2 6/4 7/2 7/14
14/22 18/1 23/21 23/22 24/11 33/15 36/8
41/24 46/9 46/17 48/11 48/15 48/17 48/17
48/24 49/21 49/21 49/23 50/13 50/14 51/19
51/21 52/5 58/9 66/17 67/6 67/16 70/18
71/12 71/12 74/14 74/18 78/9 78/10 80/2
80/25 82/4 84/24
sake [1] 33/2
same [12] 15/18 15/19 44/5 67/20 72/20
73/21 74/10 78/3 80/5 80/5 80/20 80/21
saw [4] 4/18 8/3 34/3 68/5
say [65] 3/15 3/25 5/13 6/5 7/7 7/8 7/24 8/2
10/10 16/3 18/23 19/22 20/18 21/21 22/20
22/25 23/2 24/9 24/20 25/13 25/25 26/10
26/18 26/19 32/2 32/13 33/1 33/2 33/8 37/8
40/16 40/17 42/11 42/21 44/14 47/22 48/19
49/13 49/21 50/1 50/23 52/15 52/20 52/22
56/7 56/7 56/19 56/22 56/23 57/24 58/11
62/10 63/10 63/13 64/15 68/4 68/23 70/12
71/7 72/24 74/12 74/17 78/6 81/16 82/1
saying [30] 3/8 5/18 8/4 14/18 18/5 20/20
24/12 24/14 24/18 31/20 33/8 35/10 36/1
46/11 49/8 50/3 50/5 50/6 52/9 56/11 57/18
60/7 61/25 62/1 62/1 62/12 66/21 76/9 80/3
80/4
says [14] 5/5 8/11 8/11 9/7 14/15 22/17
42/19 42/20 50/16 56/5 69/8 69/18 70/2
81/21
scam [3] 7/17 8/1 8/3
scare [1] 56/7
scent [2] 47/9 48/1
scheme [17] 12/10 32/3 33/10 35/8 45/5
45/24 46/7 46/17 46/19 47/4 49/11 49/15
54/13 54/14 68/19 68/21 80/8
school [2] 28/1 70/20
script [2] 40/17 41/21
search [1] 6/22
searched [1] 5/14
searches [1] 5/10
season [1] 71/2

seat [2] 26/24 55/23
seated [1] 2/16
SEC [1] 56/8
second [16] 13/15 15/18 38/18 39/18 41/9
41/12 42/14 43/9 44/25 56/13 65/24 65/25
70/3 71/25 76/8 81/3
seconds [1] 52/21
secure [2] 18/11 75/20
securities [13] 6/1 28/8 28/10 28/12 28/24
29/3 29/14 29/18 32/3 59/10 62/8 68/14
76/8
securities-related [1] 28/24
security [1] 32/8
see [11] 3/4 39/22 41/9 60/15 70/7 70/11
79/16 81/18 81/20 82/5 86/4
seeing [1] 10/11
seek [2] 51/3 59/21
seeking [3] 39/7 40/2 77/9
seeks [1] 51/8
seem [1] 69/10
seems [1] 35/14
seen [3] 29/24 76/15 76/23
Sees [1] 85/23
sell [8] 15/3 15/3 15/4 15/9 16/5 23/10
25/23 45/9
selling [2] 73/1 73/13
sells [1] 70/25
send [9] 26/6 29/20 29/22 45/14 45/24
48/16 57/11 70/2 70/11
sending [6] 48/4 48/23 51/12 51/22 53/12
68/25
sends [1] 56/10
sense [4] 48/13 56/16 58/4 70/7
sent [3] 21/10 47/20 52/3
sentence [9] 10/6 49/7 53/5 74/22 75/7
75/10 84/8 84/10 86/20
sentenced [1] 86/19
sentences [1] 50/4
sentencing [10] 1/10 2/18 10/7 21/6 26/14
45/22 71/5 78/10 82/19 83/10
separate [1] 21/18
separately [1] 40/24
serve [1] 79/18
served [1] 67/9
Service [1] 29/6
serving [1] 86/20
Seth [2] 67/16 71/23
seven [1] 10/18
several [6] 6/5 10/8 28/6 47/4 74/13 78/22
shall [6] 83/14 83/17 83/22 83/23 83/24
83/25
sham [1] 47/24
shame [1] 70/6
share [7] 13/15 14/19 14/19 15/17 24/22
33/4 43/7
shareholder [1] 58/9
shareholders [17] 41/4 42/5 57/20 58/1
58/5 58/11 58/18 58/24 59/6 59/8 59/11
59/25 61/12 61/14 61/15 61/19 62/25
shares [87] 13/12 13/13 13/16 13/17 13/18
13/18 13/19 13/22 13/22 13/24 14/2 14/5
14/6 14/8 14/9 14/12 14/13 14/14 14/16
14/16 14/17 14/18 14/20 14/22 14/25 15/1
15/2 15/6 15/8 15/9 15/11 15/12 15/13
15/16 16/1 16/2 16/4 16/6 16/9 16/11 16/14
16/19 16/19 16/20 16/23 16/24 16/25 17/2
17/4 17/9 17/12 17/14 17/16 17/16 19/2 19/3 19/4

USA vs. Newton

# S

shares... [31]  19/5 19/6 19/7 19/10 21/22 21/24 22/2 22/10 22/10 22/13 22/14 22/15 22/15 22/16 22/20 23/9 23/10 23/21 30/9 31/10 33/3 33/5 37/13 37/16 37/17 37/20 38/1 38/4 38/10 45/10 45/11
she [8]  19/21 70/21 70/23 70/23 70/24 71/2 71/3 71/3
shells [5]  47/8 48/7 52/13 53/13 54/17
shoes [1]  70/25
shoot [1]  17/13
should [28]  5/14 11/7 11/9 11/17 12/1 12/13 12/20 13/2 17/3 17/3 17/25 18/11 19/16 20/7 20/9 21/17 21/17 23/15 33/4 35/9 37/4 38/20 38/25 41/7 44/14 61/25 65/22 86/17
shouldn't [5]  18/21 20/13 23/12 46/9 82/8
show [3]  9/10 37/25 57/5
showed [1]  7/21
showing [1]  35/6
shown [2]  4/11 4/12
shows [7]  7/25 22/11 33/1 40/12 42/9 69/15 69/20
shred [1]  43/22
shut [1]  76/1
sic [1]  71/24
side [2]  56/1 59/1
sidetracked [1]  6/9
sign [13]  45/12 45/25 47/13 48/12 48/18 48/19 48/22 50/21 51/5 51/7 69/11 70/1 73/19
signal [1]  70/2
significant [3]  39/20 39/24 79/16
signing [2]  48/4 54/18
signs [1]  51/2
similar [2]  48/6 48/8
simplicity's [1]  33/2
simply [7]  42/2 43/2 46/8 47/2 49/8 61/14 78/15
since [2]  28/16 67/24
sincerity [2]  66/6 71/11
single [2]  60/10 64/21
sir [11]  27/14 31/7 32/9 35/17 35/17 36/16 63/15 65/15 66/10 70/14 85/8
Sisters [3]  67/10 72/7 72/9
sit [2]  46/23 46/24
sits [2]  56/1 80/20
sitting [1]  41/24
situation [6]  17/10 50/1 61/5 64/16 64/16 77/23
situations [1]  62/22
six [2]  38/8 38/10
sixties [2]  69/23 78/8
Skwara [64]  12/10 15/19 18/2 18/20 23/18 33/23 34/12 38/25 39/13 39/14 39/15 39/18 39/19 40/4 40/6 40/8 40/12 40/15 40/16 40/18 40/25 41/5 41/8 41/9 41/13 41/15 41/21 42/8 42/10 42/18 42/19 42/23 43/2 43/4 43/5 43/8 43/16 43/20 43/22 44/1 50/6 73/12 74/16 76/12 78/1 78/20 78/23 79/5 79/9 79/11 79/16 79/18 79/20 79/22 79/22 79/23 79/24 80/5 80/7 80/10 80/10 80/12 80/15 80/16
Skwara's [2]  41/18 80/16
smell [1]  23/7
so [118]
so-called [1]  50/17

society [1]  77/12
sold [7]  14/16 17/17 25/4 25/16 25/16 25/20 38/5
soliciting [1]  54/15
some [28]  4/14 10/16 10/17 18/24 24/25 25/11 27/2 29/20 29/24 29/25 37/23 55/9 57/2 57/2 58/1 62/2 62/19 65/21 65/22 66/14 71/4 71/13 71/15 74/10 74/19 74/20 78/4 82/24
somebody [6]  18/3 24/1 53/8 56/25 82/10 82/14
somehow [5]  6/5 6/8 9/25 60/18 66/7
someone [7]  18/14 49/11 49/14 49/16 80/22 80/23 82/20
something [27]  18/25 20/13 20/18 23/13 23/23 24/1 24/2 24/4 34/23 38/17 46/4 46/5 49/24 57/1 57/1 57/2 58/19 61/12 61/17 68/21 70/12 72/22 77/20 78/24 79/1 80/2 81/21
sometimes [4]  22/15 37/25 38/6 48/10
somewhere [3]  12/11 24/2 40/13
son [1]  4/15
son's [3]  4/5 4/10 4/17
soon [1]  73/19
sophisticated [24]  11/12 44/12 44/20 45/15 45/20 45/21 45/21 45/22 46/11 46/14 46/25 47/4 48/23 50/17 51/4 52/23 53/7 54/3 54/6 54/19 54/24 55/19 73/23 84/13
sophistication [2]  47/1 54/20
sore [1]  23/20
sorry [3]  2/8 2/9 20/16 33/13 34/7 34/9 34/16 44/24 49/13 53/19 65/16 75/4 84/20
sort [4]  19/1 50/22 72/23 79/12
Sotheby's [2]  48/4 54/18
sound [2]  9/16 51/16
South [3]  52/1 52/16 56/25
SOUTHERN [1]  1/1
speak [1]  64/20
special [7]  2/5 3/5 5/19 59/4 59/17 84/2 84/5
specially [1]  45/1
specific [1]  30/2
specifically [1]  84/4
spoken [2]  70/16 70/17
sports [1]  67/1
Springs [1]  66/24
Sputo [3]  3/5 5/18 5/19
Sputo's [1]  5/17
square [1]  62/5
squarely [1]  59/1
stacking [1]  6/4
stand [4]  6/22 63/15 64/14 82/18
standard [3]  26/13 40/7 84/1
standing [2]  55/22 64/14
Stanley [1]  28/7
stark [1]  79/11
start [5]  12/24 13/5 18/9 18/16 68/19
started [8]  20/14 28/3 28/15 51/11 64/2 68/11 71/3 72/25
starting [2]  47/12 51/6
starts [1]  42/4
state [1]  26/25
stated [1]  9/15
statement [1]  8/13
STATES [10]  1/1 1/3 1/11 1/22 2/3 2/5 10/9 64/10 67/5 87/5
statistical [1]  29/15

stays [2]  44/5 54/24
steal [1]  22/24
step [1]  68/6
steps [3]  47/25 53/3 53/11
Steve [4]  2/13 26/22 27/13 27/19
still [6]  10/15 19/20 37/7 44/6 44/9 68/1
sting [1]  62/9
stock [52]  13/19 16/4 16/5 16/8 17/11 17/25 18/6 18/12 18/15 18/19 18/25 19/23 20/10 20/15 22/20 23/14 24/21 25/2 25/3 25/9 31/19 31/20 32/14 32/20 32/22 33/14 33/18 33/21 34/3 34/6 34/8 34/18 34/24 35/1 35/3 35/13 36/5 36/7 36/11 36/12 37/12 37/13 37/21 37/22 46/18 60/17 60/18 61/1 61/16 68/13 69/3 73/13
stocks [9]  17/23 23/12 29/18 29/25 30/14 30/22 31/15 33/25 68/24
stole [1]  23/1
stolen [4]  25/7 25/7 25/14 62/19
stop [1]  55/12
stops [1]  22/17
store [2]  64/11 71/9
stored [1]  4/15
straight [1]  41/17
strategy [1]  28/11
stream [1]  55/13
Street [3]  1/15 1/18 23/22
stretch [2]  42/21 58/11
stretching [2]  25/6 57/24
strike [1]  35/4
strings [1]  66/14
strong [1]  86/7
struggling [1]  75/24
stuck [1]  23/11
Studies [1]  22/3
study [2]  22/12 37/24
stuff [2]  46/2 51/24
style [1]  73/1
submissions [1]  66/18
submit [2]  36/24 85/4
submitted [4]  38/2 38/9 58/8 71/16
subsection [1]  54/4
substance [1]  83/24
success [2]  68/2 73/2
successful [2]  64/7 68/10
successive [1]  16/9
successive [1]  14/11
such [8]  18/1 18/3 18/10 28/18 54/15 62/10 82/25 83/19
suffer [1]  61/16
suffered [2]  62/11 62/12
suffering [1]  65/9
sufficient [2]  7/11 9/23
suggest [1]  86/5
suggested [1]  73/19
suggesting [1]  68/19
suggestion [1]  51/14
suitability [1]  29/1
summarize [1]  36/20
Sunday [1]  6/21
supervised [3]  83/18 83/22 84/1
supplement [3]  4/11 5/25 6/13
supplemental [1]  2/25
supplementals [2]  3/1 3/2
suppliers [1]  73/4
support [3]  43/23 55/24 67/21
supported [1]  71/14

USA vs. Newton

**S**

supposed [6]  7/15 8/20 8/23 41/21 59/5
59/6
sure [7]  20/22 26/16 32/25 35/15 36/18
36/21 72/4
surety [1]  85/17
surprise [1]  8/17
surrender [1]  85/18
survivor [1]  71/25
sustained [1]  83/13
swear [1]  74/3
swoop [1]  13/23
sworn [2]  26/21 26/22
system [1]  59/5

**T**

table [1]  65/22
take [17]  14/13 14/25 17/16 37/17 37/20
40/5 49/25 50/2 50/8 55/23 65/15 65/20
68/6 75/20 76/3 77/11 82/14
takes [1]  53/3
talents [1]  74/12
talk [6]  46/13 56/14 56/18 74/2 80/19 81/10
talked [1]  42/17
talking [12]  19/24 21/19 48/20 51/23 52/1
53/17 56/3 57/4 57/8 61/21 61/21 62/9
tangential [1]  5/25
tape [11]  6/1 34/5 34/7 34/8 34/23 39/9
48/15 53/16 74/11 79/10 81/18
tapes [6]  6/6 6/8 33/22 51/18 56/19 86/4
target [3]  45/7 50/12 50/13
targeting [1]  49/17
task [1]  34/25
taxpayers [1]  29/8
team [4]  68/1 72/13 72/14 72/21
tears [1]  39/15
telemarketing [1]  54/13
tell [15]  8/23 20/23 26/6 26/11 28/2 42/8
42/14 43/9 45/15 63/16 63/19 68/21 69/10
73/12 82/2
telling [2]  39/9 42/19
tells [1]  42/2
ten [4]  22/6 22/11 37/23 71/1
ten percent [1]  37/23
tenacious [1]  79/10
tenacity [1]  76/6
term [2]  83/13 83/18
termed [1]  38/19
terminal [1]  65/9
terms [3]  46/14 73/21 86/18
terrible [1]  66/5
test [4]  55/15 62/14 62/14 62/15
testified [16]  3/5 3/7 7/2 22/5 28/21 29/4
29/5 29/9 29/17 36/20 37/11 39/15 39/20
41/22 51/25 79/23
testify [3]  4/3 20/6 26/10
testifying [1]  27/3
testimony [16]  3/6 5/19 7/8 9/24 22/4 27/2
32/25 33/10 35/5 35/14 35/20 40/11 41/18
41/20 47/23 85/3
Texas [2]  65/10 72/16
than [16]  13/18 14/13 14/17 15/5 16/1
17/15 22/14 24/11 40/9 44/3 50/15 51/5
76/2 77/2 81/3 82/24
thank [24]  4/23 8/6 17/22 26/23 27/4 36/16
36/17 39/2 39/6 43/24 51/13 51/22 51/23

55/25 63/1 66/9 66/10 66/11 75/2 78/18
82/16 85/1 85/7 86/23
thankful [2]  74/21 74/22
thanks [2]  56/11 56/11
that [473]
that's [118]
the main [1]  54/14
theft [1]  21/8
their [15]  13/22 28/20 45/9 45/19 46/21
46/24 49/6 49/6 58/12 59/25 60/15 69/3
72/9 72/19 75/20
them [55]  7/3 8/8 8/17 8/24 10/16 10/17
15/3 15/4 15/4 15/11 15/20 16/2 16/15
16/17 16/19 16/21 17/18 17/18 17/19 19/10
21/7 23/20 26/1 26/1 30/23 37/18 43/18
45/8 45/13 45/15 45/24 46/4 48/23 49/7
56/10 56/14 56/19 57/11 57/24 58/2 58/4
58/6 58/11 61/2 65/10 66/3 68/20 69/3 72/8
77/24 81/9 81/10 81/17 81/17 82/4
themed [1]  64/11
themselves [1]  46/6
then [20]  5/24 6/14 6/13 7/3 8/25 18/2 28/15
28/16 39/13 39/23 40/17 49/17 56/7 60/10
65/25 68/24 69/1 72/13 73/10 80/13
theoretical [1]  29/13
theory [2]  17/8 33/3
there [107]
there's [1]  33/8
thereafter [2]  44/5 73/20
thereby [1]  4/16
these [36]  7/3 7/13 8/23 9/10 9/20 14/12
15/8 16/18 16/18 16/24 23/9 23/21 30/22
37/15 39/11 42/2 45/17 48/8 50/8 51/1
51/11 51/13 52/16 53/11 56/19 57/4 62/22
62/22 62/24 65/12 68/19 73/21 73/25 74/1
80/19 81/5
they [167]
they're [1]  16/14
they've [1]  16/19
thick [1]  56/20
thief [1]  9/4
thing [16]  15/18 15/19 23/17 23/18 24/10
24/20 25/14 43/13 55/20 58/2 71/10 72/24
80/5 80/6 80/21 85/2
things [20]  5/1 8/22 8/23 23/5 34/25 46/7
47/19 48/8 48/10 54/10 56/14 56/17 56/24
57/4 65/3 67/7 67/16 68/11 71/12 82/23
think [74]  3/1 4/7 6/3 6/8 9/7 10/2 10/14
11/7 11/17 12/13 12/19 12/25 13/2 20/4
20/8 21/2 21/4 21/5 22/17 22/18 22/24
24/18 26/12 26/12 30/3 31/18 32/5 34/25
37/1 37/4 38/16 38/22 38/23 39/8 40/12
40/13 41/1 41/16 41/17 45/20 46/3 46/20
48/10 49/8 50/3 51/14 52/4 52/19 52/25
54/11 56/3 58/3 58/10 60/12 60/14 60/17
62/5 66/12 68/7 68/19 71/14 75/9 76/5 77/2
77/5 77/10 78/15 79/15 81/14 82/23 83/2
83/4 86/1 86/7
thinking [4]  61/18 77/6 82/11 82/12
thinks [1]  69/9
thinly [1]  17/11
thinly-traded [1]  17/11
third [1]  22/7
thirty [1]  22/7
this [226]
those [30]  2/21 6/12 23/5 31/15 31/18 31/24
40/1 40/18 41/3 47/20 47/22 49/4 52/3 52/5

52/6 53/4 53/12 54/10 56/23 57/22 59/23
64/11 64/13 66/19 72/1 72/18 74/20 76/10
79/15 81/7
though [3]  15/8 37/17 74/12
thought [3]  72/21 74/9 75/19
thousand [7]  33/10 33/11 33/12 33/14
83/15 85/15 85/17
three [7]  6/20 7/21 9/20 70/5 75/7 79/15
84/14
threw [1]  21/25
through [19]  10/14 18/23 22/18 37/14
40/17 45/6 54/16 56/15 60/19 64/13 64/13
65/19 70/4 70/20 70/22 70/23 79/1 83/19
84/23
throughout [2]  50/5 56/19
throw [6]  47/8 47/10 47/15 47/17 47/25
52/14
thrown [1]  78/9
ticket [1]  78/7
Tigers [1]  72/5
time [28]  2/15 4/20 6/20 10/10 13/13 16/12
26/7 36/11 42/11 42/14 45/17 56/13 59/19
63/6 64/13 64/22 65/2 65/20 67/21 68/1
68/2 69/14 71/4 72/15 77/10 77/10 77/11
85/13
times [4]  20/3 29/5 64/12 80/12
Timothy [1]  2/6
today [13]  20/5 20/6 22/5 32/25 69/22 71/2
71/25 75/10 76/4 76/14 77/5 79/2 86/6
together [1]  17/2
told [13]  40/16 41/22 42/23 42/23 43/2 43/4
48/21 52/16 56/5 56/20 80/18 81/15 82/4
Tom [1]  67/6
too [4]  58/11 61/23 77/15 77/15
took [6]  5/6 7/14 47/25 53/11 71/4 77/22
topics [1]  29/14
total [3]  10/11 63/7 83/8
totally [2]  64/23 64/25
tough [1]  64/12
toxic [2]  23/13 24/1
track [2]  47/9 53/9
tracks [1]  47/5
trade [2]  15/9 25/1
traded [6]  13/19 17/11 30/22 31/15 31/21
32/22
trades [1]  22/11
trading [31]  13/21 13/22 14/1 14/8 14/18
14/19 15/1 15/5 15/9 15/14 15/17 16/2 16/4
16/5 16/7 16/23 17/9 17/12 19/4 19/7 19/10
21/23 22/10 22/15 22/15 22/16 34/3 37/13
38/1 38/9 45/10
trail [1]  56/16
transaction [4]  13/15 15/18 21/18 30/7
transactions [7]  15/19 19/15 29/7 29/18
39/11 41/5 54/16
transcript [2]  1/10 50/6
transcription [1]  87/3
transcripts [1]  30/1
trial [15]  2/19 4/8 4/24 6/20 6/21 6/23 8/4
8/22 9/14 10/3 39/9 66/5 71/18 79/20 79/24
tried [5]  4/6 5/2 53/15 74/25 78/25
tries [2]  77/5 79/2
triggered [1]  46/12
trouble [1]  9/8
true [9]  9/10 17/10 21/8 22/2 24/15 24/16
24/18 35/13 48/13
Trump [1]  75/24

USA vs. Newton

**T**

trust [33]  11/21 12/12 40/21 41/3 41/6
41/11 44/13 44/17 55/2 57/17 57/20 57/21
58/12 58/15 58/22 58/24 59/2 59/10 59/15
59/16 59/17 59/18 59/21 59/24 60/11 60/14
61/8 61/9 62/16 62/18 62/19 73/23 84/13
trustee [1]  72/8
trustees [1]  67/10
truth [2]  75/15 77/7
truthful [1]  77/12
try [12]  8/10 9/9 14/7 16/6 16/10 16/22
17/12 23/10 48/3 75/13 76/3 79/6
trying [7]  10/14 47/9 47/17 52/14 53/1 77/6
79/11
Tuesday [1]  36/8
turn [3]  10/17 74/6 76/23
turned [2]  77/4 78/6
Turning [1]  12/8
twice [2]  13/13 85/23
two [19]  7/21 11/13 11/21 12/9 12/13 15/20
39/7 39/18 40/1 40/22 41/10 45/17 65/4
70/5 71/16 74/15 74/15 81/1 83/15
type [5]  51/1 53/4 59/24 67/23 78/16
types [1]  28/5

**U**

U.S [6]  1/15 1/18 38/3 38/7 38/13 87/5
uh [2]  43/8 43/8
Uh-uh [1]  43/8
ultimately [1]  47/5
unable [3]  85/8 85/10 86/6
under [6]  21/9 35/5 54/4 61/6 61/7 81/4
undercover [9]  39/10 42/13 42/17 47/24
51/13 51/18 51/20 73/14 76/7
underlying [3]  31/21 31/23 32/1
understand [16]  10/15 20/11 20/17 21/4
24/17 30/24 32/25 34/2 34/14 34/15 34/20
36/14 79/21 80/1 86/17 86/21
understood [2]  20/22 73/20
undisclosed [1]  32/21
unfortunate [1]  76/17
Unfortunately [2]  68/16 69/18
uninterrupted [1]  73/8
UNITED [11]  1/1 1/3 1/11 1/22 2/2 2/5
10/9 64/10 67/4 70/21 87/5
University [2]  27/25 64/1
unlike [1]  79/24
unsafe [1]  18/18
until [3]  8/24 15/4 86/12
up [27]  4/21 6/22 14/8 14/11 14/12 14/23
16/11 16/13 17/13 17/13 25/13 28/15 45/15
45/23 46/6 46/23 47/5 47/19 52/11 53/11
57/7 64/14 65/25 68/16 68/19 69/7 69/9
upon [5]  4/3 7/17 9/19 64/21 83/17
us [12]  9/12 19/4 28/2 38/2 38/22 45/10
46/18 49/3 55/10 69/13 73/4 84/15
use [7]  26/13 31/14 31/17 33/20 54/16
69/12 80/13
used [7]  7/15 7/15 8/10 31/15 53/10 53/10
69/20
uses [3]  53/6 53/8 53/8
USFM [8]  23/24 30/21 31/17 33/22 34/21
35/9 39/12 39/21
usually [1]  15/5

**V**

valuable [5]  14/17 16/1 19/5 22/2 25/14

valuation [13]  28/10 28/19 28/25 30/13
31/9 31/14 32/4 32/15 33/4 33/18 34/21
34/22 34/24
value [18]  21/12 22/20 24/7 24/25 25/3
25/17 25/17 26/11 29/18 31/21 32/14 34/6
35/1 35/13 36/5 38/4 38/17 68/24
valued [4]  25/9 33/22 34/3 35/9
valueless [3]  25/15 37/8 61/17
varies [1]  37/22
variety [1]  29/15
various [1]  3/19
very [18]  4/16 8/11 8/15 36/16 39/2 55/10
63/1 64/7 66/4 67/13 67/17 68/9 70/18 71/9
74/11 76/19 80/20 86/23
victim [5]  21/12 23/17 59/2 59/3 61/20
victimized [1]  62/19
victims [7]  21/7 58/4 58/12 61/13 62/18
62/23 62/23
videotape [2]  34/8 34/9
videotapes [1]  48/2
view [1]  68/8
vigorous [3]  7/6 9/8 9/20
violate [2]  59/18 75/14
violated [2]  58/2 59/10
violation [2]  59/11 59/15
virtue [2]  61/16 61/16
vis [4]  41/4 41/4 61/12 61/12
vis-a-vis [2]  41/4 61/12
visit [1]  67/9
visitors [2]  55/9 55/13
voir [2]  30/15 30/18
volatile [2]  23/14 23/24
volatility [1]  60/16
volume [3]  13/19 13/20 16/7
voluminous [1]  10/7
volunteer [2]  72/7 72/12
vouched [1]  71/11
vulnerable [1]  77/25

**W**

wait [2]  34/16 38/8
walk [1]  18/23
walked [3]  7/1 40/16 79/13
Wall [1]  23/22
want [45]  13/5 14/6 17/23 18/13 18/23 19/1
19/18 23/7 23/9 24/9 24/20 25/25 26/16
35/24 36/18 36/20 40/4 40/21 42/18 42/20
42/24 45/11 48/18 48/21 48/24 49/2 49/6
50/6 53/18 53/21 55/15 56/6 56/7 56/18
57/10 57/11 60/17 63/19 69/10 69/12 69/13
71/7 74/24 80/19 81/21
wanted [26]  8/19 9/13 10/14 14/22 17/19
19/22 19/25 20/1 20/18 20/21 20/22 25/8
34/21 43/16 44/2 44/2 45/18 47/15 54/21
55/19 56/14 57/10 65/4 72/4 72/24 75/21
wants [5]  16/3 18/11 42/3 57/1 68/17
War [1]  72/1
was [255]
wasn't [3]  7/16 8/3 34/14
watch [4]  33/22 56/8 56/8 59/5
watching [1]  6/5
water [1]  65/21
way [18]  5/8 15/23 19/19 22/14 23/11 37/22
57/3 58/23 60/15 62/10 62/19 65/7 66/2
66/7 67/20 69/13 72/25 74/21
ways [1]  47/4
we [170]

wedding [3]  23/4 66/13 66/14
Wednesday [1]  86/16
week [3]  25/8 85/24 86/13
weight [2]  35/19 60/22
Weiss [2]  28/8 28/12
Welcome [1]  55/23
well [21]  3/17 6/24 8/2 19/23 20/8 27/22
30/22 31/23 32/5 33/11 48/12 49/16 52/25
53/7 53/8 57/24 58/3 64/8 67/13 80/9 80/25
well-known [1]  64/8
well-liked [1]  67/13
went [12]  3/24 4/1 5/8 6/7 6/11 7/4 23/20
28/1 39/18 41/23 51/10 56/14
were [54]  3/13 3/14 3/17 3/21 4/9 4/10 6/7
6/14 6/15 8/9 8/10 8/17 13/19 13/24 15/16
16/2 16/20 19/4 19/6 19/11 23/10 23/10
28/8 30/1 34/4 34/5 34/21 38/5 40/17 47/3
47/9 47/21 49/19 49/20 50/20 52/9 58/12
60/23 61/20 62/19 62/19 62/20 62/21 62/23
63/25 64/10 66/3 72/19 73/6 73/17 75/19
76/2 77/25 78/4
West [1]  51/14
western [3]  64/11 73/1 73/1
western-style [1]  73/1
western-themed [1]  64/11
what [144]
what's [3]  50/17 57/15 71/9
whatever [6]  5/14 8/11 21/7 45/4 51/19
74/23
whatsoever [1]  65/14
when [50]  3/7 6/22 7/14 8/18 8/23 17/2
17/11 19/21 33/22 34/2 34/5 35/6 37/20
38/4 38/10 38/12 38/13 41/24 42/17 46/8
46/23 48/11 49/4 49/20 55/10 56/13 57/4
58/19 59/16 59/18 59/20 60/12 60/15 60/21
61/12 64/12 67/8 67/25 68/6 70/23 76/5
77/7 77/24 77/24 78/9 80/18 81/1 82/19
85/14 86/4
whenever [1]  9/7
where [27]  3/24 6/7 10/15 12/8 13/16 22/5
30/8 41/11 47/18 50/21 51/2 53/5 53/9
54/19 60/10 61/5 61/6 62/3 62/8 65/7 68/1
70/25 71/3 78/10 79/15 81/2 83/21
whether [9]  21/16 21/17 28/24 30/12 30/13
35/20 35/21 46/13 62/15
which [35]  8/12 10/12 13/1 13/12 16/1
18/15 22/9 25/17 26/5 34/13 33/23 34/7
38/2 38/15 38/24 39/10 41/13 44/14 45/12
46/3 47/4 50/16 54/20 57/9 64/24 65/7
65/12 69/10 71/18 71/21 72/24 74/7 77/13
80/10 84/10
while [4]  50/3 50/5 65/6 83/21
who [53]  2/13 3/5 8/15 14/3 20/6 40/3 43/13
43/15 48/4 49/18 49/19 49/20 52/3 57/23
58/6 58/8 58/9 59/12 59/23 60/24 61/15
62/18 64/1 64/8 64/10 65/8 68/2 68/16 69/1
69/5 69/6 69/23 69/23 69/23 69/24 71/14
71/20 71/23 71/23 72/14 73/11 73/11 73/16
75/14 76/16 76/19 76/24 77/3 77/16 80/22
81/20 82/2 82/20
whole [4]  17/8 43/13 46/2 69/9
whom [1]  74/9
whose [1]  58/8
why [38]  4/9 4/10 4/13 6/4 6/24 8/18 8/25
9/1 9/2 9/5 12/24 13/17 15/5 15/17 15/20
17/17 17/20 21/21 24/18 36/5 38/13 41/8
41/13 54/21 56/17 56/18 56/22 56/23 57/4

USA vs. Newton

**W**

why... [9]  59/16 59/21 60/14 60/15 60/22 73/24 73/25 74/14 82/1
wide [3]  51/19 56/20 74/13
wife [5]  66/15 69/22 70/19 70/21 71/10
wife's [1]  66/2
Wilkie [1]  87/5
will [18]  10/10 26/6 26/18 33/20 41/17 44/7 45/12 50/2 52/19 57/2 63/9 63/16 69/4 74/22 82/5 83/10 85/5 86/19
willing [2]  68/3 75/19
willingness [1]  67/21
wish [1]  75/4
within [5]  20/4 62/5 83/10 83/21 85/9
without [4]  43/5 49/11 49/14 80/7
witness [11]  3/4 5/21 8/15 26/22 27/9 30/12 30/15 35/12 35/25 36/8 65/21
witnesses [4]  8/14 13/7 13/8 22/5
wonderful [1]  52/17
word [6]  37/6 41/18 41/19 44/4 58/5 59/13
words [3]  32/12 34/11 63/14
work [16]  4/15 28/2 28/3 50/10 56/21 66/18 69/24 72/2 72/6 72/7 72/11 72/16 72/24 74/10 81/21 82/23
worked [6]  28/9 49/12 49/15 70/20 70/22 72/18
works [1]  71/3
world [6]  14/21 25/10 39/18 49/18 70/3 72/1
worse [3]  23/18 53/4 77/2
worth [7]  19/6 22/16 24/2 24/4 31/11 31/19 31/24
worthless [3]  24/5 36/9 36/12
worthy [1]  67/21
would [83]  2/21 4/11 4/12 4/20 6/6 6/25 7/8 7/24 8/4 12/8 12/11 14/11 14/12 14/21 14/23 14/24 14/24 15/7 15/9 15/10 16/22 18/13 19/9 19/12 21/2 23/22 23/24 23/24 25/5 25/12 26/9 26/10 26/14 26/17 26/18 26/19 30/15 30/25 31/10 32/3 32/13 32/19 34/20 34/22 34/24 34/25 36/8 36/19 36/25 37/10 37/14 37/15 37/16 40/24 50/23 50/24 52/15 52/15 56/22 56/23 60/22 63/13 63/15 66/19 67/9 67/19 68/4 68/22 68/23 68/25 69/17 70/3 70/12 73/12 75/8 75/25 77/20 78/21 80/17 81/14 82/1 85/3 85/19
wouldn't [2]  10/1 50/13
wrap [1]  65/25
wreck [1]  73/7
Wright [2]  2/6 73/11
written [1]  4/4
wrong [10]  19/17 21/4 26/6 75/1 76/2 77/11 78/24 79/1 79/25 86/7
wrote [2]  66/20 71/21

**Y**

Yan [1]  73/12
Yankees [2]  72/15 72/21
yard [3]  23/2 23/4 23/7
yeah [3]  40/8 49/21 49/22
year [7]  14/17 15/4 25/4 25/4 25/24 38/4 83/18
years [22]  6/20 8/1 50/9 63/24 63/25 64/5 64/14 66/21 66/25 68/10 70/5 70/19 70/22 71/1 71/20 71/22 71/24 72/1 72/8 73/9 74/23 75/7

yes [40]  2/20 3/3 10/5 11/14 11/18 12/3 13/6 13/9 15/14 17/16 24/13 25/2 25/23 28/22 29/5 29/11 29/19 29/21 30/16 31/12 33/7 39/7 44/12 44/18 44/23 50/2 50/14 52/7 52/11 52/16 54/1 55/4 57/16 61/23 63/12 69/18 84/19 84/24 86/1 86/22
yesterday [1]  37/24
yet [2]  6/20 32/3
York [6]  64/9 65/6 65/7 72/15 72/21 73/9
you [297]
you're [1]  61/2
you've [8]  17/18 17/18 17/19 22/14 49/2 56/8 56/8 71/15
young [2]  64/3 65/8
your [121]

**Z**

zero [8]  11/17 12/2 19/13 19/20 20/25 32/20 39/1 68/25